MACDONALD | FERNANDEZ LLP
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Debtor-in-Possession,
AQH, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>AQH, LLC,<br><br>Debtor. | Case No. 15-50553-11-ASW<br><br>Chapter 11<br><br>MOTION FOR AUTHORITY TO USE CASH COLLATERAL<br><br>Date: TBD<br>Time: TBD<br>Place: 280 South First Street, Room 3020<br>      San Jose, California<br><br>Honorable Arthur W. Weissbrodt |

COMES NOW AQH, LLC, Debtor-in-Possession herein, and moves for interim and final orders authorizing the use of cash collateral pursuant to Bankruptcy Code Sections 105(a), 363(b), and 363(c)(2)(B) and Rule 4001 of the Federal Rules of Bankruptcy Procedure, and respectfully represents:

## I. INTRODUCTORY STATEMENT

1. The within case was commenced by filing a voluntary chapter 11 petition on February 19, 2015. A trustee has not been appointed and the Debtor is in possession of the estate.

2. The Debtor is a Bitcoin transaction processor. The within case was precipitated by a short-term cash flow shortage caused by delays in obtaining permits to supply power to the Debtor's recently-expanded facilities located at 5300 Claus Road, Buildings 5, 21 and 50, in Modesto, California. The Debtor expects the power to be turned on during the week of February 23, 2015,

1

which will significantly increase the Debtor's income. Thereafter, the Debtor intends to confirm a chapter 11 plan to pay all creditors in full over time.

3. The Debtor is a small business debtor within the meaning of Bankruptcy Code Section 101(51D), and the Debtor intends to take advantage of the streamlined procedures for tentative approval of disclosures and confirmation of a combined form of disclosure statement and chapter 11 plan provided in Bankruptcy Code Section 1125(f).

### *Background*

4. Bitcoin is the world's first widespread digital currency. For the convenience of the Court and parties in interest, a treatise on Bitcoin is attached as Exhibit "A" to the Fernandez Decl. Bitcoin entails peer-to-peer transfers of value permanently recorded on a global public ledger of all transactions (called the "Blockchain") to prevent double-spending. The Debtor reserves the right to contend that Bitcoin is a currency, personal property or otherwise.

5. Unlike *fiat* currencies, new Bitcoin is not issued by governments, central banks, commercial banks or companies. Instead, Bitcoin is issued to transaction processors ("miners") who contribute computer power to maintain the extensive ledger (the Blockchain) described above. Specifically, the ledger is maintained and transactions are verified by using a public-key cryptography system (namely SHA-256) in which each Bitcoin account is assigned two keys – one private and one public. In a Bitcoin transaction, the payor sends the public key to the payee and "signs" it with his or her private key, which transaction is recorded, time-stamped and added to a "block" of transactions in the Blockchain. Verifying vast numbers of such encrypted transactions by checking them against the Blockchain requires enormous computing power. Accordingly, transaction processors dedicate their highly-specialized computer servers to such work and receive newly-issued Bitcoin and small transaction fees in return.

6. In addition to the ordinary factors present in any business, the Debtor's income depends upon two external factors: (1) the cumulative processing speed of active Bitcoin transaction processors worldwide (the average global "hashrate," which is estimated at about 330 Petahashes/second as of February 20, 2015); and (2) the $USD value of Bitcoin in the marketplace (one Bitcoin could be sold for $243.73 as of February 20, 2015, at 10:03 am). These are known and

predictable within certain risk tolerances, and they have been incorporated into the Debtor's cash-flow projections as illustrated in the Debtor's cash collateral budget (the "Budget"), attached as Exhibit "A" to the Declaration of Chris Cunningham, filed herewith (the "Cunningham Decl.").

7. As described above, the Debtor is subject to a short-term cash flow shortage by reason of delays in permitting and activating power to the Debtor's expanded facilities. Specifically, the applicable plans are under review by Interwest Consulting Group and a final site inspection to activate the power is expected to be scheduled for the week of February 23, 2015, barring any further delays. The Debtor's revenue will immediately and significantly increase when the power is turned on.

