MACDONALD | FERNANDEZ LLP
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Debtor-in-Possession,
AQH, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>AQH, LLC,<br><br>        Debtor. | Case No. 13-32227-HLB-11<br><br>Chapter 11<br><br>**DECLARATION OF CHRIS CUNNINGHAM IN SUPPORT OF MOTION FOR AUTHORITY TO USE CASH COLLATERAL AND MOTION FOR AUTHORITY TO PAY PRE-PETITION WAGES AND TAXES**<br><br>Date:  TBD<br>Time:  TBD<br>Place: 280 South First Street, Room 3020<br>       San Jose, California<br><br>Honorable Arthur W. Weissbrodt |

I, Chris Cunningham, declare:

1.      I own a majority of the membership interest (along with Regina Bernstein as join tenants with the right of survivorship) in the Debtor, and I am the proposed Responsible Individual for the Debtor.  I am familiar with the Debtor's business.  I am over the age of 18.  The following facts are true and correct of my own personal knowledge.  If called as a witness, I could and would competently testify as follows.

2.      This Declaration is made in support of (a) the accompanying Motion for Authority to Use Cash Collateral; and (b) the accompanying Motion for Authority to Pay Pre-Petition Wages and Taxes.

1

3.     The Debtor is a Bitcoin transaction processor.  The within case was precipitated by a short-term cash flow shortage caused by delays in permitting to supply power to the Debtor's expanded facilities located at 5300 Claus Road, Buildings 5, 21 and 50, in Modesto, California.  Specifically, the applicable plans are under review by Interwest Consulting Group and a final site inspection to activate the power is expected to be scheduled for the week of February 23, 2015.  The Debtor expects the power to be turned on during the week of February 23, 2015, which will significantly increase the Debtor's income.  Thereafter, the Debtor intends to confirm a chapter 11 plan to pay all creditors in full over time.

4.     Bitcoin is the world's first widespread digital currency.  Bitcoin entails peer-to-peer transfers of value permanently recorded on a global public ledger of all transactions (called the "Blockchain") to prevent double-spending.  Unlike fiat currencies, new Bitcoin is not issued by governments, central banks, commercial banks or companies.  By contrast, Bitcoin is issued to transaction processors ("miners") who contribute computer power to maintain the extensive ledger (the Blockchain) described above.  Specifically, the ledger is maintained and transactions are verified by using a public-key cryptography system (namely SHA-256) in which each Bitcoin account is assigned two keys – one private and one public.  In a Bitcoin transaction, the payor sends the public key to the payee and "signs" it with his or her private key, which transaction is recorded, time-stamped and added to a "block" of transactions in the Blockchain.  Verifying vast numbers of such encrypted transactions by checking them against the Blockchain requires enormous computing power.  Accordingly, transaction processors dedicate their highly-specialized computer servers to such work and receive newly-issued Bitcoin and small transaction fees in return.

5.     In addition to the ordinary factors present in any business, the Debtor's income depends upon two external factors:  (1) the cumulative processing speed of active Bitcoin transaction processors worldwide (the average global "hashrate," which is estimated at about 330 Petahashes/second as of February 20, 2015); and (2) the $USD value of Bitcoin in the marketplace (one Bitcoin could be sold for $243.73 as of February 20, 2015, at 10:03 am).  These are known and predictable within certain risk tolerances, and they have been incorporated into the Debtor's cash-flow projections as is illustrated in the Debtor's cash collateral budget (the "Budget"), a true and

2

correct copy of which is attached hereto as Exhibit "A" and incorporated by reference.

6.     The expenses described in said Budget are necessary for the continued operation of the Debtor's business.  If said expenses are not paid, the Debtor will be forced to shut down and stop generating revenue.   It is my opinion that payment of said expenses is in the best interests of the estate.

7.     The following parties assert liens against the Debtor's assets in the following amounts (estimated as of the petition date):

| Name | Estimated Claim Amount | Collateral | Estimated Value of Collateral | Priority |
|---|---|---|---|---|
| Andy Faris | $308,410.00 | Substantially all assets | $3,193,750[1] | First |
| Emergent Systems Exchange, LLC | $1,136,924.75 | Computers and related hardware | $1,200,000 | Purchase Money (Disputed) |
| Total: | $1,445,334.75 | | | |

8.     The amounts of the foregoing claims are disputed and unliquidated in part in light of disputed defaults, default interest, late charges and other charges.  Moreover, the Debtor contends that it holds significant counterclaims against both Faris and Emergent Exchange, including for breach of the sale agreement with Emergent Exchange.  Among other things, Emergent Exchange failed to deliver approximately 600 servers.

9.     The value of Bitcoin transaction processing servers is based upon the expected income to be generated from their operation, and they do not naturally depreciate over time as ordinary computers do.

*Andrew L. Faris*

10.     Andrew L. Faris is a former putative officer of the Debtor whose employment was terminated prepetition. Specifically, Faris was the putative Chief Executive Officer during the Debtor's formation phase, although discussions over his role and compensation were not completed. Faris' role was terminated prepetition, leaving the position of CEO vacant.  Sean Walsh (Managing

---

[1] Includes value of purported collateral for disputed purchase money lien asserted by Emergent Systems.

3

Member of the Debtor) is the CEO of the Debtor. Walsh is a creditor of the Debtor.

11. Faris' termination left the Debtor without a CEO. Walsh became CEO of the Debtor on short notice, served part-time and temporarily deferred his compensation. The Debtor has determined that it requires a full-time CEO going forward (including during the pendency of the within case), and Walsh is willing to serve provided that his compensation be paid on a current basis going forward. Accordingly, the budget includes compensation for Walsh in the amount of $15,000 per month (plus health insurance premiums included in the budget). Faris had been paid $10,000 per month immediately prior to Walsh stepping in as CEO. Other than said increase in the compensation of the Debtor's CEO, the Debtor's Budget continues its use of cash in the ordinary course of business.

12. Faris made a loan to the Debtor in the amount of $300,000 in or about November, 2014, payable with interest at the rate of 10% per annum amortized over one year and maturing on December 31, 2015. The Debtor has not located an executed copy of the purported promissory note, loan agreement or security agreement. Unsigned copies of said purported instruments are attached hereto, collectively, as Exhibit "B" and incorporated by reference.

13. Faris' contends that the Debtor is in default, and Faris served the Debtor with a notice of default dated January 28, 2015, a true and correct copy of which is attached hereto as Exhibit "C" and incorporated by reference. A notice of sale was not issued. Faris threatened to take possession of collateral during the week of February 16, 2015. This, in part, precipitated the commencement of the within case.

### *Emergent Systems*

14. Emergent Systems sold certain computer equipment to the Debtor on terms (partial payments up to 120 days) on an unsecured basis with a purported option to convert the debt to equity upon certain terms. The entirety of the purported sale agreement consists of the two-page "Sales Proposal" attached hereto as Exhibit "D" and incorporated by reference. The Debtor has not located a signed copy.

15. There is no security agreement, and the Debtor did not grant a lien to Emergent Systems or authorize it to record a UCC-1 Financing Statement.

16. Although Emergent Systems purportedly obtained the "Landlords Consent and Waiver" attached hereto as Exhibit "E" and incorporated by reference, the Debtor did not lease the subject equipment from Emergent Systems, did not agree to a lease term and has no expectation of returning the equipment upon the expiration of any purported lease term. It is important to note that said instrument incorrectly identified the Debtor's landlord as Emergent Systems.

17. Nevertheless, Emergent Systems threatened to enter upon the Debtor's premises and remove equipment during the week of February 16, 2015. In light of the coincidental timing of Faris' similar threat and other apparent coordination, the Debtor believes that Emergent Systems and Faris were coordinating their activities with the intent of ousting the Debtor's management and placing Faris in control of the Debtor. This, in part, precipitated the commencement of the within case.

18. The sale agreement provides for payment over time, without interest, as follows: $180,000.00 on day 30; $240,000.00 on day 60; $240,000.00 on day 90 (or $40,000.00 of Emergent Systems exercised an option to convert to equity); and $540,000.00 on day 120. Emergent Systems contends that the Debtor is in default.

19. The Riverbank Local Redevelopment Agency (the "Riverbank LRA") is the owner and lessor of the facilities described above. Although the Riverbank LRA holds no interest in cash collateral, it is important to note that the lease is in default and arrears are approximately $100,000.00 (the Debtor's review is ongoing, and said claim is subject to dispute). The Riverbank LRA served the Debtor with Three-Day Notices to Pay Rent or Surrender Premises on February 11 and 20, 2015. This, in part, precipitated the commencement of the within case. The Budget provides for the payment of post-petition rent, including utilities that are paid through the lease.

20. A true and correct copy of the Debtor's financial statement (balance sheet and profit and loss statement) as of the petition date of February 19, 2015, is attached hereto as Exhibit "F" and incorporated by reference.

### *Wages & Taxes*

1. Prepetition, the Debtor has entered into independent contractor agreements with seven individuals who perform necessary services for the Debtor. These individuals are paid on a

weekly basis, except for Thomas Bautista, who is paid periodically as work is completed and submitted. In addition, the Debtor has two employees, namely: (1) Anthony Brough, who is the Debtor's Chief Operations Officer and Chief Financial Officer; (2) Sean Walsh, who is the Debtor's Chief Executive Officer; and (3) Yan Ebyam, an independent contractor who is the Debtor's facilities engineer.

21. The Debtor filed its petition on an emergency basis on February 19, 2015, in the midst of a payroll period. Prior to that date, the Debtor paid the independent contractors in the ordinary course of business on February 6, 2015, the sum of $3,900.00 and on February 13, 2015, the sum of $3,603.78. The Debtor paid said contractors the total amount of $6,480.00 post-petition on February 20, 2015. The following table summarizes said payments:

| Employee | February 20, 2015 | February 13, 2015 | February 6, 2015 |
|---|---|---|---|
| Jeremy Shoemaker | N/A | N/A | $ 570.00 |
| Jacob Lopez | $ 800.00 | $ 640.00 | $ 800.00 |
| Michael White | $ 600.00 | $ 600.00 | $ 480.00 |
| Austin Roberts | $ 800.00 | $ 800.00 | $ 650.00 |
| Brian Friend | $ 800.00 | $ 800.00 | $ 800.00 |
| Tricia Hayward | $ 480.00 | $ 592.50 | $ 600.00 |
| Thomas Bautista | $ 3,000.00 | $ 171.28 | - |
| Total Wages | $ 6,480.00 | $ 3,603.78 | $ 3,900.00 |

22. Brough's salary is $12,000 per month plus employment tax expenses (e.g. unemployment insurance and medicare) of $492, for a total of $12,492. Brough is paid twice per month; he was last paid on February 15 and will next be paid on February 28, 2015. The Debtor estimates the pre-petition portion of said payment to be no more than $3,123.

