MACDONALD | FERNANDEZ LLP
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
ROXANNE BAHADURJI (SBN 290117)
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Debtor-in-Possession,
AQH, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>AQH, LLC,<br><br>          Debtor. | Case No. 15-50553-11-ASW<br><br>Chapter 11<br><br>MOTION FOR ORDER COMPELLING RIVERBANK LOCAL REDEVELOPMENT AGENCY TO PROVIDE ELECTRICITY UPON PAYMENT OF ADEQUATE ASSURANCE DEPOSIT<br><br>(11 U.S.C. § 366)<br><br>Date:  TBD<br>Time:  TBD<br>Place:  280 South First Street, Room 3020<br>         San Jose, California<br><br>Honorable Arthur S. Weissbrodt |

      COMES NOW AQH, LLC, Debtor-in-Possession herein, moving for interim and final orders compelling the Debtor's utility provider, namely the Riverbank Local Redevelopment Agency (the "Riverbank LRA") to provide electricity upon payment of a deposit equal to one-month's anticipated electricity expenses as adequate assurance pursuant to Bankruptcy Code Sections 366 and 105(a), and respectfully represents:

**I. <u>INTRODUCTION</u>**

    1.    The Debtor is a Bitcoin transaction processor. The within case was precipitated by a short-term cash flow shortage caused by delays in obtaining the Riverbank LRA's approval to

1

supply power to the Debtor's recently-expanded facilities located at 5300 Claus Road, Buildings 5, 21 and 50, in Modesto, California. The Debtor's original two facilities have power, but the Riverbank LRA refuses to allow the final safety inspection and supply power to the expanded facilities. As discussed below, the Riverbank LRA unilaterally imposed a safety-inspection requirement that was not required for the first two buildouts and is not provided for in the lease agreement.

2. Additional background information regarding the Debtor's business is provided in the Motion for Authority to Use Cash Collateral (Docket No. 10) and the Declaration of Chris Cunningham in Support of Motion for Authority to Use Cash Collateral and Motion for Authority to Pay Pre-Petition Wages and Taxes (Docket No. 12), including the cash collateral budget attached thereto, and reference is made thereto for further particulars.

## II. FACTS

3. The within case was commenced by filing a voluntary chapter 11 petition on February 19, 2015. A trustee has not been appointed and the Debtor is in possession of the estate.

4. The Riverbank LRA is the lessor of the facilities described above. The Riverbank LRA also serves as a utility and provides the Debtor with electricity via its on-side power substation. The Debtor estimates that it owes the Riverbank LRA approximately $90,000 in arrears for electricity as of February 20, 2015.[1]

*Prior Electrical Hookups Without Inspection*

5. The facilities are a former United States Army ammunitions plant. The facilities continue to be owned by the Army but are "in the process of being disposed to Landlord…." (See Section 38.2 of the Lease Agreement attached as Exhibit "A" to the Declaration of Chris Cunningham, filed herewith). The Debtor understands that Army's ownership of the property exempts it from statutes that would otherwise require permits and a safety inspection prior to

---

[1] Note that this figure has been refined since the Debtor filed its cash collateral motion, and this figure remains subject to dispute.

supplying power to the units within the buildings there.[2] In fact, the Riverbank LRA supplied power to the Debtor's first two facilities with only Army approval. Specifically, the Army is notified of a proposed change to the facilities and has ten days to conduct an internal review and respond; if there is no response, the change is deemed approved. This streamlined process was a major factor in the Debtor's decision to locate its data center at the facilities.

6. In light of the foregoing, the Debtor contends that a safety inspection is not necessary, but this Motion requests that the Riverbank LRA be ordered to permit the inspection to proceed in an abundance of caution. However, it is important to emphasize the fact that an inspection is not necessary as the Debtor is concerned that the Riverbank LRA will interfere with the inspection in order to create an excuse to avoid supplying power. Accordingly, although the Debtor requests only to preserve the *status quo* on an emergency basis and have power connected in due course, the Debtor reserves the right to request the Court to order the Riverbank LRA to provide electricity without an inspection at the final hearing hereon.

### *Unilateral Inspection Requirement and Interference*

7. With respect to the third phase of the facilities, the Riverbank LRA unilaterally required permits and a safety inspection, and the Debtor complied. This unanticipated requirement

///
///
///
///
///
///
///
///

---

[2] The fourth hanging paragraph of Section 1.16 of the Lease Agreement provides that the lease is subject only to "required permitting" and contemplates that the eventual "transfer of the property containing premises from Army ownership to City ownership will change the permitting requirements", which transfer has not taken place. The Debtor believes that the transfer of ownership will not occur for at least the next five years.

subjected the Debtor to more than $100,000 in expenses for engineering and documentation, as follows:

| Item | Approximate Cost |
| --- | --- |
| Structural Engineering | $30,000 |
| Electrical Engineering | $20,000 |
| Architectural Drawing | $20,000 |
| Modification to Electrical Infrastructure | $35,000 |
| Total: | $105,000 |

The resulting unanticipated delays kept the Debtor's new facilities offline and unable to generate revenue. Accordingly, the Debtor experienced a cash-flow shortage in light of the aforesaid extra costs as well as the fact that that the Debtor's other expansion costs had been incurred and paid while the expected income was delayed. Said extra costs and delays precipitated the commencement of the within case.