### *Summary of Proposed Use of Cash Collateral*

8. The Debtor requests authority to use cash collateral within the categories and up to the amounts described in the aforesaid Budget. For the approximately three to four weeks pending the final hearing hereon, the Debtor requests interim approval to pay expenses up to $248,193, per month, with a variance of up to 5% per category.

9. The Court has jurisdiction over this case and this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

10. The statutory bases for the relief requested herein are Bankruptcy Code Sections 105(a), 363(b), 363(c) and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

### *Chapter 11 Exit Strategy*

11. As mentioned above, the Debtor's income is expected to significantly increase upon activating the power to its new facilities in the week of February 23, 2015. Thereafter, the Debtor intends to confirm a chapter 11 plan to pay all creditors in full over time.

**A.  INFORMATION REQUIRED PURSUANT TO GUIDELINES**

12. The Court's Guidelines for Cash Collateral and Financing Motions and Stipulations require disclosure of the following information: (a) the name of each entity with an interest in the cash collateral; (b) the purposes for the use of the cash collateral; (c) the terms, including duration, of the use of the cash collateral; and (d) any liens, cash payments, or other adequate protection that

3

will be provided or an explanation of why each entity's interest is adequately protected. Pursuant to said Guidelines, the Debtor respectfully submits the following:

### *Entities With Interest in Cash Collateral*

13.     The Debtor contends that Bitcoin and the proceeds of the sale of Bitcoin do not constitute cash collateral. As discussed above, Bitcoin are received contemporaneously in exchange for the Debtor's services in verifying the Blockchain. Accordingly, Bitcoin and the proceeds of Bitcoin sales are not the "proceeds, products, offspring, or profits" of any pre-petition collateral. 11 U.S.C. § 552. Moreover, no account receivable is created, and Bitcoin are not held in accounts (there is no financial institution or intermediary). In any case, neither Faris nor Emergent Systems has possession of the Debtor's money or Bitcoin (assuming that a lien against Bitcoin could be perfected by possession) and there is no bank account control agreement. In light of the fact that the Debtor's income derives from the sale of Bitcoin, there is no cash collateral.

14.     The Debtor anticipates that secured creditors may disagree with the Debtor's contention that there is no cash collateral, and it would be inefficient and disruptive to resolve this issue on an emergency basis. Accordingly, this Motion assumes that the proceeds of the sale of Bitcoin constitute cash collateral, and the Debtor reserves all rights with respect thereto.

15.     The following parties assert liens against the Debtor's assets in the following amounts (estimated as of the petition date):

| Name | Estimated Claim Amount | Collateral | Estimated Value of Collateral | Priority |
|---|---|---|---|---|
| Andrew L. Faris | $308,410.00 | Substantially all assets | $3,193,750[1] | First |
| Emergent Systems Exchange, LLC | $1,136,924.75 | Certain computers and related hardware | $1,200,000 | Purchase Money (Disputed) |
| Total: | $1,445,334.75 | | | |

16.     The amounts of the foregoing claims are disputed and unliquidated in part in light of

---

[1] Includes value of purported collateral for disputed purchase money lien asserted by Emergent Systems. The fair market value of the collateral exceeds its book value; Faris' claim is vastly oversecured in either case.

4

disputed defaults, default interest, late charges and other charges. Moreover, the Debtor contends that it holds significant counterclaims against both Faris and Emergent Exchange, including for breach of the sale agreement with Emergent Exchange. Among other things, Emergent Exchange failed to deliver approximately 600 servers.

17. The Debtor's review of claims and counterclaims is ongoing. As further described below, the nature, validity, scope and amount of said liens are subject to dispute. The Debtor reserves all rights with respect to the characterization of claims and assets and potentially avoidable transfers under Bankruptcy Code Section 544, 547, 548, 550 and 551.

18. With respect to the value of collateral, it is important to note that the value of Bitcoin transaction processing servers is based upon the expected income to be generated from their operation; they do not naturally depreciate over time as ordinary computers do.

### *Andrew L. Faris*

19. Andrew L. Faris is a former putative officer of the Debtor whose employment was terminated prepetition. Specifically, Faris was the putative Chief Executive Officer during the Debtor's formation phase, although discussions over his role and compensation were not completed. Faris' role was terminated prepetition, leaving the position of CEO vacant. As discussed below, Sean Walsh (Managing Member of the Debtor) is the CEO of the Debtor. Because Walsh is a creditor of the Debtor, Chris Cunningham (majority owner of the Debtor along with Regina Bernstein as joint tenants with right of survivorship) is the proposed Responsible Individual.