23. Ebyam's salary is $3,000 per month, paid twice per month. Ebyam's last payment of $1,500 was paid on February 15 and his next payment of $1,500 is due on February 28, 2015, which will include a small amount on account of pre-petition work.

24. Walsh's pre-petition compensation was deferred, and the Debtor does not request authority to pay Walsh on account of said deferred compensation. Rather, the Debtor intends to pay Walsh $4,000 on February 28, 2015, which the Debtor estimates to be the portion of his compensation attributable to post-petition work and is not intended to include any pre-petition

6

portion.

25. The Debtor is not responsible for withholding payments to the taxing authorities with respect to wages paid to the independent contractors. There are no claims for sick leave, vacation pay or other benefits.

26. The services of said independent contractors and employees are critical to the continued operation of the Debtor. The Debtor has determined that delayed payment would create significant problems for said contractors and employees and there is a significant risk that some or all of them would stop work.

27. The Debtor is a limited liability company, and its income taxes pass through to its members. The Debtor is not aware of any pre-petition tax claims owed by the Debtor. However, although the Debtor is current on all of its taxes that have become due as of the petition date, there may be a delay between the time when the Debtor incurs an obligation to pay certain taxes and the date such taxes become due, as is typical for California businesses. Such taxes (if any) are entitled to priority status under Bankruptcy Code Section 507(a)(8)(C) and must be paid in full under a chapter 11 plan pursuant to Bankruptcy Code Section 1129(a)(9)(c). In addition to the sales, use and franchise taxes paid by a typical business, the Internal Revenue Service considers Bitcoin to be property subject to capital gains tax, and Bitcoins may accrue small amounts of capital gains taxes between the time they are obtained and the time they are sold (typically the same day). As a convenience to Bitcoin transaction processers, the Bitcoin exchange utilized by the Debtor to sell Bitcoin automatically calculates the capital gains taxes and provides gain and loss reporting. It would be burdensome to apportion and segregate funds to be held for such pre-petition tax claims, and the Debtor requests authority to continue paying pre- and post-petition sales, use, franchise and capital gains taxes as they become due in the ordinary course of business.

28. The Debtor's Budget is sufficient to pay the aforesaid obligations, to continue to pay taxes, and to pay other regular expenses.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 24th day of February, 2015, at Sherman Oaks, California.

/s/ Chris Cunningham
CHRIS CUNNINGHAM

7

# EXHIBIT A

**Aquifer Projections**

| | 2015 February | March | April | May | June | July |
|---|---|---|---|---|---|---|
| Max GHR @ $228/BTC | 400,000 | | | | | |
| Hashrate Added Per Month, TH | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Avg Global Hashrate, TH | 330,000 | 335,000 | 340,000 | 345,000 | 350,000 | 355,000 |
| | | | | | | |
| Average Block Time, minutes | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 |
| BTC Paid To Miners | 105,773 | 105,773 | 105,773 | 105,773 | 105,773 | 105,773 |
| Pool Variance to theoretical revenue | 5% | | | | | |
| Revenue Per TH, BTC | 0.32 | 0.32 | 0.31 | 0.31 | 0.30 | 0.30 |
| BTC Price, $ | 228.00 | 228.00 | 228.00 | 228.00 | 228.00 | 228.00 |
| Revenue Per TH, $ | 73.08 | 71.99 | 70.93 | 69.90 | 68.90 | 67.93 |
| 3-Month Revenue Per TH, $ | 216.00 | 212.82 | 209.74 | 206.74 | 136.84 | 67.93 |
| | | | | | | |
| kW Per TH (Cointerra) | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| kW Per TH (BitFury) | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 |
| Avg kWh Per Month | 720 | 720 | 720 | 720 | 720 | 720 |
| $ per kWh | 0.050 | 0.050 | 0.050 | 0.050 | 0.050 | 0.050 |
| Electricity Cost Per TH, $ | 31.07 | 31.77 | 31.77 | 31.77 | 31.77 | 31.77 |
| | | | | | | |
| Power online (kW) | 1,640.00 | 3,530.00 | 3,530.00 | 3,530.00 | 3,530.00 | 3,530.00 |
| Cointerra TH Online | 1,200.00 | 3,300.00 | 3,300.00 | 3,300.00 | 3,300.00 | 3,300.00 |
| BitFury TH Online | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 |
| Avg. TH Live | 1,900.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| BTC Generated | 609.00 | 1,262.96 | 1,244.39 | 1,226.36 | 1,208.84 | 1,191.81 |
| | | | | | | |
| **Total Revenue** | **$138,851** | **$287,956** | **$283,721** | **$279,609** | **$275,615** | **$271,733** |
| Total Electricity Costs | ($59,040) | ($127,080) | ($127,080) | ($127,080) | ($127,080) | ($127,080) |
| **Gross Profit** | **$79,811** | **$160,876** | **$156,641** | **$152,529** | **$148,535** | **$144,653** |
| | | | | | | |
| **Fixed Operating Expenses** | | | | | | |
| Lease | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| Salaries | 40,000.00 | 46,000.00 | 46,000.00 | 46,000.00 | 46,000.00 | 46,000.00 |
| Facility Costs | 9,100.00 | 9,100.00 | 9,100.00 | 9,100.00 | 9,100.00 | 9,100.00 |
| | | | | | | |
| **Reorganization, Reserves & Other** | | | | | | |
| Risk Reserve | | 32,175.14 | 31,328.21 | 30,505.83 | 29,706.95 | 28,930.57 |
| US Trustee Fees | | 975.00 | | | 1,625.00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Adequate Protection - A. Faris (est.) | 2,583.33 | 2,583.33 | 2,583.33 | 2,583.33 | 2,583.33 | 2,583.33 * interest payments |
| Adequate Protection - Emergent System Exchange | 1,650.00 | 5,280.00 | 8,850.00 | 16,950.00 | 16,950.00 | 16,950.00 * interest payments |
| Minimum Franchise Taxes | | | 800 | | | |
| Fixed Monthly OPEX | ($78,333) | ($121,113) | ($123,662) | ($130,139) | ($130,965) | ($128,564) |
| **Operating Profit** | $1,478 | $39,762 | $32,980 | $22,390 | $17,569 | $16,089 |
| **Cumulative Operating Profit** | $1,478 | $41,240 | $74,220 | $96,610 | $114,179 | $130,268 |
| Cumulative Risk Reserve | | $32,175 | $63,503 | $94,009 | $123,716 | $152,647 |
| Total OPEX | ($137,373) | ($248,193) | ($250,742) | ($257,219) | ($258,045) | ($255,644) |

## Lease Schedule

| Lease Name | Lease Description | Lease Amount |
|---|---|---|
| Modesto Apt | Apartment near mining equipment for principle engineer, and other contractors and employees on occasion (maybe 3 days out of | $1,470.00 |
| Riverbank LRA | (1) Mining/Storage, (2) Bldg 5 Mining, (3) Cafeteria-Storage/Office | $22,065.00 |
| Sunnyvale | Desk rental in shared space: Office | $450.00 |
| | | **$23,985.00** |

Page 3

Salary Schedule

| Employee Name | Position Description | Payment Amount |
|---|---|---|
| Anthony Brough | Operations | $12,000.00 |
| Contract Labor | Maintenance, | $9,000.00 |
| Daron McDaniel | Consultant | $4,000.00 |
| Employee Costs | Payroll taxes, Benefits | $3,000.00 |
| Sean Walsh | CEO | $15,000.00 |
| Yan Ebyam | Facilities, Engineering | $3,000.00 |
| | | **$46,000.00** |

Case: 15-50553   Doc# 12   Filed: 02/24/15   Entered: 02/24/15 16:16:20   Page 12 of 47

## Facilities Schedule

| Position Description | Item Description | Payment Amount |
|---|---|---:|
| Garbage | disposal fees | $150.00 |
| Insurance |  | $500.00 |
| Internet | high speed internet | $350.00 |
| Misc |  | $1,000.00 |
| Security | Camera Rental | $6,000.00 |
| Software | productivity software | $150.00 |
| Staff Travel | Gas, Meals | $500.00 |
| Trustee Exp | (mailbox, travel) | $500.00 |
|  |  | **$9,150.00** |

Case: 15-50553   Doc# 12   Filed: 02/24/15   Entered: 02/24/15 16:16:20   Page 13 of 47

# EXHIBIT B

THIS PROMISSORY NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION OF THE BALANCE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES LAW, AND MAY NOT BE PLEDGED, SOLD, ASSIGNED OR TRANSFERRED UNLESS (I) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES LAW REQUIREMENTS HAVE BEEN MET, OR (II) EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE REGISTRATION OR QUALIFICATION REQUIREMENTS OF APPLICABLE STATE SECURITIES LAWS HAVE BEEN MET.

### PROMISSORY NOTE

$300,000.00

Dated: November ___, 2014                    Sunnyvale, California

**FOR VALUE RECEIVED**, AQH, LLC, a California limited liability company ("**Borrower**"), agrees and promises to pay to Andrew L. Faris, an individual, his heirs, successors and assigns ("**Lender**"), at Lender's address as set forth by Lender's signature below, or at such other place as Lender may designate to Borrower in writing, in lawful money of the United States of America, the principal amount of Three Hundred Thousand and No/100 Dollars ($300,000.00), or, if less, the aggregate outstanding principal balance, pursuant to that certain Loan and Security Agreement dated of even date herewith between Borrower and Lender (as amended from time to time, the "**Loan Agreement**"), together with interest thereon as set forth below.

      1.    <u>Payment</u>.  On January 1, 2015, Borrower shall make a payment of all accrued interest to Lender.  Commencing on February 1, 2015, and continuing on the first (1st) day of each month thereafter, Borrower shall make monthly payments of principal and accrued interest to Lender calculated on a one (1) year amortization schedule.  The outstanding principal balance of this Promissory Note shall be due and payable in full, along with all costs, expenses, penalties and accrued and unpaid interest, on or before December 31, 2015 (the "**Maturity Date**").  The final payment shall be a balloon payment of all amounts then due.  Unless otherwise provided herein, or as required by applicable law, payments received by Lender will be applied first to accrued and unpaid interest, then to the principal balance, and then to any outstanding costs, expenses and penalties. Borrower may, without premium or penalty, prepay all or any part of the outstanding balance of this Promissory Note.  Early partial payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments pursuant to this Section 1.

      2.    <u>Interest Rate</u>.  The interest rate under this Promissory Note (the "**Interest Rate**") shall be equal to Ten Percent (10.0%) per annum; provided that the Interest Rate shall not exceed the maximum rate permitted by applicable law.  Interest will be computed on the actual number of days elapsed in a three hundred sixty (360) day year, but shall be charged for the actual number of days interest is unpaid.