8.      Power to the Debtor's expanded facilities was set to be activated upon completion of the final safety inspection by Interwest Consulting Group during the week of February 23, 2015. However, on February 24, 2015, the Debtor learned that the Riverbank LRA contacted Interwest and cancelled the inspection. On February 25, 2015, the Riverbank LRA demanded payment of its pre-petition claim in full as a condition to providing electricity to the expanded facilities, notwithstanding the Debtor's offer to pay a security deposit.

***Security Deposit***

9.      The Debtor proposes to pay the Riverbank LRA a cash deposit as adequate assurance equal to one month's projected electricity costs ($127,080) to be held for the benefit of the Debtor and applied only upon default. Moreover, the Debtor intends to timely pay all post-petition rent and utility obligations to Riverbank LRA, and the Debtor has provided for such payments in its cash collateral budget. The Debtor has sufficient cash flow to meet its post-petition obligations, including electricity and other utility costs as they come due.

10.     Electricity is essential to the Debtors' operations and to preserving value of the

4

business. Every week that the expanded facilities are offline costs the Debtor approximately $35,000 in gross revenue. In order to accomplish an effective reorganization, the Debtor must receive electricity in due course.

### III. ARGUMENT

#### A.  THE RIVERBANK LRA IS REQUIRED TO CONNECT THE DEBTOR'S POWER UPON PAYMENT OF THE PROPOSED SECURITY DEPOSIT

11.  The Riverbank LRA may not refuse to provide electricity so long as the Debtor provides adequate assurance of payment. Pursuant to Bankruptcy Code Section 366(a), a utility provider may not alter, refuse, or discontinue service, or discriminate against, a debtor solely on the basis of the commencement of a bankruptcy case or that a pre-petition debt is unpaid. However, a utility may require "adequate assurance" of payment. 11 U.S.C. § 366(b). The purpose of Section 366 is to protect a debtor from utility service interruption while providing the utility with adequate assurance of payment for post-petition utilities. See H.R. Rep. No. 95-595, at 250 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6306. Section 366(c)(1)(A) provides a non-exclusive list of acceptable forms of "assurance of payment," including a cash deposit. By denying power to the Debtor in the face of the Debtor's offer to pay a security deposit, the Riverbank LRA is in violation of Section 366.

12.  The Riverbank LRA is the Debtor's electricity utility. Specifically, the Riverbank LRA provides electricity via its on-site power substations and its own complex-wide electrical grid, and the Riverbank LRA exercises control over whether the Debtor receives power by either connecting or disconnecting power cables running to the Debtor's facilities.[3] Any entity, including a landlord, that provides utility services is subject to Section 366. For example, in *In re Good Time*

---

[3] Although there is boilerplate language in the Lease Agreement stating that the landlord will not "provide" utilities, this apparently means that the landlord will not pay for and provide utilities free of charge (Lease Agreement, Section 10.1). In fact, more specific language in the fifth hanging paragraph of Section 1.16 of the Lease Agreement provides that: "Landlord can supply approximately 3,600 amps [the Debtor is currently using approximately ½ of this amount] of power through the newest substation..." and anticipated tenant improvements include "upgrades to the main substation on site." The sixth hanging paragraph provides that: "If upgrades are made to the main substation that provides service to the site, as a whole, maintenance of these upgrades shall be the responsibility of Landlord."

5

*Charlie's Ltd.*, 25 B.R. 226, 227 (E.D. Penn. 1982), the court held that a shopping mall that supplied electricity to its restaurant tenant, the debtor, was a utility within the meaning of Section 366 and therefore was prohibited from discontinuing debtor's electric service. *Id.* at 227-228. The court also rejected the landlord's argument that the power was disconnected and inactive as of the petition date, holding that "a pre-petition interference with utility services also comes within the ambit of § 366." *Id.* Accordingly, the landlord was enjoined from refusing to supply electricity to the debtor. *Id.* at 288. Likewise, the Riverbank LRA may not interfere with the final safety inspection and refuse to connect the Debtor's power.