20. Faris made a loan to the Debtor in the amount of $300,000 in or about November, 2014, payable with interest at the rate of 10% per annum amortized over one year and maturing on December 31, 2015. The Debtor has not located an executed copy of the purported promissory note, loan agreement or security agreement. Unsigned copies of said purported instruments are attached to the Cunningham Decl., collectively, as Exhibit "B."

21. Faris asserts a lien against substantially all of the Debtor's personal property pursuant to that certain UCC-1 Financing Statement filed with the California Secretary of State on November 25, 2014, at Document No. 45962200002, a copy of which is attached to the Fernandez Decl. as Exhibit "B." As described above, Faris' claim is vastly oversecured. *In re Mellor*, 734 F.2d 1396,

5

1401 (9th Cir. 1984) (20% equity cushion provides adequate protection).

22. Faris' contends that the Debtor is in default, and Faris served the Debtor with a notice of default dated January 28, 2015, a copy of which is attached to the Cunningham Decl. as Exhibit "C." Faris elected to accelerate the balance of the loan. Faris threatened to take possession of collateral during the week of February 16, 2015. This, in part, precipitated the commencement of the within case. The Debtor's review of claims is ongoing, and the Debtor reserves all rights with respect thereto.

### ***Emergent Systems***

23. Emergent Systems has no *bona fide* claim of a security interest. Specifically, Emergent Systems sold certain computer equipment to the Debtor on terms (partial payments up to 120 days) on an unsecured basis with a purported option to convert the debt to equity upon certain terms. The entirety of the purported sale agreement consists of the two-page "Sales Proposal" attached as Exhibit "D" to the Cunningham Decl.

24. It is undisputed that there is no security agreement. The aforesaid Sales Proposal does not itself purport to be a security agreement or describe any collateral. Although Emergent Systems purportedly obtained a "Landlords Consent and Waiver," permitting Emergent Systems to enter upon the premises notwithstanding any lease and characterizing the sale as an equipment lease, it is beyond cavil that the transaction was a sale as the Debtor obtained permanent possession and ownership of the equipment with no expectation of returning the equipment upon the expiration of any lease term. Said instrument is further defective in that Emergent Systems purported to name itself as the Debtor's landlord; moreover, it does not purport to be a security agreement or lease agreement. A copy of said instrument is attached to the Cunningham Decl. as Exhibit "E."

25. Nevertheless, Emergent Systems threatened to enter upon the Debtor's premises and remove equipment during the week of February 16, 2015. The Debtor believes that Emergent Systems and Faris were coordinating their activities with the intent of improperly ousting the Debtor's management and placing Faris in control of the Debtor. This, in part, precipitated the commencement of the within case.

26. Notwithstanding the foregoing, Emergent Systems filed a UCC-1 Financing

6

Statement literally on the eve of bankruptcy on February 18, 2015, recorded with the California Secretary of State as Document No. 4731786002, a copy of which is attached to the Fernandez Decl. as Exhibit "C." The Debtor did not grant a lien to Emergent Systems or authorize it to record a UCC-1 Financing Statement.

27. Assuming said lien is valid (and it is not), it is avoidable as a preference pursuant to Bankruptcy Code Section 547. Moreover, the lien is avoidable as an unperfected security interest pursuant to Bankruptcy Code Section 544 as the UCC-1 Financing Statement misidentifies the Debtor as "Aquifer, LLC," similar to a name under which the Debtor does business (namely, "Aquifer LLC") but not the name of the Debtor of record with the California Secretary of State. The Debtor intends to promptly commence an adversary proceeding against Emergent Systems seeking a determination that its claim is unsecured and for other relief as is appropriate.

28. The sale agreement provides for payment over time, without interest, as follows: $180,000.00 on day 30; $240,000.00 on day 60; $240,000.00 on day 90 (or $40,000.00 of Emergent Systems exercised an option to convert to equity); and $540,000.00 on day 120.