      3.    <u>Late Charge; Default Rate</u>.  If a regularly scheduled payment or the balloon payment becomes overdue and such nonpayment is not cured within fifteen (15) days after Borrower receives written notice thereof from Lender, Borrower will be charged a late fee equal to Five Percent (5.0%) of the unpaid portion of the regularly scheduled payment or balloon payment, as applicable.  Upon the occurrence of an Event of Default (as defined in the Loan Agreement), the total sum due under this Promissory Note will bear interest from the date of such Event of Default at the Interest Rate plus an additional Four Percent (4.0%); provided that such total interest rate shall not exceed the maximum rate permitted by applicable law.

4.      Governing Law.  This Promissory Note shall be governed by, construed and enforced in accordance with the laws of the State of California, without regard to its conflict or choice of law principles. Any disputes arising between Borrower and Lender under this Promissory Note will be subject to, and will be resolved in accordance with, the dispute resolution procedures set forth in Section 8.4 of the Loan Agreement.

5.      Acceleration; Expenses.  Upon the occurrence of any Event of Default (as defined in the Loan Agreement), and at any time thereafter while such Event of Default is continuing, Lender may, at its option, declare this Promissory Note to be immediately due and payable in full, and thereupon the unpaid principal balance of this Promissory Note, plus accrued and unpaid interest and all other charges, fees and expenses under this Promissory Note, shall immediately become due and payable in full, without any presentment, demand, protest or other notice of any kind.  Upon the occurrence of any Event of Default (as defined in the Loan Agreement), and at any time thereafter while such Event of Default is continuing, Borrower shall be responsible for all charges, fees and expenses (including reasonable attorney's fees) incurred by Lender in enforcing or attempting to enforce its rights hereunder, regardless of whether suit is commenced.

6.      Assignment; Successors.  Borrower may not assign this Promissory Note, or any of Borrower's rights or obligations hereunder, without the prior written consent of Lender, and any attempted assignment without Lender's prior written consent shall be null and void.  The terms of this Promissory Note shall be binding upon Borrower, and upon Borrower's successors and permitted assigns, and shall inure to the benefit of Lender and Lender's heirs, successors and assigns.

7.      Security.  This Promissory Note is given to evidence a loan up to the amount noted above, and is the Promissory Note referred to in and secured by the Loan Agreement and certain other collateral security documents given by Borrower or its related parties to Lender.

8.      Miscellaneous.  Lender may delay or forego enforcing any of its rights or remedies under this Promissory Note without losing them.  No waiver of any right or remedy under this Promissory Note shall be valid unless in writing and signed by Lender, and any such waiver shall be effective only in the specific instance and for the specific purpose given.  Borrower, to the maximum extent permitted by applicable law, waives presentment, demand for payment and notice of dishonor.  Upon any change in the terms of this Promissory Note, and unless otherwise expressly stated in writing, no party who signs or otherwise becomes obligated under this Promissory Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this Promissory Note or release any party, guarantor or collateral, or impair, fail to realize upon or perfect Lender's security interest in any collateral, and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this Promissory Note without the consent of or notice to anyone other than the party with whom the modification is made.  Borrower agrees to sign and/or deliver any additional documents or amendments as are reasonably requested by Lender to consummate and fulfill the terms hereof.

9.      Jury Waiver.  LENDER BY ITS ACCEPTANCE HEREOF AND BORROWER, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, HEREBY VOLUNTARILY, KNOWINGLY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS PROMISSORY NOTE OR CONCERNING THE INDEBTEDNESS EVIDENCED HEREBY AND/OR ANY COLLATERAL CONTEMPLATED HEREBY, REGARDLESS OF WHETHER SUCH ACTION OR PROCEEDING CONCERNS ANY CONTRACTUAL, TORTIOUS OR OTHER CLAIM.  BORROWER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO

Case: 15-50553    Doc# 12    Filed: 02/24/15    Entered: 02/24/15 16:16:20    Page 16 of 47

LENDER IN EXTENDING CREDIT TO BORROWER, THAT LENDER WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS WAIVER AND THAT BORROWER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

      10.   <u>Conversion</u>.  At any time from the date hereof through two (2) years from the date hereof, and at any time during the continuation of an Event of Default (as defined in the Loan Agreement), Lender may elect, in Lender's sole discretion and upon written notice to Borrower, to convert all or a portion of the outstanding principal balance of this Promissory Note and accrued and unpaid interest thereon (collectively the "**Conversion Balance**") into a membership interest of Borrower pursuant to this Section 10 and at Borrower's sole cost and expense.  The Percentage Interest of Borrower (as such term is defined in the Operating Agreement of AQH, LLC, a California limited liability company, dated February 9, 2014, and as amended from time to time) into which part or all of the Conversion Balance shall be converted shall be determined by dividing the aggregate monetary amount of the Conversion Balance to be converted <u>by</u> the Post-Money Valuation (as defined in the Loan Agreement).  The membership interest of Borrower issuable upon conversion hereof shall be issued to Lender as soon as reasonably practicable following Borrower's receipt of Lender's written election to convert, and Borrower shall cause its organizational documents, operating agreement and other books and records (as applicable) to be updated accordingly.  In the event all of the Conversion Balance is converted into a membership interest of Borrower, this Promissory Note, along with each party's rights and obligations hereunder, shall automatically be terminated.  In the event only a portion of the Conversion Balance is converted into a membership interest of Borrower, Borrower shall sign and deliver to Lender a new promissory note in the form of this Promissory Note (apart from the principal balance which shall equal the outstanding principal balance of this Promissory Note that is not elected to be converted), and upon signature and delivery of such new promissory note, this Promissory Note, along with each party's rights and obligations hereunder, shall automatically be terminated.

**BORROWER REPRESENTS AND WARRANTS THAT PRIOR TO SIGNING THIS PROMISSORY NOTE, BORROWER HAS READ AND UNDERSTANDS ALL THE PROVISIONS OF THIS PROMISSORY NOTE AND AGREES TO BE BOUND HEREBY.**

*Agreed as of the date first written above:*

**AQH, LLC**

_____

By:

Title:

STATE OF _____ )

                                  ) ss.

COUNTY OF _____ )

       The foregoing instrument was acknowledged before me this ____ day of _____, 2014, by _____, the _____ of AQH, LLC, a California limited liability company, on behalf of such company.

_____

Notary Public

*Accepted by Lender as of the date first written above:*

**Andrew L. Faris**

_____

Lender Address:

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("**Agreement**") is entered into as of the ___ day of November, 2014, by and between AQH, LLC, a California limited liability company ("**Borrower**"), and Andrew L. Faris, an individual ("**Lender**").

　　**WHEREAS**, Borrower has requested that Lender loan to Borrower the principal amount of Three Hundred Thousand and No/100 Dollars ($300,000.00) (the "**Loan**"), as further evidenced by that certain Promissory Note given by Borrower to Lender dated of even date herewith and attached hereto as Exhibit D (as amended from time to time, the "**Promissory Note**"), and pursuant to this Agreement.

　　**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.　　<u>Loan</u>.

　　1.1　　<u>The Loan</u>.  Subject to the terms and conditions of this Agreement, Lender agrees to make the Loan to Borrower as follows: Lender shall advance to Borrower the principal amount of Three Hundred Thousand and No/100 Dollars ($300,000.00).

　　1.2　　<u>Purpose of Loan</u>.  The parties acknowledge and agree that (i) the sole purpose of the Loan is to enable Borrower to operate and expand its existing California business, and (ii) the Loan is subject to Lender's receipt and approval of the Loan Documents (as defined below and as provided by Lender from time to time).  Borrower shall be in default under this Agreement if any of the proceeds of the Loan are used for any other purpose without Lender's prior written approval.

　　1.3　　<u>Loan Documents</u>.  In conjunction with this Agreement, Borrower will sign and/or deliver to Lender the following documents in such forms and at such times as provided by Lender (collectively with this Agreement and such other documents as required by Lender pursuant to the terms of this Agreement, all as amended from time to time, the "**Loan Documents**"): (i) the Promissory Note, and (iii) those certain UCC-1 Financing Statements for filing in such office(s) as Lender may deem necessary or desirable along with any renewals and amendments thereto (the "**UCC-1s**"). The Loan Documents are incorporated herein by reference and deemed a part hereof.

　　1.4　　<u>Liability Records</u>.  Lender may maintain from time to time, at its discretion, liability records as to any and all advances made or paid and interest accrued or paid under this Agreement.  All entries made on any such record shall be presumed correct until Borrower establishes the contrary.  In the event of a dispute by Borrower, Borrower will admit and certify in writing the exact principal and interest balances that Borrower then asserts to be outstanding under this Agreement.  In the event of such a dispute, Lender shall make its liability records available to Borrower.

　　1.5　　<u>Certain Definitions</u>.  For purposes of the Loan Documents, the following terms will have the following meanings:

　　　　(a)　　"**Pre-Money Valuation**" means Two Million Two Hundred Thousand and No/100 Dollars ($2,200,000.00), which is the value established by Borrower and Lender as the current value of Borrower, before its receipt of the Loan, any other new loans or other investment capital.

(b)　　"**Post-Money Valuation**" means the Pre-Money Valuation plus the aggregate monetary amount of the Conversion Balance (as defined in the Promissory Note) to be converted under Section 10 of the Promissory Note.

2.　　Expenses and Payment.　Interest and principal on the Loan shall be payable as specified in the Promissory Note.　Borrower agrees that it will pay or reimburse Lender, on demand, for all costs, fees and expenses incurred by Lender in connection with: (i) the negotiation, preparation and execution of this Agreement, the Loan Documents, the Loan, and any transactions contemplated by this Agreement, whether or not the Loan is completed and the proceeds are advanced to Borrower, including, without limitation, closing fees, recording fees, insurance premiums, inspections, origination fees from Lender's third party lenders to fund the Loan and reasonable attorneys' fees (collectively, "**Non-Enforcement Expenses**"), up to a maximum payment or reimbursement of Six Thousand and No/100 Dollars ($6000) for such Non-Enforcement Expenses; and (ii) any enforcement by Lender of its rights under this Agreement or the Loan Documents (the "**Enforcement Expenses**").　Lender may offset the Non-Enforcement Expenses against the proceeds of the Loan.　If Borrower fails to pay any Enforcement Expenses when due, Lender may, at its option and upon written notice to Borrower, cause the same to be advanced under the Promissory Note and the payment thereof shall be secured by this Agreement and any other security documents between Borrower and Lender.