13. A deposit equal to one-month's electricity costs is adequate. Adequate assurance of payment should not be such a financial burden upon a debtor as to thwart or deter the rehabilitation of the debtor. *In re Marion Steel*, 35 B.R. 188, 199 (Bankr. D. Ohio 1983). In determining adequate assurance, the debtor need not provide a utility the equivalent of a guaranty; the utility is entitled to protection only against an unreasonable risk of non-payment for post-petition services. *In re Santa Clara Circuits W., Inc.*, 27 B.R. 680, 685 (Bankr. D. Utah 1982); *In re Steinebach*, 303 B.R. 634, 641 (Bankr. D.Az. 2004) ("Adequate assurance of payment is not, however, absolute assurance…all § 366(b) requires is that a utility be protected from an unreasonable risk of non-payment."). The court should ensure that the utility is treating the debtor the same as it would treat a similarly-situated non-bankruptcy customer. *In re Whitaker*, 84 B.R. 934, 937 (Bankr. E.D. Pa. 1998), *aff'd* 882 F.2d 791 (3rd Cir. 1989). The proposed security deposit is an order of magnitude greater than the security deposit required under Section 1.13 of the Lease Agreement ($13,800). Accordingly, the proposed security deposit provided adequate assurance.

    **B.**    **THE RIVERBANK LRA SHOULD BE ENJOINED FROM REFUSING TO PROVIDE ELECTRICITY TO THE DEBTOR**

14. As discussed above, the Riverbank LRA refused to connect the Debtor's power in the face of the Debtor's proposed security deposit. The Riverbank LRA is in violation of Section 366 and should be enjoined from refusing to provide electricity.

15. A temporary restraining order is available when the applicant may suffer irreparable injury before the court can hear the application for a preliminary injunction. See Fed.R.Civ.P. 65(b);

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2951 (3d.1998). Requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction. *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 fn 2 (1977); *Los Angeles Unified Sch. Dist. v. United States Dist. Court*, 650 F.2d 1004, 1008 (9th Cir. 1981). In issuing a preliminary injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 17 (2008) (citation and quotation omitted). Specifically, a plaintiff who seeks a preliminary injunction must show: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The movant must show that "the balance of equities tips in his favor" (*Id.*), but if the movant shows that there are "serious questions going to the merits" (which is a lesser showing than likelihood of success on the merits), then a preliminary injunction may issue if the "balance of hardships tips sharply in the plaintiff's favor," and the other two *Winter* factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.2011) (emphasis added).

16. As discussed above, the Riverbank LRA is in violation of Section 366, and the Debtor is likely to prevail on the merits. Moreover, the Debtor is likely to suffer irreparable harm in the form of approximately $35,000 per week in lost income while the power remains disconnected. By contrast, the Riverbank LRA will be protected by a security deposit, and the balance of equities tips in the Debtor's favor. Finally, it is in the public interest that the Debtor's facilities continue to operate, thereby avoiding job loss, waste, vacancy and dilapidation. Accordingly, the Riverbank LRA should be temporarily and then permanently enjoined to permit the final safety inspection to be completed in a fair and timely manner and to connect the Debtor's power upon payment of the security deposit.

## IV. **PRAYER FOR RELIEF**

WHEREFORE, the Debtor prays for entry of interim and final orders (in the form of a temporary restraining order pending the final hearing and then a permanent injunction):

1. Enjoining the Riverbank LRA from refusing to provide electricity to the Debtor upon payment of the aforesaid security deposit;

2. Affirmatively enjoining the Riverbank LRA to schedule and permit any required safety inspection to be completed within a reasonable time but no more than seven (7) calendar days after payment of said deposit;

3. Enjoining the Riverbank LRA from interfering with the conduct and completion of said inspection;

4. Affirmatively enjoining the Riverbank LRA to connect the Debtor's power within the earlier of: (a) one business day after completion of the aforesaid inspection, if required; or (b) within a reasonable time but no more than ten (10) calendar days after payment of said deposit;

5. Providing that the aforesaid deposit may be applied upon default ten (10) calendar days after receipt of written notice of default if the default is not cured; and

6. For such further relief as is appropriate in the premises.

DATED: February 27, 2015   MACDONALD | FERNANDEZ LLP

By: /s/ Reno F.R. Fernandez III
    Reno F.R. Fernandez III
    Attorneys for Debtor-in-Possession,
    AQH, LLC

8

## CERTIFICATION

The undersigned Certifying Professional has read the accompanying motion or stipulation, including the Introductory Statement; to the best of my knowledge, information and belief, formed after reasonably inquiry, the terms of the relief sought in the motion or stipulation are in conformity with the Court's Guidelines for Cash Collateral and Financing Motions and Stipulations except as set forth above. I understand and have advised the debtor in possession or trustee that the court may grant appropriate relief under Fed. R. Bankr. P. 9024 if the court determines that a material element of the motion or stipulation was not adequately disclosed in the Introductory Statement.

/s/ Reno F.R. Fernandez III
RENO F.R. FERNANDEZ III