29. Emergent Systems contends that the Debtor is in default. The sale agreement provides for late charges in the amount of 1.5% per month (18% per annum) upon unpaid payments, with no opportunity to accelerate future payments. The Debtor's review of claims is ongoing, and the Debtor reserves all rights with respect thereto (including usury claims and other counterclaims).

30. The Debtor may hold significant counterclaims against Faris and Emergent Systems, which claims are under review. The Debtor's review of claims is ongoing, and the Debtor reserves all rights with respect thereto.

### *Riverbank Local Redevelopment Agency*

31. The Riverbank Local Redevelopment Agency (the "Riverbank LRA") is the owner and lessor of the facilities described above. Although the Riverbank LRA holds no interest in cash collateral, it is important to note that the lease is in default and arrears are approximately $100,000.00 (the Debtor's review is ongoing, and said claim is subject to dispute). The Riverbank LRA served the Debtor with Three-Day Notices to Pay Rent or Surrender Premises on February 11 and 20, 2015. This, in part, precipitated the commencement of the within case. The proposed cash

collateral budget provides for the payment of post-petition administrative rent, including utilities that are paid through the lease.

### *Purpose For Use of Cash Collateral*

32. The purpose of the proposed use of cash collateral is to preserve the value of the Debtor's business, continue processing Bitcoin transactions and pay the expenses of operating the business, including by paying costs necessary to turn on power to the aforesaid facilities, paying utilities, paying insurance premiums, and paying taxes. The aforesaid budget identifies the Debtor's projected expenses for six months (including February, 2015). It is important to note that the budget assumes that the power will be turned on at the new facilities during the week of February 23, 2015.

### *Terms of Use of Cash Collateral*

33. <u>Interim Approval</u>. The Debtor requests approval on an interim basis to pay expenses up to $248,193 per month pending the final hearing, including from cash currently in the Debtor's possession and post-petition income. For each category of expenses identified in the aforesaid budget, the Debtor shall not pay more than the amount identified therein plus a variance of up to 5%.

34. <u>Final Approval</u>. The Debtor requests that it be authorized to pay expenses up to $248,193 per month, cumulative, in the categories identified in the provided budget. For each category of expenses identified in the budget, the Debtor shall not pay more than the amount identified therein plus a variance of up to 5%. Said amounts (without including said variance) shall roll over to increase the following month's budget, category by category.

35. In light of the risk presented by the fluctuating $USD value of Bitcoin, the budget includes a risk reserve equal to 20% of gross profits to be funded each month, cumulatively, and held in the Debtor's Debtor-in-Possession accounts pending confirmation of a chapter 11 plan or further order of the Court during the term of the order authorizing use of cash collateral. It is important to note that the risk reserve may eventually provide a fund for professional fees, plan payments and other expenditures if necessary and appropriate.

36. <u>Term</u>. The Debtor requests authority to use cash collateral until the earlier of: (1) July 31, 2015; or (2) the effective date of a chapter 11 plan, dismissal or conversion of the within case, appointment of a trustee, sale of substantially all assets, abandonment of substantially all

8

Case: 15-50553   Doc# 10   Filed: 02/24/15   Entered: 02/24/15 16:10:13   Page 8 of 14

assets, entry of an order granting of relief from the automatic stay to foreclose a lien against substantially all assets or further order of this Court, as the case may be.

37. <u>Adequate Protection Payments</u>. Faris shall receive adequate protection payments at the non-default contract rate of interest amortized over one year, which are $2,570.08 per month, beginning on March 15, 2015, and due on the fifteenth calendar day of each month thereafter.

38. Emergent Systems shall receive adequate protection payments at the default contract rate of interest (which are $1,650 for February, $5,280 for March, $8850 for April, 2015, and $16,950 each month thereafter), beginning on March 15, 2015, and due on the fifteenth calendar day of each month thereafter.

39. <u>Consent</u>. The Debtor further requests that it be authorized to use cash collateral for other purposes, and in addition to said budget, upon the written consent of Faris and Emergent Systems without further notice or order of the Court, provided that the Debtor's use of property otherwise complies with the Bankruptcy Code.

### *Adequate Protection*

40. Faris and Emergent Systems will be adequately protected in the form of post-petition payments of interest, as described above, beginning on March 15, 2015, and due on the fifteenth calendar day of each month thereafter. 11 U.S.C. § 361(1).