3.　　Borrower's Covenants, Representations and Warranties.

3.1　　Representations and Warranties.　Borrower represents and warrants that (i) Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and has complied with all certifications, filings and requirements necessary to continue as a limited liability company in the State of California; (ii) Borrower has full power and authority to enter into this Agreement, to borrow the full amount of the Loan and to sign and deliver the Loan Documents and other instruments required under this Agreement; (iii) the execution, delivery and compliance with the terms of the Loan Documents shall not contravene or constitute a default under any applicable law, mortgage, indenture, commitment, agreement or other instrument to which Borrower or its properties are bound, or any judgment, order or decree to which Borrower or its properties are subject; (iv) there are no (a) bankruptcy proceedings involving Borrower or its properties, or involving, to Borrower's knowledge, its members or their properties, (b) dissolution proceedings involving Borrower or, to Borrower's knowledge, its members, (c) unsatisfied judgments of record against Borrower or its properties, or against, to Borrower's knowledge, its members or their properties, (d) tax liens filed against Borrower or its properties, or against, to Borrower's knowledge, its members or their properties, or (e) suits, actions, proceedings or investigations pending or, to Borrower's knowledge threatened against or affecting Borrower or its properties (nor is Borrower aware of any basis therefor) at law or in equity or by or before any court, arbitrator, administrative agency or other federal, state or local governmental authority which individually or in the aggregate, if adversely determined, might have a material adverse effect on Borrower's ability to perform its obligations, or affect the validity as to Borrower or the Collateral (as defined below), under the Loan Documents; (v) Borrower has filed all federal and state income tax returns required to be filed, and has paid all assessments due thereunder; (vi) Borrower's intended use of the Collateral is a proper use within and shall materially comply with the zoning and environmental laws, and all permits, restrictions of record and agreements affecting Borrower, its properties, the Collateral and the location thereof, and all other applicable federal, state and local laws and regulations; (vii) no Event of Default (as defined below) has occurred and is continuing as of the date hereof and no event has occurred and is continuing which would be an Event of Default were it not for any grace period specified herein or which would become an Event of Default if notice thereof

2

were given to Borrower; (viii) all governmental and other approvals required for the ownership, transportation, installation and use of the Collateral have been obtained, except as expressly approved by Lender in writing; and (ix) to Borrower's knowledge, no information contained in this Agreement, the other Loan Documents or any other document furnished by or on behalf of Borrower contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading and there are no facts known to Borrower which have not been disclosed to Lender that may materially adversely affect the Collateral, Borrower or its business operations or financial condition.

3.2     Borrower's Covenants.  Borrower hereby covenants and agrees with Lender that (i) while any Obligations (as defined below) remain outstanding under the Loan Documents, Borrower shall authorize, execute, deliver or endorse any and all instruments, documents, assignments, security agreements and other agreements and writings which Lender may at any time reasonably request in order to secure, protect, perfect or enforce Lender's rights under the Loan Documents; (ii)  Borrower shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon Borrower, Borrower's income or profits or Borrower's assets or properties (but only to the extent that any such payment and discharge is a legal obligation of Borrower), prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a lien or charge upon the property or assets of Borrower; provided, however, that Borrower shall not be required to pay any such tax, assessment, charge, levy or claim, the payment of which is being contested in good faith and by proper proceedings and for which it shall have set aside adequate reserves; (iii) Borrower shall promptly notify Lender of (a) any litigation which may materially and adversely affect Borrower or any of its properties, including, without limitation, the Collateral (as defined below), (b) the occurrence of an Event of Default (as defined below) or an anticipated Event of Default, and (c) any Material Adverse Change (as defined below); (iv) Borrower shall promptly reperform or replace any defective work or materials related to the Collateral following receipt of Lender's reasonable request therefor; and (v) Borrower shall comply with, and require all persons furnishing labor or materials to Borrower for the transportation, installation, use and maintenance of the Collateral to comply with, all federal, state and local laws and regulations concerning such work and the Collateral.

3.3     Negative Covenants.  Borrower hereby covenants and agrees with Lender, that so long as any Obligations (as defined below) remain outstanding under the Loan Documents, Borrower shall not (i) merge or consolidate with or into any other entity or entities, dissolve or transfer, lease or sell all or substantially all of Borrower's property and/or business, other than in the ordinary course of business; (ii) default upon or fail to pay any of its other debts or obligations as the same mature or otherwise become due by acceleration or otherwise and which in the aggregate exceed the sum of Fifty Thousand and No/100 Dollars ($50,000.00) at any time, unless the same are being contested in good faith by appropriate proceedings and adequate reserves shall have been established with respect thereto; (iii) change its legal name, its principal place of business, its jurisdiction of organization or its federal taxpayer identification number without in each instance providing Lender prior written notice and obtaining Lender's prior written approval which may be withheld, conditioned or delayed in Lender's sole discretion; and/or (iv) make any material alterations to the Collateral (as defined below).

3.4     Outstanding Obligations.     Lender acknowledges notice of Borrower's outstanding monetary obligations to certain vendors, suppliers, contractors and lenders of Borrower, which obligations total approximately Three Hundred Twenty-Five Thousand and No/100 Dollars ($325,000.00) as of the date hereof ("**Outstanding Obligations**"), and which Outstanding Obligations will be set forth in detail on a Schedule of Outstanding Obligations to be prepared by Borrower and submitted to Lender within thirty (30) days after the parties' execution

Case: 15-50553    Doc# 12    Filed: 02/24/15    Entered: 02/24/15 16:16:20    Page 21 of 47

and delivery of this Agreement. Upon Lender's approval, the Schedule of Outstanding Obligations will be attached hereto as Exhibit A to this Agreement and incorporated herein by reference. Subject to the provisions of this Agreement, Lender and Borrower agree that the payment of the Loan shall rank, *pari passu*, with the Outstanding Obligations.

4.      Security Agreement.

        4.1     Security Interest.  Borrower hereby grants to Lender a security interest (the "**Security Interest**") in the Collateral (as hereinafter defined) to secure the payment and performance of all of Borrower's and any other parties' obligations, covenants, duties, debts and liabilities to Lender under this Agreement and the other Loan Documents, now or hereafter existing, including, without limitation, the payment when due of principal and interest under the Promissory Note (collectively the "**Obligations**").  The Security Interest shall continue in effect until the Obligations are satisfied in full, whereupon the Security Interest shall be released by Lender upon receipt of Borrower's written request to such effect and at Borrower's sole expense. The "**Collateral**" means all of Borrower's right, title and interest in and to the assets and other rights identified on Exhibit B, attached hereto and incorporated herein by reference.  Borrower and Lender acknowledge and agree that the Security Interest constitutes a "purchase-money security interest" under the Uniform Commercial Code enacted in the State of California, as amended from time to time (the "**UCC**"), with respect to any Collateral that secures Borrower's obligation to repay the Loan where such obligation was incurred by Borrower to finance the purchase price of such Collateral.

        4.2     Representations and Warranties.  Borrower represents and warrants that:

                4.2.1   Title.  Borrower is and shall be the legal and beneficial owner of, or possesses and shall at all times relevant to this Agreement possess the right to use, the Collateral and will continue to own or have the right to use each item of the Collateral, free and clear of any liens, security interests or other encumbrances, except for the Security Interest.  Borrower shall, at its sole expense, defend its title to the Collateral and Lender's first position therein from any and all third parties claiming any adverse interest, except for the Security Interest.

                4.2.2   UCC-1 Financing Statement.  Borrower will do all acts and things, and hereby consents to the filing of the UCC-1s (and any other UCC-1 financing statements), to establish, perfect, maintain and continue the perfection and priority of the Security Interest, and will do all things deemed necessary by Lender to establish and determine the validity and the priority of the Security Interest.  A carbon, photographic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement and may be filed in lieu of the original in any or all jurisdictions which accept such reproductions.  The UCC-1, when properly recorded, will create a valid first priority lien on the Collateral and the proceeds thereof.

                4.2.3   Transfers.  Borrower will not sell, convey, transfer or otherwise dispose of any of the Collateral without the prior written consent of Lender, except for Collateral with a fair market value of less than Twenty-Five Thousand and No/100 Dollars ($25,000.00) in the ordinary course of Borrower's business.  No provision contained in this Agreement shall be construed to authorize any such sale, conveyance, transfer or other disposition of the Collateral by Borrower except upon satisfaction of the conditions contained in this Section 4.2.3.  Further, Borrower shall not enter into any agreement, voluntarily become subject to any order, judgment or decree, or take any other action that

4

could reasonably result in a restriction on the transferability of any of the Collateral or otherwise impair Lender's ability to freely exercise its remedies hereunder, except for the Loan Documents.

4.3     Covenants.  Lender and Borrower hereby agree as follows:

4.3.1     Fees and Charges.     Borrower shall, upon Lender's submission of documentation therefor, pay all filing and recording fees actually incurred and arising out of or in connection with the UCC-1s or any UCC-1 financing statements and any amendments or continuations thereof.

4.3.2     Records.  Borrower will keep accurate and complete records pertaining to the Collateral and to Borrower's business and financial condition and, upon Lender's reasonable request (including, but not limited to, during an Event of Default (as defined below)), will submit to Lender copies of all reports, statements and tax returns regarding the Collateral and Borrower's business and financial condition as and when Lender may reasonably request.

4.3.3     Authorization.  Upon the occurrence of an Event of Default (as defined below), and at any time thereafter while such Event of Default is continuing, Lender, in the name of Borrower or otherwise, shall have the authority but shall not be obligated to demand, collect, receive and receipt for, compromise, compound, settle and give acquittance for and prosecute and discontinue any suits or proceedings in respect of any or all of the Collateral, and take any action which Lender may deem necessary or desirable in order to realize on the Collateral, including, without limitation, the power to perform any contract and to endorse in the name of the Borrower on any checks, drafts, notes or other documents which are Collateral or are received in payment or on account of the Collateral.

4.3.4     Location.  Excluding California (for which it shall be Lender's obligation under Section 1.3 above to provide for the filing of the UCC-1s), Borrower will not permit any tangible Collateral to be located in any state (and, if a county filing is required, in any county) in which a UCC-1 financing statement covering such Collateral is required to be, but has not in fact been, filed in order to perfect the Security Interest.  In the event Borrower desires to move any tangible Collateral with a fair market value in excess of Ten Thousand and No/100 Dollars ($10,000.00), Borrower shall provide written notice to Lender of such desire, which written notice shall include, at a minimum, (i) a description of the Collateral to be moved, and (ii) a description of such Collateral's new location.  Prior to such move, Borrower shall provide Lender with any other information and assistance reasonably requested by Lender in order to maintain the validity, perfection and priority of the Security Interest.  Notwithstanding anything to the contrary, in no event shall any of the Collateral be moved outside of the United States of America.

4.3.5     Condition.  Borrower will keep all tangible Collateral in good repair, working order and condition, normal depreciation and wear and tear excepted, and shall, from time to time, make any and all reasonably necessary or appropriate structural, non-structural, exterior, interior, ordinary, extraordinary, foreseen and unforeseen repairs, replacements and maintenance, including, without limitation, repair or replacement of any worn, broken or defective parts thereof.