41. As discussed above, secured creditors are protected by a significant equity cushion. *In re Mellor*, 734 F.2d at 1401.

42. Finally, the Debtor's transaction processing activities increase the size and value of the pool of collateral (assuming that Bitcoin and the proceeds of Bitcoin sales constitute cash collateral). Moreover, the value of Bitcoin transaction processing servers is based upon the expected income to be generated from their operation; they do not naturally depreciate over time as ordinary computers do. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988) (secured creditor entitled to adequate protection against diminution in value of collateral only).

## II. DISCUSSION

**A. PAYMENT OF THE DEBTOR'S OPERATING EXPENSES IS IN**

**THE BEST INTERESTS OF THE ESTATE**

43. Bankruptcy Code Section 363(c)(2)(B) provides that the Court may authorize the use of cash collateral after notice and a hearing. The Debtor's sole source of revenue is the proceeds of Bitcoin transaction processing and selling Bitcoin for $USD. The Debtor proposes to use cash collateral to pay the ordinary expenses of operating the business. Otherwise, the Debtor will be forced to shut down and stop generating revenue. In order to accomplish an effective plan of reorganization, the Debtor must continue to operate. Moreover, the Debtor's Bitcoin transaction processing activities increase the size and value of the available pool of collateral (assuming that Bitcoin and the proceeds of Bitcoin sales are cash collateral). In light of the foregoing, the proposed use of cash collateral is in the best interests of the estate and creditors.

44. The Debtor further requests authority to use assets as described in the budget pursuant to Bankruptcy Code Section 363(b)(1), which provides that a debtor-in-possession, after notice and a hearing, may use, sell, or lease property of the estate other than in the ordinary course of business. The Debtor is entitled to use assets if the use is proposed pursuant to the Debtor's "business judgment," meaning that there is "some articulated business justification" for the proposed use. *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) (quoting *In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986)). "[T]he bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) (applying the business judgment standard in context of rejection of executor contract). The Debtor's projected post-petition cash flow is positive, and the Debtor's budget is sufficient to pay the budgeted expenses, and payment of such expenses is within the Debtor's sound business judgment.

45. Although the Debtor contends that its proposed use of assets is within its ordinary course of business and does not require Court approval, the Debtor requests approval in an abundance of caution. A transaction is in the ordinary course of business if it meets the "vertical" and "horizontal" tests, as follows:

The vertical dimension test "views the disputed transaction from the vantage point of

> a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* (quoting *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir.1988)). In determining whether a transaction meets this test, courts often compare the debtor's prepetition business practices to his postpetition business activities. *Id.*
>
> "Under the horizontal dimension test, the question is 'whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business.' " *Id.* at 880–81 (quoting *Dant & Russell*, 853 F.2d at 704). The purpose of this test is "to assure that neither the debtor nor the creditor did anything abnormal to gain an advantage over other creditors." *Id.* at 881.

*In re Wheeler*, 444 B.R. 598, 612 (Bankr. D. Idaho 2011). A creditor's reasonably expectations in extending credit to the Debtor include the types of expenditures included in the budget.

46. As discussed above, Faris' termination left the Debtor without a CEO. Walsh became CEO of the Debtor on short notice, served part-time and temporarily deferred his compensation. The Debtor has determined that it requires a full-time CEO going forward (including during the pendency of the within case), and Walsh is willing to serve provided that his compensation be paid on a current basis going forward. Accordingly, the budget includes compensation for Walsh in the amount of $15,000 per month (plus health insurance premiums included in the budget). Faris had been paid $10,000 per month immediately prior to Walsh stepping in as CEO. Other than said increase in the compensation of the Debtor's CEO (and the Debtor contends that appropriately compensating its officers and employees is within its ordinary course of business), the Debtor's budget continues its use of cash in the ordinary course of business.

47. Payment of the Debtor's operating expenses is in the best interests of the estate. The Court is entitled to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code pursuant to Section 105(a), and the payment of the Debtor's operating expenses is in the best interests of the estate. Specifically, payment of such expenses is necessary to operate the Debtor's business. If the expenses cannot be paid, the Debtor's business will shut down and stop generating income.