5

4.3.6   <u>Insurance</u>.   Within 30 days after their execution and delivery of this Agreement, the parties will identify the insurance policies and applicable coverage limits to be obtained by Borrower in order to insure the Collateral against risks of loss or damage, and will set forth such polices and coverage limits on a Schedule of Required Insurance Coverage that, when approved by both parties, will be attached hereto as Exhibit C and incorporated herein by reference.   Within thirty (30) days after Exhibit C is approved and attached hereto, Borrower will secure the insurance policies identified on Exhibit C in at least the amounts set forth therein.   Such insurance policies shall be written on forms and with insurance companies reasonably satisfactory to Lender, shall name Lender as an additional insured and shall bear a satisfactory loss payable clause in favor of Lender with loss proceeds under any such policies to be made payable to Lender. All required policies of insurance or acceptable certificates thereof together with evidence of the payment of current premiums therefor shall be delivered to and be held by Lender.   Borrower shall, within thirty (30) days prior to the expiration of any such policy, deliver other original policies or certificates of the insurer evidencing the renewal of such insurance together with evidence of the payment of current premiums therefor. After the occurrence and during the continuation of an Event of Default (as defined below), all such policies and any proceeds payable therefrom, whether payable before or after a sale, if any, shall become the absolute property of Lender to be utilized at its discretion (but only up to the amount of the Obligations) and Lender may act as attorney for Borrower in making, adjusting and settling claims under and cancelling such insurance and endorsing Borrower's name on any drafts drawn by insurers of the Collateral.   Any expense reasonably incurred by Lender in the adjustment and collection of insurance proceeds (including, without limitation, the cost of any independent appraisal of the loss or damage on behalf of Lender) shall be reimbursed to Lender first out of any proceeds.   In the event that any insurance proceeds from such insurance policies are paid to Borrower after the occurrence and during the continuation of an Event of Default, such proceeds shall be held in trust for Lender and promptly remitted to Lender and shall be applied to reduction of the Obligations then most remotely to be paid, whether due or not, without the application of any prepayment premium, or to the restoration or repair of the Collateral, the choice of application to be solely at the discretion of Lender.

4.3.7   <u>Compliance with Laws</u>.   Borrower will not use or keep any Collateral, or permit it to be used or kept, for any unlawful purpose or in violation of any federal, state or local law, statute or ordinance, or any policy of insurance maintained on the Collateral.

4.3.8   <u>Fixtures</u>.   Borrower will not permit any tangible Collateral to become part of or to be affixed to any real property without first assuring to the reasonable satisfaction of Lender that the Security Interest will be prior and senior to any interest or lien then held or thereafter acquired by any mortgagee of such real property or the owner or purchaser of any interest therein.

4.3.9   <u>Damage or Loss</u>.   Borrower will promptly notify Lender of any material loss of or material damage to any Collateral or of any adverse change, known to Borrower, in the prospect of payment of any sums due on or under any asset constituting Collateral.

4.4   <u>Remedies</u>.

Case: 15-50553   Doc# 12   Filed: 02/24/15   Entered: 02/24/15 16:16:20   Page 24 of 47

4.4.1    Upon the occurrence of an Event of Default (as defined below) and at any time thereafter while such Event of Default is continuing, Lender may exercise one or more of the following rights and remedies: (i) exercise and enforce any rights or remedies available upon default to a secured party under the UCC, and, if notice to Borrower of the intended disposition of the Collateral or any other intended action is required by law, such notice shall be commercially reasonable if given at least ten (10) calendar days prior to the intended disposition or other action on account of such Event of Default; (ii) in the name of Borrower or otherwise, in respect of any or all of the Collateral, demand, collect, receive, compound, compromise, settle and give acquittances for, and prosecute or discontinue any suits or proceedings; (iii) place upon Borrower's books and records relating to the Collateral a notation or legend stating that such Collateral is subject to the Security Interest; (iv) apply for the appointment of a receiver for Borrower's business under applicable law (as a matter of right without notice, without giving bond and without regard to the solvency or insolvency of Borrower, waste of the Collateral or adequacy of the security of the Collateral); (v) occupy any location owned or leased by Borrower where the Collateral or any part thereof is located, without liability to Borrower, for a reasonable period of time for the purpose of effectuating its rights and remedies hereunder and under the UCC; and/or (vi) dispose of the Collateral, at the sole discretion of Lender.  If Lender disposes of any of the Collateral, the proceeds of such disposition may be applied to payment as set forth in Article 9 of the UCC or any successor statute, and Borrower specifically grants to Lender the right to apply such proceeds to payment of attorneys' fees and legal expenses incurred by Lender in collection of the Obligations and the protection and enforcement of Lender's rights and remedies. Whenever an Event of Default shall exist hereunder, Borrower agrees to make the Collateral available to the Lender at a location designed by Lender. Mere delay or failure to act will not preclude the exercise or enforcement of any of Lender's rights or remedies and shall not result in any liability to Lender.  Lender shall not be obligated to preserve any rights Borrower may have against prior parties or to realize on the Collateral at all or in any particular manner or order.

4.4.2    To the maximum extent permitted by applicable law, (i) Borrower hereby unconditionally waives, releases, relinquishes and forever discharges Lender from any and all claims, counterclaims, demands, causes of action, suits, liabilities, damages, losses, costs and expenses, whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect, arising out of or related to Lender's exercise of its rights hereunder, regardless of whether suit is commenced, and (ii) Borrower hereby further waives and releases any right of redemption with respect to the Collateral (both before and after any sale thereof) and any right of marshalling of the Collateral.  Notwithstanding anything to the contrary, Lender shall not be obligated to sell or otherwise dispose of any of the Collateral, regardless of whether notice of such sale or disposition has been given, and Lender shall have no obligation to maximize the potential sale price of the Collateral, including, without limitation, by cleaning or repairing the Collateral prior to any such sale.

4.4.3    Borrower shall remain liable for any deficiency after Lender's exercise of any of its remedies hereunder if the proceeds received by Lender are insufficient to fully satisfy the Obligations and collect such deficiency, including, without limitation, reasonable attorneys' fees and legal expenses incurred by Lender in the exercise of any right or remedy available to it under this Agreement or any other Loan Documents, whether or not suit is commenced.

5.    <u>Default and Remedies</u>.

Case: 15-50553    Doc# 12    Filed: 02/24/15    Entered: 02/24/15 16:16:20    Page 25 of 47

5.1     Default.  The occurrence of any of the following while Obligations remain outstanding hereunder shall be an event of default if not cured within fifteen (15) days of written notice from Lender ("**Event of Default**"): (i) Borrower fails to pay as required under the Promissory Note or fails to pay any fees or expenses payable to Lender under this Agreement; (ii) Borrower fails to perform any of the terms or conditions to be kept or performed by it under the Loan Documents or any covenant, representation or warranty under the Loan Documents is untrue, false or misleading; (iii) Borrower becomes insolvent or unable to pay its debts as they mature or makes an assignment for the benefit of creditors, or any proceedings are initiated by or against Borrower alleging that Borrower is insolvent or unable to pay its debts as they mature, or a petition is filed by or against Borrower under any of the provisions of the United States Bankruptcy Code; (iv) a third party brings an action or proceeding involving, affecting or bringing into question the title to, an interest in or a lien upon, the Collateral, except if such action, proceeding, lien or claim is being contested in good faith and by proper proceedings and for which Borrower shall have set aside adequate reserves; (v) a judgment, writ or warrant of attachment or execution, or similar process, shall be entered and become a lien or be issued or levied against all or substantially all of the Collateral; (vi) the occurrence of a Material Adverse Change (as hereinafter defined); (vii) the occurrence of a Change of Control (as hereinafter defined); (viii) Borrower defaults upon or fails to pay any of its other debts or obligations as the same mature or otherwise become due by acceleration or otherwise and which in the aggregate exceed the sum of Fifty Thousand and No/100 Dollars ($50,000.00); (ix) any of the Loan Documents ceases to be in full force and effect or is otherwise declared invalid or unenforceable by a court of competent jurisdiction, or Borrower claims that it has no liability under any of the Loan Documents; (x) a failure by Borrower to correct any material defect in the Collateral within sixty (60) days of receipt of written notice of the same from Lender; and (xi) Borrower's commission of any default specified elsewhere in this Agreement or in any other Loan Documents.  For the purposes of this Agreement, a "**Material Adverse Change**" means a material adverse change or material adverse effect on (A) the financial condition, operations, assets, business, properties or prospects of Borrower, (B) Borrower's ability to duly and punctually pay or perform its obligations under this Agreement or the other Loan Documents, (C) Lender's liens on the Collateral or the priority or perfection of any such liens, and/or (D) the enforceability of Lender's rights and remedies under this Agreement and the other Loan Documents; provided, however, that Material Adverse Change shall not include any material adverse change, effect, event, occurrence, state of facts or development relating to or resulting from the industry in which the Company operates generally, only to the extent such adverse change, effect, occurrence, state of fact or development does not affect the Company more adversely than comparable companies and does not continue for more than 30 days after Borrower receives Lender's notice of default hereunder.  For the purposes of this Agreement, a "**Change of Control**" shall mean a change in the direct or indirect ability (1) to vote more than fifty percent (50.0%) of the outstanding voting interests of Borrower, or (2) to direct or cause the direction of general management decisions of Borrower, including, without limitation, through a management agreement.

5.2     Remedies.  Upon and during the continuation of any Event of Default, Lender may, in addition to any other remedies it may have hereunder and under applicable law: (i) declare immediately due and payable the entire unpaid balance of the Promissory Note and all amounts payable under the Loan Documents, without demand or notice of any kind, which are expressly waived by Borrower; (ii) foreclose the Security Interest and realize upon any other security now or subsequently securing the Promissory Note; (iii) perform, in its discretion, but without obligation to do so, any covenants or agreements of Borrower in the Loan Documents, or any other document executed in connection with the Loan (the amounts so expended by Lender,

Case: 15-50553    Doc# 12    Filed: 02/24/15    Entered: 02/24/15 16:16:20    Page 26 of
47

together with interest thereon from the date of advancement at the rate provided in the Promissory Note, shall be payable by Borrower upon demand and the payment thereof may be considered an advance under the Promissory Note (at Lender's option) and shall be secured by this Agreement and the other security documents between Borrower and Lender (whether or not those amounts when added to previous advances exceed the original principal amount of the Loan)); (iv) commence an action to enforce specifically Borrower's performance of its obligations under the Loan Documents; (v) terminate this Agreement; and/or (vi) convert all or a portion of the Obligations into membership interest of Borrower pursuant to Section 10 of the Promissory Note (which conversion, for avoidance of doubt, will be in full satisfaction of those Obligations so converted).