**B. SECURED CREDITORS ARE ADEQUATELY PROTECTED BY AN EQUITY CUSHION AND ADEQUATE PROTECTION PAYMENTS**

48. Bankruptcy Code Section 363(e) provides that the Court may prohibit or condition such use "as is necessary to provide adequate protection" for the interest of the secured creditor. In

11

*Timbers of Inwood Forest*, 484 U.S. at 370 (1988), the Supreme Court held that the "interest in property" which is to be the subject of adequate protection is limited to the "value of the collateral." A secured creditor is protected only from post-petition diminution in the value of the collateral. *Id.* The determination of whether a secured creditor's interests are adequately protected requires "an individual determination of the *value* of that interest and whether a proposed use of cash collateral threatens that value." *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984) (emphasis in original). "The protection afforded secured creditors is not absolute…" and the Bankruptcy Code "allow[s] the debtor to use cash collateral while ensuring that the creditor will ultimately receive the full value of that collateral." *In re Proalert, LLC*, 314 B.R. 436, 441 (B.A.P 9th Cir. 2004).

49. Payment of the Debtor's expenses preserves the value of collateral and provides adequate protection to secured creditors. Specifically, the Debtor's Bitcoin transaction processing operation increases the size and value of the collateral (although the Debtor reserves the right to contend that Bitcoin and the proceeds of the sale of Bitcoin are not subject to the aforesaid liens).

50. By contrast, non-payment of said expenses would threaten the value of collateral. Specifically, insurance premiums would not be paid; security costs would not be paid and the premises would not be secure; power and other utilities would not be paid; maintenance costs would not be paid; and the equipment and other property would dilapidate.

51. Moreover, secured creditors will be adequately protected in the form of post-petition adequate protection payments. 11 U.S.C. § 361(1). Secured creditors are further protected by an equity cushion. *In re Mellor*, 734 F.2d at 1401.

## III PRAYER FOR RELIEF

WHEREFORE, the Debtor prays for entry of an order:

1. Authorizing the Debtor to use cash collateral up to the amount of $248,193 per month in the categories identified in the aforesaid budget on a final basis; provided that, for each category of expenses identified in the budget, the Debtor shall not pay more than the amount identified therein plus a variance of up to 5%;

2. Authorizing the Debtor to use cash collateral up to the amount of $248,193 per

12

month on an interim basis pending the final hearing hereon; provided that, for each category of expenses identified in the budget, the Debtor shall not pay more than the amount identified therein plus a variance of up to 5%;

3. Providing that unused portions of said budget (except for the variance of 5%) shall roll over to increase the following months' budgets, category by category;

4. Authorizing the Debtor to use cash collateral for purposes other than those stated in the budget, and in addition to the amounts provided in the budget, upon the written consent of Faris and Emergent Systems without further notice or order of the Court, provided that the Debtor's use of property otherwise complies with the Bankruptcy Code;

5. Providing that the order shall remain in effect pending the earlier of: (1) July 31, 2015; or (2) the effective date of a chapter 11 plan, dismissal or conversion of the within case, appointment of a trustee, sale of substantially all assets, abandonment of substantially all assets, entry of an order granting of relief from the automatic stay to foreclose a lien against substantially all assets or further order of this Court, as the case may be; and

6. For such further relief as is appropriate in the premises.

DATED: February 24, 2015   MACDONALD | FERNANDEZ LLP

By: /s/ Reno F.R. Fernandez III
    Reno F.R. Fernandez III
    Attorneys for Debtor-in-Possession,
    AQH, LLC

13

## CERTIFICATION

The undersigned Certifying Professional has read the accompanying motion or stipulation, including the Introductory Statement; to the best of my knowledge, information and belief, formed after reasonably inquiry, the terms of the relief sought in the motion or stipulation are in conformity with the Court's Guidelines for Cash Collateral and Financing Motions and Stipulations except as set forth above. I understand and have advised the debtor in possession or trustee that the court may grant appropriate relief under Fed. R. Bankr. P. 9024 if the court determines that a material element of the motion or stipulation was not adequately disclosed in the Introductory Statement.

/s/ Reno F.R. Fernandez III
RENO F.R. FERNANDEZ III