      5.3   <u>Lender's Additional Rights upon an Event of Default</u>.  The rights and remedies of Lender are distinct and cumulative and any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any other right or remedy.  Borrower agrees to pay the actual costs and expenses, including, but not limited to, reasonable attorneys' fees and legal expenses incurred by Lender in the exercise of any right or remedy available to it under this Agreement or any other Loan Documents, whether or not suit is commenced, including, without limitation, reasonable attorneys' fees and legal expenses incurred in connection with any appeal of a lower court's order or judgment.  Effective upon an Event of Default and while such Event of Default is continuing, Borrower hereby grants to Lender, its contractors, agents, successors and assigns, a non-exclusive, fully paid up, royalty free, irrevocable license to use, sublicense, reproduce, create derivative works from, modify, publish, edit, translate, distribute, perform and display, including digitally or electronically, any trademark, service mark, copyright and other intellectual property or proprietary rights of Borrower in conjunction with Lender's exercise of any of its remedies under any of the Loan Documents, including, without limitation, the right to use any of Borrower's trade names.

      5.4   <u>Waivers</u>.  Borrower's obligations hereunder shall not be affected or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, without notice or approval by Borrower): (i) extension, renewal, modification or amendment of the Promissory Note, the other Loan Documents or the terms of any of Borrower's obligations; (ii) any waiver or indulgence granted to Borrower or any person or entity obligated under Borrower's obligations; (iii) any delay or lack of diligence in the enforcement of any of the Obligations; (iv) any failure to institute proceedings, file a claim or give any required notices; (v) any full or partial release of, settlement with or agreement not to sue Borrower or any other person or entity obligated under Borrower's obligations; (vi) any acceptance of additional security; (vii) any failure to obtain or realize upon any other collateral or to see to the proper perfection thereof or to establish the priority of the lien thereon; and/or (viii) resort to any other security agreements, guaranties, assignments or other collateral, and exhaustion of any one or more of such securities and collateral, either concurrently or independently, and in such order as Lender may determine

      6.   <u>Indemnification</u>.  Borrower agrees to indemnify, defend and hold Lender and Lender's heirs, personal representatives, agents, affiliates, contractors, successors and assigns harmless from and against any and all third-party losses, liabilities, suits, actions, obligations, fines, damages, judgments, penalties, claims, causes of action, charges, costs and expenses (including, but not limited to, reasonable attorneys' fees, disbursements and court costs prior to trial, at trial and on appeal) (collectively "**Costs**") which may be imposed on, incurred or paid by, or asserted against Lender by reason or on account of, or in connection with, (i) the Loan, (ii) any default or Event of Default, (iii) the Collateral and/or the transportation, installation, repair, use and maintenance of the Collateral, (iv) any tortious conduct of Borrower or its contractors, or any of their respective agents, contractors, subcontractors, servants,

Case: 15-50553   Doc# 12   Filed: 02/24/15   Entered: 02/24/15 16:16:20   Page 27 of 47

directors, officers, employees, licensees or invitees, (v) any liens, mortgages or other encumbrances concerning the Collateral (except for the Security Interest), or (vi) any accident, injury, death or damage to any person or property occurring in, on or about the Collateral or any street, drive, sidewalk, curb or passageway adjacent thereto; provided, the foregoing provisions of this Section 6 shall not apply to the extent such Costs arise out of the gross negligence or willful misconduct of Lender or Lender's contractors. Borrower's liability hereunder shall not be limited to the extent of insurance carried by or provided by Borrower or subject to any exclusion from coverage in any insurance policy. Borrower's obligations under this Section 6 shall survive the payment or conversion of the Promissory Note and/or the foreclosure of the Security Interest for any Costs that arise in whole or in part from acts or omissions which occurred prior to the payment or conversion of the Promissory Note or the foreclosure of the Security Interest.

7. <u>Power of Attorney</u>. Borrower hereby appoints Lender as Borrower's attorney-in-fact, with the power, at any time an Event of Default occurs hereunder, to do any of the following (but only in the event that Borrower is unable, or fails for two business days, for any reason whatsoever, to take such action following Lender's written request therefor): (i) endorse Borrower's name on any checks, notes acceptances, drafts or other forms of payment or security evidencing or relating to any collateral that is or comes into Lender's control or possession; (ii) notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by Lender; (iii) receive and open all mail addressed to Borrower; (iv) send requests for verification of assessments, accounts or collateral to the account debtors, owners of any property subject to assessment, or any other obligor upon any account, assessment or other right to payment; and (v) do all things necessary to carry out the terms of the Loan Documents. Borrower ratifies and approves all acts of the attorney-in-fact when taken within the scope of the authority granted hereunder. Neither Lender nor such attorney-in-fact will be liable for any acts, omissions, errors in judgment or mistakes of fact or law which do not constitute willful misconduct or gross negligence. Such power of attorney, being coupled with an interest, is irrevocable so long as any portion of the Loan or other amounts due under the Loan Documents remain unpaid. Borrower waives presentment and protest of all Loan Documents and notice thereof, notice of default and dishonor and all other notices to which Borrower may otherwise be entitled.

8. <u>Miscellaneous</u>.

8.1 <u>Entire Agreement; Amendment</u>. This Agreement and the Loan Documents constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to the subject matter hereof. There are no warranties, representations or agreements among the parties with respect to subject matter hereof, except as set forth or referred to herein or in the Loan Documents. This Agreement may not be modified, altered or amended except in a writing that is duly signed by the parties hereto.

8.2 <u>Notices</u>. All notices or other communications which are required or permitted hereunder shall be in writing and sufficient if (i) delivered personally, (ii) sent by nationally recognized overnight courier, or (iii) sent by certified mail, postage prepaid, return receipt requested, addressed as set forth by the parties' signatures to this Agreement, or to such other address as a party may specify by notice provided under this paragraph. Any such communication shall be deemed to have been given (a) when delivered if personally delivered, (b) on the business day after dispatch if sent by nationally recognized overnight courier, or (c) on the third day after dispatch, if sent by mail.

Borrower hereby agrees to provide Lender with written notice of any change of address of Borrower within fifteen (15) days of such change. Lender may change its notice address by

Case: 15-50553   Doc# 12   Filed: 02/24/15   Entered: 02/24/15 16:16:20   Page 28 of 47

providing Borrower notice of the change and the modified address. Borrower hereby represents and warrants to Lender that the address of Borrower as specified herein is true and correct and until Lender shall have actually received a written notice specifying any such change of address and specifically requesting that notices be issued to such changed address, Lender may rely on the address stated as being accurate.

8.3     Lender No Duty as to the Collateral. Subject to Section 3.4 of this Agreement, and excluding any obligations specifically undertaken by Lender or at Lender's request, Lender shall have no duty whatsoever to any claimant for labor performed or material furnished in connection with the Collateral or to apply an undisbursed portion of the Loan to the payment of any such claim, nor shall Lender be liable for the transportation, installation, repair or maintenance of the Collateral.

8.4     Governing Law; Dispute Resolution. This Agreement shall be governed by, construed and enforced according to the laws of the State of California, without regard to its conflict or choice of law principles. If a dispute arises out of or relates to this Agreement, or the breach thereof, the parties agree first to try in good faith to resolve the dispute by good faith discussions and negotiations for a period of at least fifteen (15) days, before resorting to arbitration. Thereafter, any unresolved controversy or claim arising out of or relating to this Agreement shall be resolved by binding arbitration before a single arbitrator chosen in accordance with, and with the arbitration administered pursuant to the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association. Judgment upon an award rendered by the arbitrator may be entered in any court having jurisdiction thereof pursuant to applicable law. The foregoing notwithstanding, the parties' agreement to engage in good faith negotiations and (if necessary) binding arbitration will not limit the right of either party to (a) seek judicial equitable relief, or other equitable relief available to it under applicable law, or (b) to exercise any other rights or remedies available to it under this Agreement with respect to the Collateral or the Security Interest provided herein.

8.5     Severability. Should any provision of this Agreement be held invalid or unenforceable, such invalidity will not invalidate the whole of this Agreement, but rather that invalid provision will be amended to achieve as nearly as possible the same economic effect as the original provision, or, if it cannot be so amended then it will be deemed omitted to the extent it was invalid or unenforceable, and the remainder of this Agreement will remain in full force and effect.

8.6     Waivers. No waiver of any provision of this Agreement nor consent to any departure by Borrower herefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

8.7     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.8     Headings. Section and subsection headings are not to be considered part of this Agreement. They are included solely for convenience and not intended to be full or accurate descriptions of the content hereof.

8.9     Assignment. Borrower may not assign this Agreement, or any of its rights or obligations hereunder, without the prior written consent of Lender and any attempted assignment

Case: 15-50553     Doc# 12     Filed: 02/24/15     Entered: 02/24/15 16:16:20     Page 29 of 47

without Lender's prior written consent shall be null and void. The terms of this Agreement shall be binding upon Borrower, and upon Borrower's successors and permitted assigns, and shall inure to the benefit of Lender and its successors and assigns.

8.10    Jury Waiver. LENDER AND BORROWER HEREBY VOLUNTARILY, KNOWINGLY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR CONCERNING THE INDEBTEDNESS EVIDENCED HEREBY AND/OR ANY COLLATERAL CONTEMPLATED HEREBY, REGARDLESS OF WHETHER SUCH ACTION OR PROCEEDING CONCERNS ANY CONTRACTUAL, TORTIOUS OR OTHER CLAIM. BORROWER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO LENDER IN EXTENDING CREDIT TO BORROWER, THAT LENDER WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS WAIVER, AND THAT BORROWER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

8.11    Acknowledgement. Lender understands and agrees that the Pre-Money Valuation reflects a good faith agreement between Lender and Borrower as to the Company's current valuation, that any election by Lender to convert the Promissory Note into a membership interest in Borrower may have tax consequences as a result in any change to Borrower's valuation and the resultant value of the membership interest received by Lender, and that Lender will be solely responsible for the payment of any taxes, fees, impositions, or other costs that may result from conversion of the Promissory Note into a membership interest in Borrower, whether such costs are incurred or otherwise charged at the time of conversion or at any time thereafter.


**IN WITNESS WHEREOF**, this Agreement has been duly signed and delivered by the undersigned effective as of the day and year first above written.


ANDREW L. FARIS                              AQH, LLC


_____        _____
                                         By:
                                         Its:


Address:                                 Address:

# Exhibit A

## Outstanding Obligations

**COLLATERAL**

**DEBTOR**:               AQH, LLC, a California limited liability company

**SECURED PARTY**:      Andrew L. Faris, an individual

All Inventory, Chattel paper, Accounts, Goods, Equipment, General intangibles, Deposit accounts, Contracts and Contract Rights, Licenses, Software License Agreements, Documents, Instruments, Investment property, Letter of credit rights, Letters of credit, money, and oil, gas or other minerals before extraction, Debtor's rights as lessor or lessee under any Lease or Sublease of property and tax refunds and rebates, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located.

The collateral also includes (i) any and all assets acquired with the proceeds of the loan given by Secured Party to Debtor for such purpose, and (ii) all of the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

       (a)      All works in progress, Accessions, attachments, accessories, replacements of and additions to any of the collateral described herein.

       (b)      All products and produce of any of the collateral described herein.

       (c)      All Accounts, General intangibles, Payment intangibles, Instruments, rents, monies, payment and all other rights, arising out of a sale, lease, consignment or other disposition of any of the collateral described herein.

       (d)      All Proceeds (including insurance, warranty and indemnity proceeds) from the sale, transfer, destruction, loss or other disposition of any of the collateral described herein, and sums due from a third party who has damaged or destroyed any of the collateral described herein or from that party's insurer, whether due to judgment, settlement or other process.

       (e)      All Records and data relating to any of the collateral described herein, whether in the form of a writing, photograph, microfilm, microfiche or electronic media, together with all right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electric media.

Terms not otherwise defined herein shall have their respective meanings set forth in the UCC. The "**UCC**" as used herein, shall mean the Uniform Commercial Code enacted in the State of California, as amended from time to time.

**EXHIBIT C**

**INSURANCE POLICIES**

**EXHIBIT D**

**PROMISSORY NOTE**

# EXHIBIT C



**HELLMUTH & JOHNSON** PLLC

**ATTORNEYS AT LAW**

WRITER'S DIRECT DIAL NO.: (952) 746-2175
E-MAIL: TMOORE@HJLAWFIRM.COM

January 28, 2015

Anthony Brough
AQUIFER LLC
440 N. Wolfe Road
Sunnyvale, CA 94085

Re:     Andy Faris – Aquifer LLC
        Our File No.: 22873.0001

Dear Mr. Brough:

This law firm represents Andrew Faris with respect to certain matters.  The purpose of this letter is to supply you written notice of default pursuant to Section 5.1 of the Security and Loan Agreement ("Loan Documents") entered into between Aquifer LLC and Mr. Faris dated November 20, 2014.

Under Section 5.1, any failure to pay any of its debts or obligations totaling in excess of $50,000 constitutes a default on the Loan Documents.  We received word on Tuesday, January 27, 2015 that you are in default on an obligation to Mr. Henry Cornelius in excess of $50,000.  Your default on that obligation constitutes a default under Section 5.1 of the Loan Documents.  Accordingly, the Loan has been accelerated and the entire outstanding balance of $320,000 is due and payable immediately.  Please contact me within five (5) days from the date of this letter.

To be clear, we are reserving all potential remedies under the Loan Documents.

                                    Very truly yours,

                                    HELLMUTH & JOHNSON, PLLC

                                    Terrance W. Moore
                                    Attorney at Law

TWM/kjs

cc:     Andy Faris

22873.0001 -- 2089489_1

8050 West 78th Street, Edina, MN 55439  •  T 952-941-4005  •  F 952-941-2337  •  www.hjlawfirm.com

# EXHIBIT D



# Sales Proposal 134

# Emergent Systems Exchange

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Date** 11/13/2014 | **Terms** WIRE TRANSFER | **Valid for** 30 days | **SO** 0 |

| Customer | Ship From | Ship To |
|---|---|---|
| AQH, LLC | Emergent Systems Exchange | AQH, LLC |
| DBA- Aquifer, LLC | 7160 Shady Oak Road | DBA- Aquifer, LLC |
| 440 N Wolfe Road | | 440 N Wolfe Road |
| Unit 243 | | Unit 243 |
| Sunnyvale, CA 94085 | Eden Prairie, MN 55344 | Sunnyvale, CA 94085 |
| UNITED STATES | UNITED STATES | UNITED STATES |
| Attn: Anthony Brough | Phone: 952-943-0900 | Attn: Anthony Brough |
| Phone: 415.630.2285 | | Phone: 415.630.2285 |

| Item | CLEI | Mfgr | Decription | Qty | List Price | Disc % | Unit Price | Extended |
|---|---|---|---|---|---|---|---|---|
| Lot of Equipment | | ? | Equipment Unsure of MFG Needing Audit Upon Receipt | 1 | 0.00 | 0.00 | 1,200,000.00 | 1,200,000.00 |
| | | | TerraMiner IV 1.6* TH/s Bitcoin Miners Qty 990 | | | | | |
| | | | TerraMiner IV 2.0* TH/s Bitcoin Miners Qty 1400 | | | | | |
| | | | TerraMiner IV 1.6* TH/s Bitcoin Miners Qty 40 | | | | | |
| | | | Modular Power Supply, PFE1100-12-054NA  Qty 100 | | | | | |
| | | | Liquid Cooling Assembly, COOLIT 820-00556  Qty 100 | | | | | |
| | | | Fan, Delta AFB1212SHE-DX62  Qty 250 | | | | | |

| | |
|---|---|
| **Your Price** | **$ 1,200,000.00** |

**All Currency Totals are in US Dollar**

**Comments to Customer**

Payment Schedule:
Down Payment $0
Day 30 - 15% $180,000.00
Day 60 - 20% $240,000.00
Day 90 - 20%  $240,000.00 or $40,000.00 depending on Equity option
Day 120 - 45% $540,000.00

Terms:
Payment via Bank ACH
Late Terms: 1.5% per month on unpaid payments
Equity Options up to 91 days invest up to $200K based on a current company valuation of $2.2Million — *On exercise, purchase price reduced by amount of investment.*
Execute Certificate of Authority
Execute Land Lord Statement (stating equipment purchased by ESX, is our equipment until final payment)

**Quote**

Case: 15-50553    Doc# 12    Filed: 02/24/15    Entered: 02/24/15 16:16:20    Page 38 of 47

Full Name   Anthony Brough   Signature

You may use this form as a purchase order. Initial the items you want to purchase, enter Purchase Order (if any), sign, then mail, email or fax back to us

PO   _____

# EXHIBIT E



**EMERGENT SYSTEMS EXCHANGE**
TECHNOLOGY SOLUTIONS

## LANDLORDS
## CONSENT AND WAIVER

For good valuable consideration, receipt of which is hereby acknowledged,

*Emergent Systems Exchange*
Name of Landlord of Aquifer, LLC/AQL, LLC
AQH

Hereinafter referred to as "Landlord", being the landlord of the premises and leasehold Known as

*Aquifer Modesto Data Center*
Equipment Location

Hereinafter called the "Premises", held and occupied by

AQH
**Aquifer, LLC/AQL, LLC**
Name of Buyer/Lessee

hereinafter referred to as "Buyer/Lessee", having leased or purchased or intending to lease or purchase from **Emergent Systems Exchange, LLC, hereinafter referred to as ESX**, the following equipment, hereinafter called the "Equipment", described or to be described in a certain Conditional Sale Contract/Security Agreement/Lease, hereinafter referred to as the "Agreement", effective November 13, 2014, between **ESX** and Buyer/Lessee, which is incorporated herein by reference:

**DESCRIPTION OF EQUIPMENT:**

Does hereby agree that:

    1. The Equipment may be installed at the affixed to the Premises and that the Equipment shall remain personal property notwithstanding the manner in which it is affixed to Premises and that title thereof shall remain in **ESX**, its legal representatives, successors, agents, or assigns, or in the Buyer/Lessee, as the case may be.

    2. This agreement shall also apply to any part of the Equipment which is already on the Premises, or may hereafter be delivered or installed thereon, and which is or may thereafter become subject to the Agreement.

    3. Landlord waives each and every right which Landlord now has or may hereafter have under the laws of the State where the Equipment is located or any other state by the terms of any lease now in effect or hereafter executed by Landlord or Buyer/Lessee to levy or detain upon for rent, in arrears, in advance or both, or to claim or assert title to the Equipment leased, sold, or held as security by **ESX**.

    4. Landlord recognizes and acknowledges that any claim or claims that **ESX** has or may hereafter have against the Equipment or any part thereof by virtue of the Agreement is superior to any lien or claim of any nature which Landlord now has or may hereafter have to the Equipment or any part thereof by statute or otherwise.

    5. **ESX** its agents or assigns, may remove the Equipment from the Premises whenever **ESX** feels it is necessary to do so to protect its interest and without liability or accountability to Landlord therefore, and Landlord further agrees that it will grant and does hereby grant **ESX** the Right of Entry at any reasonable time to remove the Equipment from the Premises.

    6. Landlord further agrees that it will not in any way impair, invalidate, or violate the within CONSENT AND WAIVER or its effect and  **ESX's** rights hereunder by act of commission or omission; that the within CONSENT AND WAIVER is not and will not be in violation or contravention of any other agreement, lease, or mortgage now or hereafter existing covering the Premises and not notice to, or consent of, any other person is required in order for Landlord to execute and deliver this CONSENT AND WAIVER.

Case: 15-50553   Doc# 12   Filed: 02/24/15   Entered: 02/24/15 16:16:20   Page 41 of 47

7. **ESX** may, without affecting the validity of this agreement, extend the items or payment of any indebtedness of Buyer/Lessee to **ESX** or alter the performance of any of the terms and conditions of the Agreement, without the consent of Landlord and without giving notice thereof to Landlord.

8. This agreement shall inure to the benefit of the successor sand assigns of **ESX** and shall be binding upon the heirs, personal representatives, successors, and assigns of Landlord.

IN WITNESS WHEREOF, landlord has executed this agreement on  _11/17/14_

By: _Anthony Brough_

Title _CFO +COO_

Date: _11/17/14_

Witness: _PP Mishy_

By _P.P. Mistry_

Title _Notary_

Phone: _510-438-9474_

Email: _strelb4o@theupsstore.com_

---



EMERGENT SYSTEMS EXCHANGE
TECHNOLOGY SOLUTIONS

## CERTIFICATE OF AUTHORITY

I, _Anthony Brough_, do hereby certify that I am a corporate officer
of _AQH, LLC_, a _California LLC_ and am duly authorized as such to
execute guaranty(s), loans of personal property, equipment, fixtures and leasehold improvements and all
documents and contracts relating thereto on behalf of said Company.

Signed and certified this day, _Nov. 17, 2014_.

X: _[signature]_

Printed Name: _Anthony Brough_

Title: _CFO & COO_

# EXHIBIT F

# AQH LLC
## Profit and Loss
### January 1, 2014 - February 19, 2015

| | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Aug 2014 | Sep 2014 | Oct 2014 | Nov 2014 | Dec 2014 | Jan 2015 | Feb 1-19, 2015 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | | |
| Sales | | 0.00 | | 244.93 | 96,358.56 | 202,900.58 | 225,420.78 | 170,045.33 | 173,427.96 | 138,372.28 | 96,875.65 | 142,446.05 | 139,050.26 | 77,382.56 | 1,462,524.94 |
| Uncategorized Income | | 5.81 | 17.39 | 2.96 | 0.15 | 0.10 | 0.11 | 0.07 | | | | | | | 26.59 |
| | | | | | | | | | | | | | | | |
| **Total Income** | $ 0.00 | $ 5.81 | $ 17.39 | $ 247.89 | $ 96,358.71 | $ 202,900.68 | $ 225,420.89 | $ 170,045.40 | $ 173,427.96 | $ 138,372.28 | $ 96,875.65 | $ 142,446.05 | $ 139,050.26 | $ 77,382.56 | $ 1,462,551.53 |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | |
| Electricity | | | | | | | 27,735.16 | 32,537.40 | 58,097.52 | 56,619.26 | | 110,631.36 | | | 285,620.70 |
| **Total Cost of Goods Sold** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 27,735.16 | $ 32,537.40 | $ 58,097.52 | $ 56,619.26 | $ 0.00 | $ 110,631.36 | $ 0.00 | $ 0.00 | $ 285,620.70 |
| | | | | | | | | | | | | | | | |
| **Gross Profit** | $ 0.00 | $ 5.81 | $ 17.39 | $ 247.89 | $ 96,358.71 | $ 202,900.68 | $ 197,685.73 | $ 137,508.00 | $ 115,330.44 | $ 81,753.02 | $ 96,875.65 | $ 31,814.69 | $ 139,050.26 | $ 77,382.56 | $ 1,176,930.83 |
| **Expenses** | | | | | | | | | | | | | | | |
| Advertising | | | | | | | | | | | | | 59.00 | 10.00 | 69.00 |
| Bank Charges | 30.00 | 29.87 | 131.72 | 256.40 | 121.95 | 38.99 | 65.00 | 14.00 | 0.00 | 51.50 | 91.50 | 186.50 | 35.00 | 82.00 | 1,134.43 |
| Insurance | | 500.00 | | | | 2,336.00 | | | | | | | | 4,190.00 | 7,026.00 |
| Interest Expense | | | | | | | | | | | | | 5,000.00 | | 5,000.00 |
| Job Materials | | | | 4,000.00 | 4,000.00 | 2,000.00 | 6,000.00 | 3,225.28 | | | | | | | 19,225.28 |
| Legal & Professional Fees | | | 3,361.87 | | | 2,000.00 | 5,050.00 | 4,000.00 | 1,400.00 | 928.71 | 39.95 | 79.80 | 56.51 | 58,194.08 | 75,110.92 |
| Meals and Entertainment | | | 74.25 | 664.06 | 376.15 | 427.56 | 492.51 | 506.24 | 79.11 | 685.64 | 893.17 | 1,965.89 | 745.54 | 77.28 | 6,987.40 |
| Office Expenses | | 55.85 | 160.32 | 286.93 | 314.96 | 644.50 | 845.06 | 523.42 | 206.92 | 267.58 | 229.22 | 317.40 | 543.36 | 652.26 | 5,047.78 |
| Other General and Admin Expenses | | | 0.00 | 530.21 | 894.88 | 507.76 | 1,003.60 | 77.74 | 460.00 | 1,021.88 | | 1,127.15 | 590.50 | 1,286.60 | 7,500.32 |
| Other Utilities | | | | 280.84 | 429.84 | 386.86 | 386.86 | 386.86 | 658.56 | 749.12 | 1,672.34 | 633.20 | 452.04 | 685.03 | 6,721.55 |
| **Payroll Expenses** | | | | | | | | | | | | -0.40 | | | -0.40 |
| Taxes | | | | | | | | | | 287.00 | | 1,571.08 | 287.00 | | 2,145.08 |
| Wages | | | | | | | | | | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 6,000.00 | 54,000.00 |
| **Total Payroll Expenses** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 12,287.00 | $ 12,000.00 | $ 13,570.68 | $ 12,287.00 | $ 6,000.00 | $ 56,144.68 |
| Promotional | | | | | | | | | | | 739.30 | 215.00 | | | 954.30 |
| Rent or Lease | | | 13,800.00 | 1,500.00 | 1,400.00 | 2,866.00 | 2,714.00 | 8,267.19 | 16,666.53 | 16,666.53 | 16,666.53 | 33,013.54 | 16,379.63 | 23,862.13 | 153,802.08 |
| Repair & Maintenance | | | | 1,609.00 | 5,145.00 | 4,860.00 | 6,825.00 | 4,987.59 | 6,633.75 | 5,062.50 | 6,174.62 | 8,060.99 | 2,632.50 | 51,990.95 | |
| Salaries and wages | | | | 5,000.00 | 4,000.00 | 9,000.00 | 10,000.00 | 9,500.00 | 4,700.00 | 12,930.00 | 16,002.95 | 11,406.00 | 16,634.12 | 11,452.20 | 110,625.27 |
| Security | | | | | | | 4,500.00 | 6,000.00 | 6,000.00 | 6,000.00 | 4,000.00 | 4,000.00 | 2,000.00 | 4,000.00 | 36,500.00 |
| Shipping and delivery expense | | | | | | | | | | | | 24.25 | | 77.16 | 101.41 |
| Taxes & Licenses | | | | | | | | | | | | | 1,330.42 | 1,306.46 | 2,636.88 |
| Taxes Paid | | | | | | | | 800.00 | | | | | | | 800.00 |
| Travel | | | 1,262.22 | 3,929.47 | 3,233.05 | 5,214.17 | 316.79 | 209.37 | 244.90 | 2,769.06 | 2,026.58 | 5,001.90 | 1,077.20 | 239.15 | 25,523.86 |
| Unapplied Cash Bill Payment Expense | | | | | | | | | 91.87 | | | | | | 91.87 |
| Uncategorized Expense | | 930.00 | | | | | | | | | 906.50 | | | | 1,836.50 |
| **Total Expenses** | $ 30.00 | $ 1,515.72 | $ 18,790.38 | $ 16,447.91 | $ 16,379.83 | $ 30,566.84 | $ 36,233.82 | $ 40,335.10 | $ 35,495.48 | $ 61,897.27 | $ 58,708.99 | $ 78,215.98 | $ 65,466.31 | $ 114,746.85 | 574,830.48 |
| **Net Operating Income** | -$ 30.00 | -$ 1,509.91 | -$ 18,772.99 | -$ 16,200.02 | $ 79,978.88 | $ 172,333.84 | $ 161,451.91 | $ 97,172.90 | $ 79,834.96 | $ 19,855.75 | $ 38,166.66 | -$ 46,401.29 | $ 73,583.95 | -$ 37,364.29 | $ 602,100.35 |
| **Other Expenses** | | | | | | | | | | | | | | | |
| Depreciation | | | | | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | | | 300,000.00 |
| Miscellaneous | | | | | 103.00 | 101.26 | 1,100.00 | 1,000.00 | | 103.00 | | -7.50 | 300.00 | | 2,699.76 |
| R&D | | 22,700.00 | 169,398.98 | 13,711.90 | -872.78 | 4,400.00 | 7,599.88 | | 11,990.96 | 925.44 | 1,800.00 | -311.08 | 900.00 | 1,800.00 | 234,043.30 |
| Reconciliation Discrepancies | | | | | | | | | | | | -6,200.00 | | | -6,200.00 |
| **Total Other Expenses** | $ 0.00 | $ 22,700.00 | $ 169,398.98 | $ 13,711.90 | $ 36,730.22 | $ 42,001.26 | $ 46,199.88 | $ 38,500.00 | $ 49,490.96 | $ 38,528.44 | $ 39,300.00 | $ 37,181.42 | $ 5,000.00 | $ 1,800.00 | $ 530,543.06 |
| **Net Other Income** | $ 0.00 | -$ 22,700.00 | -$ 169,398.98 | -$ 13,711.90 | -$ 36,730.22 | -$ 42,001.26 | -$ 46,199.88 | -$ 38,500.00 | -$ 49,490.96 | -$ 38,528.44 | -$ 39,300.00 | -$ 37,181.42 | $ 5,000.00 | -$ 1,800.00 | -$ 530,543.06 |
| **Net Income** | -$ 30.00 | -$ 24,209.91 | -$ 188,171.97 | -$ 29,911.92 | $ 43,248.66 | $ 130,332.58 | $ 115,252.03 | $ 58,672.90 | $ 30,344.00 | -$ 18,672.69 | -$ 1,133.34 | -$ 83,582.71 | $ 78,583.95 | -$ 39,164.29 | $ 71,557.29 |

Monday, Feb 23, 2015 06:15:33 PM PST GMT-8 - Cash Basis

# AQH LLC
# Balance Sheet
### As of February 19, 2015

|  | TOTAL |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Bank Accounts** | |
| Checking - Core (ending in 8489) | 10,633.44 |
| External Savings | 0.00 |
| Operating (x4700) | 32,829.89 |
| Operating Overdraft | 1,082.31 |
| Savings - Core | 2,593.55 |
| **Total Bank Accounts** | **$ 47,139.19** |
| **Other current assets** | |
| Investments - Other | 12,744.00 |
| **Total Other current assets** | **$ 12,744.00** |
| **Total Current Assets** | **$ 59,883.19** |
| **Fixed Assets** | |
| Leasehold Improvements | 27,534.50 |
| **Machinery & Equipment** | |
| Avalon Systems - Hardware | |
| Depreciation | -300,000.00 |
| Original Cost | 300,000.00 |
| **Total Avalon Systems - Hardware** | **$ 0.00** |
| Avalon Systems - Infrastructure | 451,639.67 |
| BF Systems - Infrastructure | 330,952.94 |
| Phase 1 Expansion - Hardware | 1,136,924.75 |
| Phase 1 Expansion - Infrastructure | 400,428.05 |
| **Total Machinery & Equipment** | **$ 2,347,479.91** |
| Network | 11,420.48 |
| **Total Fixed Assets** | **$ 2,386,434.89** |
| **TOTAL ASSETS** | **$ 2,446,318.08** |
| **LIABILITIES AND EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| **Payroll Liabilities** | |
| CA PIT / SDI | 1,927.55 |
| CA SUI / ETT | 490.00 |
| Federal Taxes (941/944) | 643.23 |
| Federal Unemployment (940) | 84.00 |
| **Total Payroll Liabilities** | **$ 3,144.78** |
| Short Term Debt | 1,424,245.39 |
| **Total Other Current Liabilities** | **$ 1,427,390.17** |
| **Total Current Liabilities** | **$ 1,427,390.17** |
| **Long-Term Liabilities** | |
| Long Term Debt | 418,910.00 |

| | | |
|---|---|---|
| **Total Long-Term Liabilities** | $ | 418,910.00 |
| **Total Liabilities** | $ | 1,846,300.17 |
| **Equity** | | |
| **Net Equity** | | 600,017.91 |
| **Total Equity** | $ | 600,017.91 |
| | | |
| **TOTAL LIABILITIES AND EQUITY** | $ | 2,446,318.08 |