MACDONALD | FERNANDEZ LLP
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
ROXANNE BAHADURJI (290117)
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Debtor-in-Possession,
AQH, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 15-50553-11-ASW |
| AQH, LLC, | Chapter 11 |
| Debtor. | DECLARATION OF CHRIS CUNNINGHAM IN SUPPORT OF MOTION FOR ORDER COMPELLING RIVERBANK LOCAL REDEVELOPMENT AGENCY TO PROVIDE ELECTRICITY UPON PAYMENT OF ADEQUATE ASSURANCE DEPOSIT, MOTION TO APPROVE LOAN TO PAY UTILITY DEPOSIT AND SUPPLEMENTAL MOTION FOR AUTHORITY TO USE CASH COLLATERAL |
| | Date:   TBD |
| | Time:   TBD |
| | Place:  280 South First Street, Room 3020 |
| |          San Jose, California |
| | Honorable Arthur S. Weissbrodt |

I, Chris Cunningham, declare:

1.     I am the duly appointed Responsible Individual for AQH, LLC, Debtor-in-Possession herein.  I am familiar with the Debtor's business.  I am over the age of 18.  The following facts are true and correct of my own personal knowledge.  If called as a witness, I could and would competently testify as follows.

2.     This declaration supports the Debtor's (1) Motion for Order Compelling Riverbank Local Redevelopment Agency to Provide Electricity Upon Payment of Adequate Assurance Deposit

1

and (2) Motion to Approve Loan to Pay Utility Deposit and Wages and Supplemental Motion to Authorize Use of Cash Collateral, filed herewith.

3.     The Debtor leases its facilities from the Riverbank Local Redevelopment Agency (the "Riverbank LRA") pursuant to that certain Lease Agreement, a true and correct copy of which is attached hereto as Exhibit "A" and incorporated by reference.

1.     The Riverbank LRA also serves as a utility and provides the Debtor with electricity via its on-side power substation.  The Debtor owes the Riverbank LRA approximately $90,000 in arrears for electricity.  See the Three-Day Notice to Perform Covenants or Quit Premises, a true and correct copy of which is attached hereto as Exhibit "B" and incorporated by reference.

4.     The facilities are a former United States Army ammunitions plant.  The facilities continue to be owned by the Army but are in the process of being transferred to the Riverbank LRA, which process I am informed and believe has not been completed and will not be completed for at least the next five years.  I am further informed and believe that Army's ownership of the property exempts it from statutes that would otherwise require permits and a safety inspection prior to supplying power to the units within the buildings there.

5.     In fact, the Riverbank LRA supplied (and continues to supply) power to the Debtor's first two facilities with only Army approval.  Specifically, the Army is notified of a proposed change to the facilities and has ten days to conduct an internal review and respond; if there is no response, the change is deemed approved.  This streamlined process was a major factor in the Debtor's decision to locate its data center at the facilities.

6.     With respect to the third phase of the facilities, the Riverbank LRA unilaterally required permits and a safety inspection, and the Debtor complied.  This unanticipated requirement subjected the Debtor to more than $100,000 in expenses for engineering and documentation, as follows:

| Item | Approximate Cost |
|---|---|
| Structural Engineering | $30,000 |
| Electrical Engineering | $20,000 |
| Architectural Drawing | $20,000 |

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 2 of
103

| | |
|---|---|
| Modification to Electrical Infrastructure | $35,000 |
| Total: | $105,000 |

The resulting unanticipated delays kept the Debtor's new facilities offline and unable to generate revenue. Accordingly, the Debtor experienced a cash-flow shortage in light of the aforesaid extra costs as well as the fact that that the Debtor's other expansion costs had been incurred and paid while the expected income was delayed. Said extra costs and delays precipitated the commencement of the within case.

7.     Power to the Debtor's expanded facilities was set to be activated upon completion of the final safety inspection by Interwest Consulting Group during the week of February 23, 2015. However, on February 24, 2015, the Debtor learned that the Riverbank LRA contacted Interwest and cancelled the inspection. Specifically, on February 24, 2015, Shawn Songer informed the Debtor that he had cancelled the inspection at the request of the Riverbank LRA. Songer is employed by the Riverbank RLA's on-site facilities engineering firm responsible for connecting the Debtor's power.

8.     In light of the aforesaid interference, the Debtor is concerned that the Riverbank LRA may interfere with the inspection in order to create an excuse to avoid supplying power.

9.     On February 25, 2015, counsel for the Debtor demanded that the Riverbank LRA reschedule and permit the inspection to take place, and thereafter to connect the Debtor's power, and offered to pay a security deposit. The Riverbank RLA refused and demanded payment of its pre-petition claim in full as a condition to providing electricity.

10.     The Debtor proposes to pay the Riverbank LRA a cash deposit as adequate assurance equal to one month's projected electricity costs ($127,080) to be held for the benefit of the Debtor and applied only upon default.

11.     Electricity is essential to the Debtors' operations and to preserving value of the business. I estimate that every week the expanded facilities are offline costs the Debtor approximately $35,000 in gross revenue.

12.     The Debtor has at hand liquid assets estimated to be worth at least $89,100 consisting of at least $50,000 in cash and Bitcoin ("XBT") worth at least $39,100, which the Debtor proposes to

3

use to partially pay the aforesaid security deposit. The Debtor requires debtor-in-possession financing to pay the estimated remainder of $37,980. The Debtor requires further financing to pay post-petition wages and related payroll expenses of $2,742.50 due on February 27, 2015.

13. Certain family members (collectively, the "Lender") of Sean Walsh, CEO and Managing Member of the Debtor, has agreed to provide a loan upon the terms described in the promissory note attached hereto as Exhibit "C" and incorporated by reference. Specifically, upon the Debtor's request, the Lender shall loan up to $55,000 to the Debtor; provided, however, that the Debtor shall first use up to $89,100 of the aforesaid liquid assets to partially pay the security deposit, and the Debtor shall request that Lender loan only up to an amount sufficient to pay the unpaid balance of said deposit plus the amount of $2,742.50 to pay the post-petition wages and related payroll expenses due on February 27, 2015, which are as follows:

| First Name | Last Name | Amount |
|------------|-----------|--------|
| Jacob | Lopez | $640.00 |
| Michael | White | $240.00 |
| Austin | Roberts | $820.00 |
| Brian | Friend | $510.00 |
| Tricia | Hayward | $532.50 |
| | Total: | $2,742.50 |

Said amounts do not include any pre-petition portion. The Debtor intends to tentatively borrow the amount of $2,742.50 from Lender to pay said wages and payroll expenses on February 27, 2015, subject to Court approval such that, if the loan is not approved, Lender will waive any claim and consider the transfer to be a capital contribution. The Debtor's cash flow is sufficient to pay said wages, but the Debtor wishes to avoid using any purported cash collateral prior to the hearing on its cash collateral motion.

14. A sources-and-uses table is included in the revised cash collateral budget, a true and correct copy of which is attached hereto as Exhibit "D" and incorporated by reference.

///

4

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is

2    true and correct.  Executed this 27th day of February, 2015, at Sherman Oaks, California.

                                            /s/ Chris Cunningham
                                            CHRIS CUNNINGHAM

5

# EXHIBIT A

**RIVERBANK INDUSTRIAL COMPLEX**

**LEASE AGREEMENT**

**Between**

**CITY OF RIVERBANK LOCAL REDEVELOPMENT AUTHORITY,**
**a public corporation of the State of California**

**as**

**LANDLORD**

**and**

**AQH, LLC**
**a CALIFORNIA LIMITED LIABILITY CORPORATION**

**as**

**TENANT**

**RIVERBANK INDUSTRIAL COMPLEX**
**LEASE AGREEMENT**

This Riverbank Industrial Park Lease Agreement ("**Lease**") is made on March 12, 2014 ("**Effective Date**") by and between the City of Riverbank Local Redevelopment Authority ("**LRA**"), a public corporation of the State of California ("**Landlord**"), and AQH, LLC ("**Tenant**"). Landlord and Tenant are referred to individually as "**Party**" and collectively as the "**Parties**." In consideration of the terms, covenants and conditions hereinafter set forth, Landlord and Tenant agree as follows:

1. BASIC LEASE PROVISIONS.

    1.1.    DATE:                  March 12, 2014

    1.2.    LANDLORD:        City of Riverbank Local Redevelopment Authority

    1.3.    TENANT:           AQH, LLC
                                  440 N. Wolfe Road, MS # 46
                                  Sunnyvale, CA 94085

    1.4.    PROPERTY ADDRESS:     5300 Claus Road, Modesto, California 95357

    1.5.    PREMISES ADDRESS:     5300 Claus Road, Modesto, California 95357, Suite 24

    1.6.    APPROXIMATE LEASABLE AREA    34,201 square feet of inside space (all of Building 3),
            OF PREMISES:                expandable to 85,162 square feet as outlined in Section 1.16 and 17,870 square feet of outside space in the courtyards between Buildings 3 and 4.

    1.7.    AUTHORIZED USES OF PREMISES:   Data processing servers

    1.8.    TERM OF LEASE:         5 years, ending on March 31, 2019

    1.9.    EXTENDED TERM         5 years, subject to revised lease rates, if properly exercised

    1.10.  EFFECTIVE DATE:        March 12, 2014
    1.11.  BASE RENT:

        1.11.1. YEAR 1:
               1.11.1.1 YEAR 1:    As of the Effective Date:    $       0.00/month
               1.11.1.2 Year 1:    As of June 13, 2014    $ 13,757.00/month
        1.11.2. YEAR 2:     As of April 1, 2015    $ 14,169.71/month
        1.11.3. YEAR 3:     As of April 1, 2016    $ 14,584.80/month
        1.11.4. YEAR 4:     As of April 1, 2017    $ 15,032.65/month
        1.11.5. YEAR 5:     As of April 1, 2018    $ 15,483.62/month

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 8 of 103

The above rates are based on $0.35 per square foot for indoor space and $0.10 per square foot for outdoor space.

1.12. TENANT'S PERCENTAGE SHARE:          See Section 7.4 of this Lease.

1.13. SECURITY DEPOSIT:                   $ 13,800

1.14. AMOUNT DUE ON LEASE                 $ 13,800
      EFFECTIVE DATE:                     (payable to City of Riverbank Local Redevelopment
                                          Authority)

1.15. DESIGNATED PARKING SPACES:          None

1.16. OTHER LEASE CONSIDERATION(S):       Landlord may assign a bathroom for tenant's sole use.  If
                                          that occurs, tenant shall be responsible for all
                                          maintenance costs of this bathroom.  If, in the future,
                                          another tenant is assigned to that bathroom, the
                                          maintenance costs shall be prorated.

                                          Landlord may, at its sole discretion, require Tenant to
                                          install (or pay Landlord to install) a backflow prevention
                                          meter, a water meter and an electrical meter to comply
                                          with Section 10.

                                          Tenant shall pay $900 upon effective date of lease for
                                          Landlord to install a sign approximately 13" x 120" in size
                                          on the lighted sign on Claus Road.  Said installation shall
                                          occur within 60 days of Tenant providing Landlord with
                                          the artwork (logo, etc.) that is desired on the sign.  If
                                          initialed here _____ Tenant has exercised his right
                                          to refuse such a sign and no money will be due.

                                          Tenant shall be responsible for all Tenant Improvements
                                          needed to serve their use including utilities such as
                                          electricity.  Any upgrades needed to provide adequate
                                          utilities for Tenant's use shall be Tenant's responsibility.
                                          All such improvements shall be subject to the terms of
                                          this agreement including any required permitting.
                                          Tenant understands that transfer of the property
                                          containing premises from Army ownership to City
                                          ownership will change the permitting requirements.

                                          With respect to electricity, Tenant is accepting the
                                          Premises "as is" and is aware that significant

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 9 of
103

improvements will be needed to service their needs. These improvements will include upgrades to the main substation on site. At present, Landlord can supply approximately 3,600 amps of power through the newest substation that exists for use in Building 3. Any power needs in excess of that shall require improvement at Tenant's expense. At no time will Tenant's power needs have a negative impact on the power used by other tenants.

Regardless of any lease provisions to the contrary, Tenant shall be responsible for maintaining any substations added to the electrical distribution system that they install for their exclusive use. If upgrades are made to the main substation that provides service to the site, as a whole, maintenance of these upgrades shall be the responsibility of Landlord.

The property is fenced and 24 hour security is provided. Any additional security shall be the responsibility of the Tenant and shall not unduly interfere in the operation of the site nor shall it interfere with the use of the property and common areas by other tenants. Any such security measures shall be approved by the Landlord prior to implementation.

Initial space is to consist of Building 3, west of Broadway to give Landlord time to relocate existing material from the east end of Building 3. After 6 weeks and when this material is moved, Tenant shall then be able to occupy all of Building 3. During this 6 week period, Tenant shall have access to the entire building for the purpose of preparing the space for occupancy provided no work is done where the material is stored and Tenant does not disturb the material or interfere with its relocation.

Tenant shall have the first right of refusal, at the same rate per square foot as may then be in effect for inside space under section 1.11 of this Lease for Building 47. In addition, Landlord acknowledges that Tenant desires to occupy Buildings 4 and 48. However, these buildings are currently partially occupied by two other tenants who have permanent leases. During the first 120 days of this lease, Landlord shall work with the tenants in Buildings 4 and 48 to attempt to vacate all of Buildings 4 and 48 for

use by Tenant.  Should this be possible, Tenant shall then have first right of refusal for Building 4.  If this is not possible, then Tenant shall have first right of refusal for Building 1.  Should Tenant not exercise this first right of refusal prior to another Tenant (new or existing) desire to lease the space, Tenant shall have 30 days following written notice of same to exercise this first right of refusal.  Failure to execute a Lease Amendment adding the square footage to this Lease shall make the portion of this first right of refusal not exercised null and void.

Tenant has been notified and understands that at some point during the initial term of this Lease the floors within the Premises will need to be coated in order to encapsulate PCBs as disclosed in Section 28.5 of this Lease.  Tenant shall not be financially responsible for the cost of this coating but shall cooperate in making the space available for the coating to occur.  It is not anticipated that this cooperation shall require removal of any fixed equipment.  Should any fixed equipment need to be moved, it shall be at Landlord's expense.

1.17.   EXHIBITS ATTACHED AND INCORPORATED INTO LEASE:

| | |
|---|---|
| Exhibit A | Property |
| Exhibit B | Premises |
| Exhibit C | Equipment |
| Exhibit D | Parking Area |
| Exhibit E | Hazardous Materials Disclosure Certificate |
| Exhibit F | Environmental Questionnaire |
| Exhibit G | Rules and Regulations |
| Exhibit H | Base Lease |

1.18.   ADDRESS FOR NOTICES:

1.18.1. LANDLORD:   City of Riverbank Local Redevelopment Authority
5300 Claus Road, Suite 1
Modesto, California 95357

TEL: (209) 863-8352
FAX: (209) 863-8071

1.18.2. TENANT:   AQH, LLC
440 N. Wolfe Road, MS #46
Sunnyvale, CA 94085
TEL: (607) 351-2859

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 11 of 103

2.      D<small>EFINITIONS</small>.

2.1.    ACM. "ACM" shall mean asbestos containing materials.

2.2.    A<small>DDITIONAL</small> R<small>ENT</small>. "Additional Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of this Lease, including, but not limited to, Tenant's Percentage Share of Operating Expenses and late charges. The term "Additional Rent" shall not include Base Rent as defined below.

2.3.    A<small>LTERATIONS</small>. "Alterations" shall have the meaning set forth in section 15.1 below.

2.4.    A<small>LTERNATE</small> S<small>ERVICE</small> P<small>ROVIDER</small>. "Alternate Service Provider" shall have the meaning set forth in section 10.5 below.

2.5.    APN. "APN" shall mean Assessor Parcel Number.

2.6.    B<small>ASE</small> L<small>EASE</small>. "Base Lease" shall have the meaning set forth in section 39.1 below.

2.7.    B<small>ASE</small> R<small>ENT</small>. "Base Rent" shall have the meaning set forth in section 6.1 below.

2.8.    C<small>APITAL</small> I<small>MPROVEMENT</small>. "Capital Improvement" shall have the meaning set forth in section 7.1.3 below.

2.9.    CERCLA. "CERCLA" shall mean the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended.

2.10.   C<small>HANGES</small>. "Changes" shall have the meaning set forth in section 33 below.

2.11.   C<small>ITY</small>. "City" shall mean the City of Riverbank in the State of California.

2.12.   C<small>OMMON</small> A<small>REAS</small>. "Common Areas" shall have the meaning set forth in section 3.3 below.

2.13.   C<small>ONDEMNATION</small>. "Condemnation" shall have the meaning set forth in section 17 below.

2.14.   C<small>OUNTY</small>. "County" shall mean the County of Stanislaus in the State of California.

2.15.   D<small>AMAGES</small>. "Damages" shall have the meaning set forth in sections 16.1 and 22 below.

2.16.   D<small>O</small>D. "DoD" shall mean the United States Department of Defense.

2.17.   EDC MOA. "EDC MOA" shall have the meaning set forth in section 39.2 below.

2.18.   E<small>FFECTIVE</small> D<small>ATE</small>. "Effective Date" shall have the meaning set forth in the Preamble.

2.19.   E<small>LECTRIC</small> S<small>ERVICE</small> P<small>ROVIDER</small>. "Electric Service Provider" shall have the meaning set forth in 10.5 below.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 12 of 103

2.20. ELEMENTS OF THE PREMISES. "Elements of the Premises" shall have the meaning set forth in section 15.6 below.

2.21. ENVIRONMENTAL QUESTIONNAIRE. "Environmental Questionnaire" shall have the meaning set forth in section 29.17 below.

2.22. EPA. "EPA" shall mean the United States Environmental Protection Agency.

2.23. EQUIPMENT. "Equipment" shall have the meaning set forth in section 3.2 below.

2.24. ESTIMATED OPERATING EXPENSES. "Estimated Operating Expenses" shall have the meaning set forth in section 7.3 below.

2.25. EXECUTIVE ORDER. "Executive Order" shall have the meaning set forth in section 38.24 below.

2.26. EXPIRATION DATE. "Expiration Date" shall have the meaning set forth in section 4.1 below.

2.27. EXTENDED TERM. "Extended Term" shall have the meaning set forth in section 4.2 below.

2.28. EXTENDED TERM BASE RENT. "Extended Term Base Rent" shall have the meaning set forth in section 4.2.1 below.

2.29. EXTENDED TERM NOTICE. "Extended Term Notice" shall have the meaning set forth in section 4.2 below.

2.30. EXTENDED TERM OPTION PERIOD. "Extended Term Option Period" shall have the meaning set forth in section 4.2 below.

2.31. FFA. "FFA" shall have the meaning set forth in sections 29.4 and 29.7 below.

2.32. GBCI. "GBCI" shall mean the Green Building Certification Institute.

2.33. GOVERNMENT. "Government" shall mean the government of the United States of America and the Department of the Army.

2.34. HAZARDOUS MATERIALS. "Hazardous Materials" shall have the meaning set forth in section 29.1.1 below.

2.35. HAZARDOUS MATERIALS HANDLING PLAN. "Hazardous Materials Handling Plan" shall have the meaning set forth in section 29.17 below.

2.36. HAZARDOUS MATERIALS LAWS. "Hazardous Materials Laws" shall have the meaning set forth in section 29.1.1 below.

2.37. HVAC. "HVAC" shall have the meaning set forth in section 14.1 below.

2.38. IAG. "IAG" shall have the meaning set forth in section 29.4.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 13 of 103

2.39.   INDEMNIFIED MATTER.  "Indemnified Matter" shall have the meaning set forth in section 22 below.

2.40.   INDEMNIFIED PARTIES.  "Indemnified Parties" shall have the meaning set forth in section 22 below.

2.41.   INTERAGENCY AGREEMENT.  "Interagency Agreement" shall have the meaning set forth in section 29.4 below.

2.42.   IRP. "IRP" shall have the meaning set forth in section 29.7 below.

2.43.   LANDLORD. "Landlord" shall have the meaning set forth in the Preamble.

2.44.   LANDLORD AUTHORIZED USERS. "Landlord Authorized Users" shall have the meaning set forth in section 3.3 below.

2.45.   LANDLORD FEE. "Landlord Fee" shall have the meaning set forth in section 15.1 below.

2.46.   LANDLORD MAINTENANCE ITEMS.  "Landlord Maintenance Items" shall have the meaning set forth in section 14.2 below.

2.47.   LANDLORD PARTIES. "Landlord Parties" shall have the meaning set forth in section 23 below.

2.48.   LANDLORD'S SUSTAINABILITY OBJECTIVES.  "Landlord's Sustainability Objectives" shall have the meaning set forth in section 40.1 below.

2.49.   LANDSCAPED AREAS. "Landscaped Areas" shall have the meaning set forth in section 14.2 below.

2.50.   LBP. "LBP" shall have the meaning set forth in section 29.15 below.

2.51.   LEASE. "Lease" shall have the meaning set forth in the Preamble.

2.52.   LEASE YEAR. "Lease Year" shall have the meaning set forth in section 4.1 below.

2.53.   LEED.  "LEED" shall mean the Leadership in Energy and Environmental Design Green Building Rating System™ administered by the U.S. Green Building Council and the Green Building Certification Institute.

2.54.   LEED-CI.  "LEED-CI" shall mean the Leadership in Energy and Environmental Design Green Building Rating System™ for Commercial Interiors administered by the U.S. Green Building Council and the Green Building Certification Institute.

2.55.   LEED-CS.  "LEED-CS" shall mean the Leadership in Energy and Environmental Design Green Building Rating System™ for Core and Shell administered by the U.S. Green Building Council and the Green Building Certification Institute.

2.56.   LEED-EB.  "LEED-EB" shall mean the Leadership in Energy and Environmental Design Green Building Rating System™ for Existing Buildings administered by the U.S. Green Building Council and the Green Building Certification Institute.

2.57.   LEED-NC.  "LEED-NC" shall mean the Leadership in Energy and Environmental Design Green Building Rating System™ for New Construction administered by the U.S. Green Building Council and the Green Building Certification Institute.

2.58.   LEED-ND.  "LEED-ND" shall mean the Leadership in Energy and Environmental Design Green Building Rating System™ for Neighborhood Development administered by the U.S. Green Building Council and the Green Building Certification Institute.

2.59.   LRA.  "LRA" shall mean the Riverbank Local Redevelopment Authority.

2.60.   MAINTENANCE CONTRACTS.  "Maintenance Contracts" shall have the meaning set forth in section 14.3 below.

2.61.   MONEY LAUNDERING ACT.  "Money Laundering Act" shall have the meaning set forth in section 38.24 below.

2.62.   NET WORTH.  "Net Worth" shall have the meaning set forth in section 18.2 below.

2.63.   NON-PERMITTED ALTERATIONS.  "Non-Permitted Alterations" shall have the meaning set forth in section 15.1 below.

2.64.   NPL.  "NPL" shall have the meaning set forth in section 29.4 below.

2.65.   NOTICE OF INTENT.  "Notice of Intent" shall have the meaning set forth in section 39.8 below.

2.66.   OFAC.  "OFAC" shall have the meaning set forth in section 38.24 below.

2.67.   OPERATING EXPENSES.  "Operating Expenses" shall have the meaning set forth in sections 7.1 and 7.2 below.

2.68.   OPTION.  "Option" shall have the meaning set forth in section 31.1 below.

2.69.   PARKING AREAS.  "Parking Areas" shall have the meaning set forth in section 3.4.1 below.

2.70.   PARTIES.  "Parties" shall have the meaning set forth in the Preamble.

2.71.   PARTY.  "Party" shall have the meaning set forth in the Preamble.

2.72.   PCBS.  "PCBs" shall have the meaning set forth in section 29.5 below.

2.73.   PERMITTED ALTERATIONS.  "Permitted Alterations" shall have the meaning set forth in section 15.1 below.

2.74.   POLLUTION POLICY.  "Pollution Policy" shall have the meaning set forth in section 12.1.4 below.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 15 of 103

2.75.   Possession Date.  "Possession Date" shall mean the date Tenant is authorized by Landlord to exclusively use and occupy the Premises.

2.76.   Premises.  "Premises" shall have the meaning set forth in sections 3.1 and 3.2 below.

2.77.   Prohibited Person.  "Prohibited Person" shall have the meaning set forth in section 38.24.

2.78.   Property.  "Property" shall mean the real and personal property commonly referred to as the former Riverbank Army and Ammunition Plant, located at 5300 Claus Road, Riverbank, California and depicted in greater detail in **Exhibit A**.

2.79.   Real Property Taxes.  "Real Property Taxes" shall have the meaning set forth in section 11.2.

2.80.   Reduction.  "Reduction" shall have the meaning set forth in section 11.6

2.81.   Rent.  "Rent" shall have the meanings set forth in section 20.11.

2.82.   ROD.  "ROD" shall have the meaning set forth in section 39.6 below.

2.83.   Rules.  "Rules" shall have the meaning set forth in section 38.21 below.

2.84.   Statement.  "Statement" shall have the meaning set forth in section 7.3 below.

2.85.   Tenant.  "Tenant" shall have the meaning set forth in the Preamble.

2.86.   Tenant Authorized Users.  "Tenant Authorized Users" shall have the meaning set forth in section 3.3 below.

2.87.   Tenant Delay.  "Tenant Delay" shall have the meaning set forth in section 4.4 below.

2.88.   Tenant Parties.  "Tenant Parties" shall have the meaning set forth in section 22 below.

2.89.   Tenant Representatives.  "Tenant Representatives" shall have the meaning set forth in section 29.1 below.

2.90.   Tenant's Contamination.  "Tenant's Contamination" shall have the meaning set forth in section 29.1.3 below.

2.91.   Tenant's Percentage Share.  "Tenant's Percentage Share" shall have the meaning set forth in section 7.4 below.

2.92.   Tenant's Property.  "Tenant's Property" shall have the meaning set forth in section 16.5 below.

2.93.   Term.  "Term" shall have the meaning set forth in sections 4.1 and 4.2 below.

2.94.   Transfer.  "Transfer" shall have the meaning set forth in section 18.1 below.

2.95.  TRANSFER PREMIUM.  "Transfer Premium" shall have the meaning set forth in section 18.6 below.

2.96.  TRANSFEREE HAZMAT CERTIFICATE.  "Transferee HazMat Certification" shall have the meaning set forth in section 18.1 below.

2.97.  USGBC. "USGBC" shall mean the United States Green Building Council.

2.98.  UTILITIES. "Utilities" shall have the meaning set forth in section 10.1 below.

3.  PREMISES.  Landlord does hereby lease to Tenant and Tenant leases from Landlord, the following:

3.1.  PREMISES.  Those certain premises known as a portion of building 3, located at 5300 Claus Road, Modesto, California, containing approximately thirty-four thousand two hundred and one (34,201) rentable square feet (which measurement is binding and conclusive on the parties), more particularly described on **Exhibit B** attached hereto, together with the improvements and fixtures situated therein (the "**Premises**").  In addition, Tenant shall have the first right of refusal on Building 47 (and Building 48 if vacated by existing Tenant) and either Building 1 or 4 (a determination to be made by Landlord as to availability within 120 days of Effective Date) as shown on **Exhibit B**.

3.2.  EQUIPMENT.  No equipment is included in this lease.

3.3.  COMMON AREAS.  In addition to the Premises, Tenant shall have the non-exclusive use of all areas and facilities within the Property that are not designated by Landlord for the exclusive use of Tenant, Landlord, the Government or any other Tenant or Licensee of the Property. This non-exclusive use of the Common Areas shall include but not be limited to the roadways, loading facilities, sidewalks, vehicle parking areas, railways, rail spurs, driveways, footways and any other facilities designated by Landlord as common use area or facilities (collectively, the "**Common Areas**"). The use of the Common Areas shall be for the non-exclusive use of Tenant and Tenant's employees, agents, suppliers, customers and patrons ("**Tenant Authorized Users**"), in common with Landlord and all other tenants and licensees of the Property and all such other persons to whom Landlord has previously granted, or may hereinafter grant, rights of usage ("**Landlord Authorized Users**").  Use of the Common Areas by Tenant and Tenant Authorized Users shall at all times be subject to the terms, conditions, covenants and restrictions in this Lease and the Rules and Regulations, which may be amended from time to time.   Tenant and Tenant Authorized Users shall not be entitled to use the Common Areas for storage of goods, vehicles, refuse or any other items unless otherwise specified in this Lease.  Landlord reserves the exclusive right to alter, modify, enlarge, diminish, reduce or eliminate the Common Areas from time to time in its sole discretion.  If Tenant shall use any of the Common Areas for storage of any items, Tenant shall pay all fines and other charges imposed upon either Landlord or Tenant by any fire, building or other regulatory body, and Tenant shall pay all costs incurred by Landlord to clear and clean the Common Areas and dispose of such items, including but not limited to, a disposal fee of twenty five dollars ($25.00) for each

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 17 of
103

pallet or other container and fifty dollars ($50.00) for each drum, together with any additional costs for testing and special disposal, if required.

3.4. PARKING.

3.4.1. PARKING AREA(S). Tenant and Tenant Authorized Users shall have the non-exclusive right to use, for vehicular parking, a maximum of ten (10) parking spaces within those parking area(s) designated by Landlord (the "**Parking Area**"). The Parking Area as of the Effective Date of this Lease is more particularly described on the attached **Exhibit D**. Tenant's parking rights are in common with the parking rights of any other tenants of the Property, and all of Tenant's parking spaces are unreserved parking spaces. Landlord reserves the exclusive right to alter, modify, enlarge, diminish, or reduce the Parking Area from time to time in its sole discretion and at any time may designate areas in the Common Areas where Tenant may or may not park.

3.4.2. PARKING AREA RULES. Use of the Parking Area by Tenant or Tenant Authorized Users shall at all times be subject to the terms, conditions, covenants, restrictions in this Lease and those specific rules and restrictions promulgated by Landlord relating to use of the Parking Area (the "**Parking Area Rules**"). The Parking Area Rules as of the Effective Date of this Lease are more particularly described on the attached **Exhibit G**, and may be changed from time to time by Landlord, in Landlord's sole discretion.

3.4.3. VIOLATION OF THE PARKING AREA RULES. If Tenant commits or allows in the Parking Area any of the activities prohibited by this Lease or the Parking Area Rules, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable by Tenant upon demand by Landlord. Tenant's parking rights are the personal rights of Tenant, and Tenant shall not transfer, assign or otherwise convey its parking rights separate and apart from this Lease. All parking spaces may only be used for parking vehicles no larger than full-size passenger automobiles or pick-up trucks. Landlord, in addition to its other remedies, shall have the right to remove or tow away any other vehicles. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord for such activities.

3.5. CONDITION. Tenant accepts the Premises in its "as is, where is" condition as of the Effective Date, subject to all applicable laws, ordinances, regulations, covenants, conditions, restrictions, easements, and rules and regulations, except as otherwise expressly provided for herein. Landlord shall not be obligated to make any repairs, alterations or improvements to the Premises. Tenant acknowledges that Landlord has

made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes.

4. TERM.

4.1. TERM. The term of this Lease shall be for five (5) years beginning on the Effective Date and expiring on March 31, 2019 ("**Expiration Date**") (collectively, the "**Term**"), unless otherwise extended or terminated pursuant to the terms of this Lease. The term "**Lease Year**" as used herein shall mean any three hundred sixty-five (365) consecutive day period beginning on the Effective Date or any anniversary thereafter.

4.2. EXTENDED TERM. Landlord grants Tenant the option to extend the Term of this Lease one (1) time, for a period of five (5) years (the "**Extended Term**"). To exercise this Extended Term right, Tenant must deliver written notice to Landlord ("**Extended Term Notice**"), no earlier than one (1) year, and no later than three (3) months prior to the Expiration Date ("**Extended Term Option Period**"). The definition of the word "**Term**" in this agreement shall include the Extended Term, where and when appropriate.

4.2.1. EXTENDED TERM BASE RENT. The Base Rent in this Lease shall not apply in any way to the Rent Tenant owes Landlord during the Extended Term. Any Rent owed during a properly exercised Extended Term shall be separately agreed to in writing by both Landlord and Tenant (the "**Extended Term Base Rent**") prior to the Expiration Date. If Landlord and Tenant are unable to agree upon the Extended Term Base Rent prior to the Expiration Date, this Lease shall terminate on the Expiration Date.

4.2.2. EVENT OF DEFAULT FOLLOWING EXTENDED TERM NOTICE. Unless otherwise agreed to in writing by Landlord, an Extended Term Notice shall be deemed invalid and Tenant's right to an Extended Term shall be terminated if an Event of Default by Tenant occurs twelve (12) months prior to, or following, Tenant's proper delivery of an Extended Term Notice to Landlord.

4.3. DELAY IN POSSESSION. If for any reason Landlord cannot deliver possession of the Premises to Tenant on the Effective Date or any other date, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Tenant hereunder; provided, however, in such a case, Tenant shall not be obligated to pay the Base Rent or perform any other obligation of Tenant under this Lease, except as is otherwise provided for in this Lease, until possession of the Premises is tendered to Tenant.

4.4. DELAYS CAUSED BY TENANT. Unless otherwise agreed to in writing by Landlord and Tenant, Tenant shall pay the full Base and not be entitled to any abatement of the Base Rent if Tenant's possession of the Premises is in any way related to or caused by the acts or omissions of Tenant, Tenant's agents, employees and contractors, or, if applicable, any

Tenant delays as defined in the work letter agreement attached to this Lease ("**Tenant Delay**"). During any Tenant Delay period, Tenant shall also be responsible for its percentage share of operating expenses as set forth in this Lease.

4.5. DELIVERY OF POSSESSION. Possession of the Premises shall be deemed tendered and delivered to Tenant on the Effective Date, or any earlier or later date Tenant occupies any part of the Premises or is delivered keys to access the Premises.

4.6. LANDLORD IMPROVEMENTS TO PREMISES. Any improvements to the Premises constructed by Landlord shall be deemed "substantially" completed when the improvements have been completed except for minor items or defects which can be completed or remedied after Tenant occupies the Premises without causing substantial interference with Tenant's use of the Premises.

4.7. EARLY POSSESSION. If Tenant occupies the Premises prior to the Effective Date, such occupancy shall be subject to all the terms, covenants, conditions and restrictions of this Lease, such occupancy shall not change the Expiration Date, and, except as provided below, Tenant shall pay Base Rent and all other charges provided for in this Lease during the period of such occupancy. Prior to entering the Premises, Tenant shall obtain all insurance it is required to obtain pursuant to this Lease and shall provide certificates of said insurance to Landlord.

5. USE.

5.1. AUTHORIZED USES. The Premises shall be used only for those purposes described in Section 1.7 above. Unless otherwise agreed to in writing by Landlord and Tenant, no portion of the Premises shall be used for retail sales. Tenant shall not initiate, submit an application for, or otherwise request, any land use approvals or entitlements with respect to the Premises or any other portion of the Property, including, without limitation, any variance, conditional use permit or rezoning, without first obtaining Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. Tenant shall not (a) permit any animals or pets to be brought to or kept in the Premises, (b) install any antenna, dish or other device on the roof of the building or outside of the Premises, (c) make any penetrations into the roof of the building, (d) place loads upon floors, walls or ceilings in excess of the load such items were designed to carry, (e) place or store, nor permit any other person or entity to place or store, any property, equipment, materials, supplies or other items outside of the building in which the Premises is located or (f) change the exterior of the Premises or the building in which the Premises is located without Landlord's prior written consent. Tenant acknowledges that it has satisfied itself by its own independent investigation that the Premises and the Property are suitable for its intended use and that its use is permitted by applicable laws and regulations, and that neither Landlord nor Landlord's agents has made any representation or warranty as to the present or future suitability of the Premises, or the Property for the conduct of Tenant's business.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 20 of 103

5.2.   COMPLIANCE WITH LAWS.  Tenant shall, at Tenant's sole expense, promptly comply with all applicable laws, ordinances, rules, regulations, orders, certificates of occupancy, conditional use or other permits, variances, covenants, conditions, restrictions, easements, the recommendations of Landlord's engineers or other consultants, and requirements of any fire insurance underwriters, rating bureaus or government agencies, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the term hereof, relating in any manner to the Premises or the occupation and use by Tenant of the Premises.  Tenant shall, at Tenant's sole expense, comply with all requirements of the Americans With Disabilities Act that relate to the Premises, and all federal, state and local laws and regulations governing occupational safety and health.  Tenant acknowledges that it will be responsible for complying with current and future laws and regulations even though such compliance requires Tenant to make substantial repairs or modifications (including structural modifications) to the Premises and even though the application of the law or regulation is unrelated to Tenant's specific use of the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance, create a dangerous situation, or would disturb, unreasonably interfere with or endanger Landlord or any other tenants of the Property.  Tenant shall obtain, at its sole expense, any permit or other governmental authorization required to operate its business at the Premises.  Landlord shall not be liable for the failure of any other tenant or person to abide by the requirements of this Section or to otherwise comply with applicable laws and regulations, and Tenant shall not be excused from the performance of its obligations under this Lease due to such a failure.

6.   BASE RENT.

6.1.   BASE RENT.  Tenant shall pay as "**Base Rent**" the amounts set forth in Section 1.11 of this Lease.  The first month's Base Rent, the Security Deposit, and the first monthly installment of estimated Operating Expenses shall be due and payable on or before the Effective Date of this Lease.  Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of the Base Rent on or before the tenth (10th) day of each calendar month succeeding the Effective Date.  Payments of Base Rent for any fractional calendar month shall be prorated.  All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith.  Tenant shall have no right at any time to abate, reduce, or set off any rent due hereunder except where expressly provided in this Lease.

6.2.   APPLICATION OF PAYMENT.  All Rent, monies, amounts and payments received by Landlord from Tenant shall be applied to the oldest payment obligation owed by Tenant to Landlord.  No designation by Tenant either in a separate writing or on a check or money order, shall modify this Section or have any force or effect.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 21 of 103

6.3.    SURVIVAL OF RENT OBLIGATION(S). Rent and all other financial obligations of Tenant in this Lease shall survive the expiration or earlier termination of this Lease.

7.    OPERATING EXPENSE PAYMENTS.

7.1.    OPERATING EXPENSES.    Tenant shall pay Tenant's Percentage Share of the Operating Expenses for the Property.    For the purposes of this Lease, the term "**Operating Expenses**" shall mean all expenses and disbursements of every kind (subject to the limitations set forth below) which Landlord incurs, pays or becomes obligated to pay in connection with the ownership, operation, and maintenance of the Property, including, but not limited to, the associated Common Area and the following:

7.1.1.    MANAGEMENT FEES.  Tenant shall pay Tenant's Percentage Share of the wages and salaries (including management fees) of all employees, agents, consultants and other individuals or entities engaged in the operation, repair, replacement, maintenance, and security of the Property, including taxes, insurance and benefits relating thereto;

7.1.2.    SUPPLIES AND MATERIALS.  Tenant shall pay Tenant's Percentage Share of all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Property;

7.1.3.    CAPITAL IMPROVEMENTS.  Tenant shall pay Tenant's Percentage Share of annual cost of all Capital Improvements made to the Property which although capital in nature can reasonably be expected to reduce the normal operating costs of the Property, as well as all Capital Improvements made in order to comply with any law now or hereafter promulgated by any governmental authority, as amortized over the useful economic life of such improvements as determined by Landlord in its reasonable discretion (without regard to the period over which such improvements may be depreciated or amortized for federal income tax purposes) together with an interest factor on the unamortized cost of such item equal to the lesser of twelve percent (12%) per annum or the maximum rate of interest permitted by applicable law.  For purposes of this Lease, a "**Capital Improvement**" shall be an improvement to the Property that Landlord is obligated or permitted to make pursuant to this Lease, the cost of which is not fully deductible in the year incurred in accordance with generally accepted accounting principles; provided, however, that, at Landlord's option, the following items shall be treated as expenses and not Capital Improvements, and the entire cost of these items may be included in Operating Expenses in the year incurred:  (a) the cost of painting all or part of the Property, (b) the cost of resurfacing and restriping roadways and parking areas, (c) the cost of any items Tenant is obligated to pay for pursuant to Section 14 that Landlord elects, in its sole discretion, to include in Operating Expenses and (d) the cost of Capital Improvements incurred in any calendar year to the extent the cost of the Capital Improvements are less than twenty five thousand dollars ($25,000).  References to facilities, services, utilities or other

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 22 of 103

items in this section shall not impose an obligation on Landlord to have said facilities or to provide said services unless such facilities and services already exist at the Property.

7.1.4.  UTILITIES.  Tenant shall pay Tenant's Percentage Share of cost of all utilities paid by Landlord;

7.1.5.  INSURANCE.  Tenant shall pay Tenant's Percentage Share of cost of any insurance or insurance related expense applicable to the Property and Landlord's personal property used in connection therewith, including, but not limited to, the insurance costs described in Section 12;

7.1.6.  MAINTENANCE.  Tenant shall pay Tenant's Percentage Share of cost of repairs, replacements and general maintenance of the Property (including all truck court areas, paving and parking areas, Common Area lighting facilities, fences, gates, water lines, sewer lines, rail spur areas and any other item Landlord is obligated to repair or maintain), other than costs necessary to assure the structural soundness of the roof, foundation and exterior walls of the Property which are payable solely by Landlord under Section 13;

7.1.7.  SERVICE CONTRACTS.  Tenant shall pay Tenant's Percentage Share of cost of service or maintenance contracts with independent contractors for the operation, maintenance, repair, replacement or security of the Property (including, without limitation, alarm service, exterior painting, trash collection, snow, ice, debris and waste removal and landscape maintenance);

7.1.8.  PROFESSIONAL SERVICES.  Tenant shall pay Tenant's Percentage Share of the cost of all accounting fees, management fees, legal fees and consulting fees attributable to the operation, ownership, management, maintenance or repair of the Property;

7.1.9.  AGREEMENTS.  Tenant shall pay Tenant's Percentage Share of payments made by Landlord under any easement, license, operating agreement, declaration, restrictive covenant or other agreement relating to the sharing of costs among property owners;

7.1.10. BUSINESS LICENSES AND FEES.  Tenant shall pay Tenant's Percentage Share of the cost of all business licenses, permits or similar fees relating to the operation, ownership, repair or maintenance of the Property;

7.1.11. REAL PROPERTY TAXES.  Tenant shall pay Tenant's Percentage Share of the cost of all Real Property Taxes; and

7.1.12. MISCELLANEOUS.  Tenant shall pay Tenant's Percentage Share of the cost of any other item the cost of which is stated in this Lease to be an Operating Expense.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 23 of 103

7.2.    OPERATING EXPENSE EXCLUSIONS.  Notwithstanding anything to the contrary contained herein, for purposes of this Lease, the term "**Operating Expenses**" shall not include the following: (a) costs (including permit, license and inspection fees) incurred for tenant improvements for other tenants within the Property; (b) legal and auditing fees (other than those fees reasonably incurred in connection with the maintenance and operation of all or any portion of the Property), leasing commissions, advertising expenses and similar costs incurred in connection with the leasing of the Property; (c) depreciation of the building or any other improvements situated within the Property; (d) any items for which Landlord is actually reimbursed by insurance or by direct reimbursement by any other tenant of the Property; (e) costs of repairs or other work necessitated by fire, windstorm or other casualty (excluding any deductibles) and/or costs of repair or other work necessitated by the exercise of the right of eminent domain to the extent insurance proceeds or a condemnation award, as applicable, is actually received by Landlord for such purposes; provided, such costs of repairs or other work shall be paid by the parties in accordance with the provisions of Sections 13 and 14, below; (f) other than any interest charges for Capital Improvements referred to in Section 7.1.3 hereinabove, any interest or payments on any financing for the Premises or the Property and interest and penalties incurred as a result of Landlord's late payment of any invoice; (g) costs associated with the investigation and/or remediation of Hazardous Materials (hereafter defined) present in, on or about any portion of the Property, unless such costs and expenses are the responsibility of Tenant as provided in Section 29 below, in which event such costs and expenses shall be paid solely by Tenant in accordance with the provisions of Section 29 below; (h) overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services on the Property to the extent the same exceeds the costs of such by unaffiliated third parties on a competitive basis; (i) any payments under a ground lease or master lease; and (j) except as provided above, the cost of Capital Improvements.

7.3.    PAYMENT.  Tenant's Percentage Share of Operating Expenses shall be payable by Tenant within ten (10) days after a reasonably detailed statement of actual expenses is presented to Tenant by Landlord.  At Landlord's option, however, Landlord may, from time to time, estimate what Tenant's Percentage Share of Operating Expenses will be ("**Estimated Operating Expenses**"), and the Estimated Operating Expenses shall be payable by Tenant monthly during each calendar year for the Term of this Lease, on the same day as the Base Rent is due hereunder.  In the event that Tenant pays the Estimated Operating Expenses, Landlord shall use its commercially reasonable best efforts to deliver to Tenant within one hundred eighty (180) days after the expiration of each calendar year a reasonably detailed statement (the "**Statement**") showing Tenant's Percentage Share of the actual Operating Expenses incurred during such year.  Landlord's failure to deliver the Statement to Tenant within said period shall not constitute Landlord's waiver of its right to collect said amounts or otherwise prejudice Landlord's rights hereunder.  If Tenant's payments under this section during said calendar year exceed Tenant's Percentage Share as indicated on the Statement, Tenant shall be entitled to credit the amount of such overpayment against Tenant's Percentage Share of Operating Expenses next falling due. If Tenant's payments under this section during said calendar year were less than Tenant's

Percentage Share as indicated in the Statement, Tenant shall pay to Landlord the amount of the deficiency within thirty (30) days after delivery by Landlord to Tenant of the Statement.  Landlord and Tenant shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last calendar year for which Tenant is responsible for Operating Expenses, notwithstanding that the Lease term may have terminated before the end of such calendar year; and this provision shall survive the expiration or earlier termination of the Lease.

7.4.   TENANT'S PERCENTAGE SHARE.  Except as otherwise noted in Section 7.1 below, "**Tenant's Percentage Share**" as used in this Lease shall mean the percentage of the cost of Operating Expenses for which Tenant is obligated to reimburse Landlord pursuant to this Lease.  Notwithstanding anything to the contrary in this Lease, Landlord shall have the right to determine Tenant's Percentage Share of the cost of Operating Expenses using any one of the following methods or any combination of the following methods, and Tenant hereby agrees that the following methods of allocation are reasonable: (a) by multiplying the cost of all Operating Expenses by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in all buildings in the Property; or (b) with respect to an Operating Expense attributable solely to the building in which the Premises is located, requiring Tenant to pay that portion of the cost of the Operating Expense that is obtained by multiplying such cost by a fraction, the numerator of which is the number of square feet of leasable space in the Premises and the denominator of which is the number of square feet of leasable space in the building in which the Premises is located or (c) by allocating an Operating Expense in any other reasonable manner, as determined by Landlord in its sole discretion.

7.4.1.   TENANT'S PERCENTAGE SHARE DURING THE INITIAL TERM.  During the initial Term of this Lease as shown in Section 1.8 of this Lease or for the first 12 months from the effective date, whichever occurs first, Landlord shall be solely responsible for any and all payments, costs and charges related to Tenant's Percentage Share of Operating Expenses.  Unless otherwise agreed to in writing by Landlord and Tenant, during any Extended Term, Tenant shall be solely responsible for Tenant's Percentage Share of Operating Expenses pursuant to Section 7.4 above and the allocation methods contained therein.

In addition, during the Initial Term of this Lease, Tenant shall not be required to pay more than $0.09/square foot of space leased.  This limitation shall apply to any expenses under Section 7.1.3.

7.5.   AUDITS.  If Tenant disputes the amount set forth in the Statement, Tenant shall have the right, at Tenant's sole expense, not later than sixty (60) days following receipt of such Statement, to cause Landlord's books and records with respect to the calendar year which is the subject of the Statement to be audited by a certified public accountant mutually acceptable to Landlord and Tenant.  The audit shall take place at the offices of Landlord where its books and records are located at a mutually convenient time during Landlord's

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 25 of 103

regular business hours. Tenant's Percentage Share of Operating Expenses shall be appropriately adjusted based upon the results of such audit, and the results of such audit shall be final and binding upon Landlord and Tenant. Tenant shall have no right to conduct an audit or to give Landlord notice that it desires to conduct an audit at any time Tenant is in default under the Lease. The accountant conducting the audit shall be compensated on an hourly basis and shall not be compensated based upon a percentage of overcharges it discovers. No subtenant or licensee shall have any right to conduct an audit, and no assignee shall conduct an audit for any period during which such assignee was not in authorized possession of the Premises. Tenant's right to undertake an audit with respect to any calendar year shall expire sixty (60) days after Tenant's receipt of the Statement for such calendar year, and such Statement shall be final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct, at the end of such sixty (60) day period, unless prior thereto Tenant shall have given Landlord written notice of its intention to audit Operating Expenses for the calendar year which is the subject of the Statement. If Tenant gives Landlord notice of its intention to audit Operating Expenses, it must commence such audit within sixty (60) days after such notice is delivered to Landlord, and the audit must be completed within one hundred twenty (120) days after such notice is delivered to Landlord. If Tenant does not commence and complete the audit within such periods, the Statement which Tenant elected to audit shall be deemed final and binding upon Tenant and shall, as between the parties, be conclusively deemed correct. Tenant agrees that the results of any Operating Expense audit shall be kept strictly confidential by Tenant and shall not be disclosed to any other person or entity.

8.    SECURITY DEPOSIT. If applicable, Tenant shall deliver to Landlord at the time it executes this Lease the security deposit set forth in Section 1.13 as security for Tenant's faithful performance of Tenant's obligations hereunder. If Tenant fails to pay Base Rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Landlord may use all or any portion of said deposit for the payment of any Base Rent or other any other fees, costs, or charges due hereunder, to pay any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord so uses or applies all or any portion of said deposit, Tenant shall within ten (10) days after written demand therefor deposit cash with Landlord in an amount sufficient to restore said deposit to its full amount. Landlord shall not be required to keep said security deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Landlord, shall be returned, without payment of interest or other amount for its use, to Tenant (or, at Landlord's option, to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the term hereof, and after Tenant has vacated the Premises. No trust relationship is created herein between Landlord and Tenant with respect to said security deposit. Tenant acknowledges that the security deposit is not an advance payment of any kind or a measure of Landlord's damages in the event of Tenant's default. Tenant hereby waives the provisions of any law which is inconsistent with this section including, but not limited to, Section 1950.7 of the California Civil Code.

9.  LATE CHARGES, INTEREST AND INCREASED SECURITY DEPOSIT.

    9.1.  LATE CHARGES.  Tenant hereby acknowledges that late payment by Tenant to Landlord of Base Rent, Tenant's Percentage Share of Operating Expenses or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the terms of any mortgage or trust deed encumbering the Property.  Accordingly, if any installment of Base Rent, Tenant's Percentage Share of Operating Expenses or any other sum due from Tenant shall not be received by Landlord when such amount shall be due, then, without any requirement for notice or demand to Tenant, Tenant shall immediately pay to Landlord a late charge equal to ten percent (10%) of such overdue amount.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.  Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder, including the assessment of interest under Section 20.1.

    9.2.  INTEREST ON PAST-DUE OBLIGATIONS.  Except as expressly herein provided, any amount due to Landlord that is not paid when due shall bear interest at the lesser of ten percent (10%) per annum or the maximum rate permitted by applicable law.  Payment of such interest shall not excuse or cure any default by Tenant under this Lease; provided, however, that interest shall not be payable on late charges incurred by Tenant nor on any amounts upon which late charges are paid by Tenant.

    9.3.  PAYMENT OF RENT AND SECURITY DEPOSIT AFTER DEFAULT.  If Tenant fails to pay Base Rent, Tenant's Percentage Share of Operating Expenses, parking charges or any other monetary obligation due hereunder on the date it is due, after Tenant's third (3rd) failure to pay any monetary obligation on the date it is due, at Landlord's option, all monetary obligations of Tenant hereunder shall thereafter be paid by cashier's check, and Tenant shall, upon demand, provide Landlord with an additional security deposit equal to three (3) months' Base Rent.  If Landlord has required Tenant to make said payments by cashier's check or to provide an additional security deposit, Tenant's failure to make a payment by cashier's check or to provide the additional security deposit shall be a material default hereunder.

10.  UTILITIES.

    10.1.  UTILITIES AND PAYMENT.  Except as noted in Section 10.2 below, Utilities will not be provided to Tenant by Landlord and Tenant shall pay for all water, gas, electricity, telephone, sewer, sprinkler services, refuse and trash collection and other utilities and services used on the Premises, together with any taxes, penalties, surcharges or the like pertaining thereto ("**Utilities**").  With the exception of water, gas, electricity and sewerage services, Tenant shall contract directly with the applicable public utility for such services.  Landlord shall contract for water, gas, electricity and sewerage services and bill Tenant each

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 27 of 103

calendar month for Tenant's share as Landlord establishes in its sole, but reasonable, discretion. If any Utilities are not separately metered or billed to Tenant for the Premises, but rather are billed to and paid by Landlord, Tenant shall pay as "**Additional Rent**" its pro rata share of the cost of such services, as reasonably determined by Landlord. If any Utilities are not separately metered, Landlord shall have the right to determine Tenant's consumption by either submetering, survey or other methods designed to measure consumption with reasonable accuracy.

10.2.   UTILITIES PROVIDED BY LANDLORD. As part of this Lease, Landlord agrees to provide Tenant water and sewerage services to the Premises. Landlord shall, however, only be required to provide Tenant ten thousand (10,000) gallons of water per calendar month for such water and sewerage purposes. Any water used by Tenant in excess of ten thousand (10,000) gallons per calendar month shall be paid for by Tenant to Landlord as Additional Rent pursuant to Section 10.1 above.

10.3.   INTERRUPTIONS. Tenant agrees that Landlord shall not be liable to Tenant for its failure to furnish water, gas, electricity, telephone, sewer, refuse and trash collection or any other utility services or building services when such failure is occasioned, in whole or in part, by repairs, replacements or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, telephone service or other utility at the Property, by any accident, casualty or event arising from any cause whatsoever, including the negligence of Landlord, its employees, agents and contractors, by act, negligence or default of Tenant or any other person or entity, or by any other cause, and such failures shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from the obligation of paying rent or performing any of its obligations under this Lease. Furthermore, Landlord shall not be liable under any circumstances for loss of property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any such services or utilities. Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease.

10.4.   RAILROAD SPURS. If the Premises is served by a railroad spur, Tenant shall execute any agreement required by the railroad company serving the railroad spur, and such agreement shall be satisfactory to Landlord, in Landlord's sole discretion.

10.5.   ALTERNATIVE UTILITY PROVIDERS. If permitted by applicable laws, Landlord shall have the right at any time and from time to time during the term of this Lease to either contract for service from a different company or companies (each such company referred to as an "**Alternate Service Provider**") other than the company or companies presently providing electrical service for the Property (the "**Electric Service Provider**") or continue to contract for service from the Electric Service Provider, at Landlord's sole discretion. Tenant agrees to cooperate with Landlord, the Electric Service Provider, and an Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord, the Electric

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 28 of 103

Service Provider, and any Alternate Service Provider reasonable access to the building's electric lines, feeders, risers, wiring and any other machinery within the Premises.

11.   REAL AND PERSONAL PROPERTY TAXES.

11.1.   PAYMENT OF TAXES.  Tenant shall pay Real Property Taxes as part of Operating Expenses.

11.2.   DEFINITION OF REAL PROPERTY TAX.  As used herein, the term "**Real Property Taxes**" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, improvement bond or bonds imposed on the Property or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Property or in any portion thereof.  Real Property Taxes shall not include income, inheritance and gift taxes.

11.3.   NOTICE OF POTENTIAL REAL PROPERTY TAXATION.  The interest created by this Lease may at some time be subject to property taxation under the laws of the State of California.  If property taxes are imposed, the party in whom the possessory interest is vested may be subject to the payment of the taxes levied on such interest.  This notice is included in this Lease pursuant to the requirements of section 107.6 (a) of the Revenue and Taxation Code of the State of California.

11.4.   POSSESSORY INTEREST TAXES.  This Lease and Tenant's use of the Premises may create a possessory interest that is taxable and that possessory interest may be subject to payment of property taxes on that interest.  Tenant shall be solely responsible for any possessory taxes levied or imposed against this Lease or Tenant's use of the Premises.

11.5.   PERSONAL PROPERTY TAXES.  Tenant shall pay, prior to delinquency, all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or related to Tenant's use of the Premises.  If any of Tenant's personal property shall be assessed with Landlord's real or personal property, Tenant shall pay to Landlord the taxes attributable to Tenant within ten (10) days after receipt of a written statement from Landlord setting forth the taxes applicable to Tenant's property.

11.6.   REASSESSMENTS.  From time to time Landlord may challenge the assessed value of the Property as determined by applicable taxing authorities and/or Landlord may attempt to cause the Real Property Taxes to be reduced on other grounds.  If Landlord is successful in causing the Real Property Taxes to be reduced or in obtaining a refund, rebate, credit or similar benefit (hereinafter collectively referred to as a "**Reduction**"), Landlord shall, to the extent practicable, credit the Reduction(s) to Real Property Taxes for the calendar year to which a Reduction applies and recalculate the Real Property Taxes owed by Tenant for that year based on the reduced Real Property Taxes.  All costs incurred by Landlord in connection with obtaining and/or processing the Real Property Tax reductions (e.g., consulting fees, accounting fees etc.) may be included in Operating Expenses or

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 29 of
103

deducted from the Reduction. Landlord shall have the right to compensate a person or entity it employs to obtain a Reduction by giving such person or entity a percentage of any Reduction obtained.

12. INSURANCE.

12.1. INSURANCE-TENANT. Tenant shall procure and maintain for the duration of the Lease, insurance against claims for injuries to persons or damages to property which may arise from or in connection with the Tenant's operation and use of the leased premises. The cost of such insurance shall be borne by the Tenant. Tenant shall maintain the following types of insurance with limits no less than the following as set forth below.

12.1.1. COMMERCIAL GENERAL LIABILITY COVERAGE: Three million dollars ($3,000,000) per occurrence for bodily injury, personal injury and property damage. The policy shall be endorsed to provide Fire Legal Liability or Damage to Rented Premises coverage, as well as for Products and Completed Operations;

12.1.2. AUTOMOBILE LIABILITY COVERAGE: Coverage for owned, hired, leased and rented vehicles, with limits of not less than one million dollars ($1,000,000) for combined bodily injury and property damage, on a per occurrence basis;

12.1.3. PROPERTY INSURANCE COVERAGE: Coverage against all risks of loss (excluding flood and earthquake). One million dollars ($1,000,000) in Property Insurance Coverage with no coinsurance penalties shall apply and coverage shall extend to include any tenant improvements or betterments. The Riverbank Local Redevelopment Authority shall be listed on all settlement checks as the Loss Payee; or, coverage against all risks of loss (excluding flood and earthquake). Coverage shall include full replacement cost with no coinsurance penalties, and coverage shall extend to include any tenant improvements or betterments. The Riverbank Local and Redevelopment Authority shall be listed on all settlement checks as the Loss Payee;

12.1.4. ENVIRONMENTAL IMPAIRMENT COVERAGE: Coverage with limits of not less than one million dollars ($1,000,000) or such other larger limits as may be reasonably required by Landlord, taking into consideration the extent and nature of Tenant's activities. Upon placement of Landlord's Pollution Legal Liability insurance policy ("**Pollution Policy**"), Tenant shall be provided, subject to approval of Landlord and Landlord's environmental insurance carrier, an opportunity to satisfy the requirements of this subparagraph by being named an additional insured of the Pollution Policy. If approved, Tenant shall be charged a proportional premium of the total insurance premium, which shall be calculated as the proportion of Tenant's sub-aggregate of coverage to the total aggregate of coverage. In the event that Tenant executes this option, Tenant shall be responsible for all self insured retention amounts. Tenant's payment of its proportional share of the premium shall be payable to Landlord no later than twenty five (25) days after

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 30 of 103

approval of coverage by Landlord and Landlord's environmental insurance carrier. In the event that Landlord's environmental insurance terminates during Tenant's occupancy, Tenant shall be responsible for obtaining environmental insurance that satisfies the requirements of this subsection.

12.1.5. WORKERS COMPENSATION COVERAGE: As required by law, with Employer's Liability coverage with limits of not less than One Million Dollars ($1,000,000).

12.2. INSURANCE-LANDLORD.

12.2.1. COMMERCIAL GENERAL LIABILITY COVERAGE. Landlord shall obtain and keep in force a policy of general liability insurance with coverage against such risks and in such amounts as Landlord deems advisable insuring Landlord against liability arising out of the ownership, operation and management of the Property.

12.2.2. PROPERTY INSURANCE COVERAGE. Landlord shall also obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Property in the amount of the replacement cost thereof (excluding foundations and similar items), as determined by Landlord from time to time. The terms and conditions of said policies, their deductibles and the perils and risks covered thereby shall be determined by Landlord, from time to time, in Landlord's sole discretion. In addition, at Landlord's option, Landlord shall obtain and keep in force, during the term of this Lease, a policy of rental interruption insurance, with loss payable to Landlord, which insurance shall, at Landlord's option, also cover all Operating Expenses. Tenant will not be named as an additional insured in any insurance policies carried by Landlord and shall have no right to any proceeds therefrom. The policies purchased by Landlord shall contain such deductibles as Landlord may determine. Tenant shall pay at Tenant's sole expense any increase in the property insurance premiums for the Property over what was payable immediately prior to the increase to the extent the increase is specified by Landlord's insurance carrier as being caused by the nature of Tenant's occupancy or any act or omission of Tenant.

12.3. INSURANCE POLICIES. Tenant shall deliver to Landlord certificates of the insurance policies required under Section 4.7 concurrently with Tenant's execution of this Lease using an ACORD 27 form or a similar form approved by Landlord. Tenant's insurance policies shall not be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord. Tenant shall, at least thirty (30) days prior to the expiration of such policies, furnish Landlord with renewals thereof. Tenant's insurance policies shall be issued by insurance companies authorized to do business in the state of California, and said companies shall maintain during the policy term a "General Policyholder's Rating" of at least A and a financial rating of at least "Class X" (or such other rating as may be required by any lender having a lien on the Property) as set forth in the most recent edition of "Best Insurance Reports." All insurance obtained by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord,

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 31 of 103

whose insurance shall be considered excess insurance only. Tenant's insurance policies shall not include deductibles in excess of five thousand dollars ($5,000).

12.4. ADDITIONAL INSURED. The Riverbank Local Redevelopment Authority, the City of Riverbank, the City Council, and the Boards, Commissions, Officers, Employees, Agents and Volunteers of these entities, the United States Army and any other party designated by Landlord (as determined in Landlord's sole discretion), and at Landlord's request any mortgagee of Landlord, shall be named as an additional insured under all insurance coverages, except on worker's compensation and professional liability insurance policies. The naming of an additional insured shall not affect any recovery to which such additional insured would be entitled under this policy if not named as such additional insured. An additional insured named herein shall not be held liable for any premium, deductible portion of any loss, or expense of any nature on this policy or any extension thereof. Any other insurance held by an additional insured shall not be required to contribute anything toward any loss or expense covered by the insurance provided by this policy.

12.5. WAIVER OF SUBROGATION. Landlord waives any and all rights of recovery against Tenant and Tenant's employees and agents for or arising out of damage to, or destruction of, the Property to the extent that Landlord's insurance policies then in force insure against such damage or destruction (or to the extent of what would have been covered had Landlord maintained the insurance required to be carried under this Lease) and permit such waiver. Tenant waives any and all rights of recovery against Landlord and Landlord's employees and agents for or arising out of damage to, or destruction of, the Property to the extent that Tenant's insurance policies then in force insure against such damage or destruction (or to the extent of what would have been covered had Tenant maintained the insurance required to be carried under this Lease) and permit such waiver. Tenant shall cause the insurance policies it obtains in accordance with Section 12.2.2 relating to property damage to provide that the insurance company waives all right of recovery by subrogation against Landlord in connection with any liability or damage covered by Tenant's insurance policies.

12.6. COVERAGE. Landlord makes no representation to Tenant that the limits or forms of coverage specified above or approved by Landlord are adequate to insure Tenant's property or Tenant's obligations under this Lease, and the limits of any insurance carried by Tenant shall not limit Tenant's obligations or liability under any indemnity provision included in this Lease or under any other provision of this Lease.

13. LANDLORD'S REPAIRS. Landlord shall maintain, at Landlord's expense, only the structural elements of the roof of the building (excluding the roof membrane), the structural soundness of the foundation of the building and the structural elements of the exterior walls of the building. Despite the foregoing, during the first three (3) years of this lease, Landlord shall be responsible for repairing the roof membrane. Tenant shall reimburse Landlord for the cost of any maintenance, repair or replacement of the foregoing necessitated by Tenant's misuse, negligence, or alterations to the Premises or any breach of its obligations under this Lease. By way of example, and not limitation, the term "exterior walls" as used in this section shall not

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 32 of 103

include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries. Tenant shall immediately give Landlord written notice of any repair required by Landlord pursuant to this section, after which Landlord shall have a reasonable time in which to complete the repair. Nothing contained in this section shall be construed to obligate Landlord to seal or otherwise maintain the surface of any foundation, floor or slab. Tenant expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair.

14. <u>TENANT'S REPAIRS</u>.

14.1. OBLIGATIONS OF TENANT. Subject to Section 14.2 below, Tenant shall, at its sole cost and expense, keep and maintain all parts of the Premises (except those listed as Landlord's responsibility in Section 13 above) in good and sanitary condition, promptly making all necessary repairs and replacements, including but not limited to, windows, glass and plate glass, doors, skylights, roof membranes, gutters and downspouts, any special store front or office entry, walls and finish work, floors and floor coverings, heating and air conditioning systems, dock boards, bumpers, plates, seals, levelers and lights, plumbing work and fixtures (including periodic backflow testing), electrical systems, lighting facilities and bulbs, sprinkler systems, alarm systems, fire detection systems, termite and pest extermination, sidewalks, landscaped areas, fencing, tenant signage and regular removal of trash and debris. Tenant shall notify Landlord in writing prior to making any repair or performing any maintenance pursuant to this section, and Landlord shall have the right to designate the contractor Tenant shall use to make any repair or to perform any maintenance on the roof, heating, ventilation and air conditioning systems ("**HVAC**"), plumbing systems, electrical systems, sprinkler systems, fire alarm systems or fire detection systems located at the Premises. Tenant shall not paint or otherwise change the exterior appearance of the Premises without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion. The cost of maintenance and repair of any common party wall (any wall, divider, partition or any other structure separating the Premises from any adjacent premises occupied by other tenants) shall be shared equally by Tenant and the tenant occupying the adjacent premises; provided, however, if Tenant damages a party wall the entire cost of the repair shall be paid by Tenant, at Tenant's sole expense. Tenant shall not damage any party wall or disturb the integrity and support provided by any party wall. If Tenant fails to keep the Premises in good condition and repair, Landlord may, but shall not be obligated to, make any necessary repairs. If Landlord makes such repairs, Landlord may bill Tenant for the cost of the repairs as additional rent, and said additional rent shall be payable by Tenant within ten (10) days after demand by Landlord.

14.2. PERFORMANCE OF WORK BY LANDLORD. Notwithstanding Tenant's obligation to keep the roof membranes, HVAC units, sprinkler systems, fire alarm systems, fire detection systems and exterior walls of the Premises in good condition and repair, Landlord shall employ contractors to perform all repairs, maintenance and replacements of the roof

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 33 of
103

membranes, HVAC units, sprinkler systems, fire alarm systems, fire detection systems and exterior walls of the Premises. The items described in the previous sentence that Landlord will cause to be repaired, maintained and replaced are hereinafter referred to as the "**Landlord Maintenance Items**." Tenant shall reimburse Landlord as additional rent for all costs Landlord incurs in performing the Landlord Maintenance Items within ten (10) days after written demand by Landlord. Landlord shall determine in its sole discretion the scope and timing of the performance of such Landlord Maintenance Items, and Tenant shall not perform such Landlord Maintenance Items. Landlord's maintenance of the exterior walls of the Premises shall include the right, but not the obligation, of Landlord to paint from time to time all or some of the exterior walls, canopies, doors, windows, gutters, handrails and other exterior parts of the Premises with colors selected by Landlord, and Tenant shall reimburse Landlord as provided above for all costs incurred by Landlord in painting such items. If the Premises contains landscaped areas ("**Landscaped Areas**"), Landlord shall maintain the Landscaped Areas, and Tenant shall reimburse Landlord for all costs incurred by Landlord in maintaining the Landscaped Areas within ten (10) days after written demand by Landlord; provided, however, Landlord shall have the right to estimate the monthly cost of maintaining the Landscaped Areas, and Tenant shall pay such amount to Landlord as additional rent each month at the same time Tenant pays Base Rent. Tenant shall immediately give Landlord written notice of any repair or maintenance required by Landlord pursuant to this section, after which Landlord shall have a reasonable time in which to complete such repair or maintenance. Landlord shall have the right, but not the obligation, to include the cost of Landlord Maintenance Items and the cost of the maintenance of Landscaped Areas in Operating Expenses, and Tenant shall then pay Tenant's Percentage Share of such costs as determined by Landlord. Landlord shall have the right at any time, and from time to time, to elect upon written notice to Tenant to have Tenant perform some or all of the Landlord Maintenance Items and/or the maintenance of the Landscaped Areas, in which event Tenant shall employ contractors designated by Landlord to perform such work and shall pay for all such work at Tenant's sole cost and expense, all in accordance with the requirements of Section 14.1.

14.3. MAINTENANCE CONTRACTS. Landlord shall enter into regularly scheduled preventative maintenance/service contracts for some or all of the following: the HVAC units servicing the Premises, the sprinkler, fire alarm and fire detection systems servicing the Premises, backflow testing for the plumbing servicing the Premises and for the roof membrane of the Premises (the "**Maintenance Contracts**"). The Maintenance Contracts shall include maintenance services satisfactory to Landlord, in Landlord's sole discretion. Tenant shall reimburse Landlord for the cost of the Maintenance Contracts within ten (10) days after written demand by Landlord; provided, however, Landlord shall have the right to estimate the monthly cost of the Maintenance Contracts, and Tenant shall pay such amount to Landlord as additional rent each month at the same time Tenant pays Base Rent. Landlord shall have the right, but not the obligation, to include the cost of Maintenance Contracts in Operating Expenses, and Tenant shall then pay Tenant's Percentage Share of such costs as determined by Landlord. Landlord shall have the right at any time, and from time to time, to elect upon written notice to Tenant to have Tenant

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 34 of 103

purchase some or all of the Maintenance Contracts, in which event Tenant shall purchase such contracts from persons designated or approved by Landlord and shall pay for such Maintenance Contracts at Tenant's sole cost and expense.

15.   ALTERATIONS AND SURRENDER.

15.1.1. CONSENT OF LANDLORD.  Tenant shall have the right, subject to Landlord's reasonable requirements relating to construction at the Property, upon ten (10) days prior written notice to Landlord, to make alterations ("**Permitted Alterations**") to the inside of the Premises (e.g., paint and carpet, communication systems, telephone and computer system wiring) that do not (a) involve the expenditure of more than five thousand dollars ($5,000), (b) affect the exterior appearance of the building or the roof, (c) affect the building's electrical, plumbing, HVAC, life, fire safety or similar building systems or the structural elements of the building, (d) affect the Common Areas or Parking Areas or (e) materially adversely affect any other tenant of the Property.  Except with respect to Permitted Alterations, Tenant shall not, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion, make any alterations, improvements, additions, utility installations or repairs (hereinafter collectively referred to as "**Non-Permitted Alterations**") in, on or about the Premises or the Property.  References in this Lease to "**Alterations**" shall mean both Permitted Alterations and Non-Permitted Alterations.  At the expiration of the Term or, Landlord may require the removal of any Alterations installed by Tenant and the restoration of the Premises and the Property to their prior condition, at Tenant's expense.   If, as a result of any Alteration made by Tenant, Landlord is obligated to comply with the Americans With Disabilities Act or any other law or regulation, and such compliance requires Landlord to make any improvement or Alteration to any portion of the Property, as a condition to Landlord's consent, Landlord shall have the right to require Tenant to pay to Landlord prior to the construction of any Alteration by Tenant the entire cost of any improvement or alteration Landlord is obligated to complete by such law or regulation.   Should Landlord permit Tenant to make its own Alterations, Tenant shall use only such architect and contractor as has been expressly approved by Landlord, and Landlord may require Tenant to provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alterations, to insure Landlord against any liability for mechanic's and materialmen's liens and to insure completion of the work.  In addition, Tenant shall pay to Landlord a fee equal to three percent (3%) of the cost of the Alterations to compensate Landlord for the overhead and other costs it incurs in reviewing the plans for the Alterations and in monitoring the construction of the Alterations (the "**Landlord Fee**").  If Landlord incurs architectural, engineering or other consultants fees in evaluating such Alterations, Tenant shall reimburse Landlord for these fees in addition to the Landlord Fee.  If Tenant proposes Alterations to Landlord but subsequently elects not to construct the Alterations, and Landlord has incurred costs in reviewing Tenant's proposed Alterations (e.g., architect's, engineer's or

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 35 of 103

property management fees), Tenant shall reimburse Landlord for the costs incurred by Landlord within ten (10) days after written demand. Should Tenant make any Alterations without the prior approval of Landlord, or use a contractor not expressly approved by Landlord, Landlord may, at any time during the Term of this Lease, require that Tenant remove all or part of the Alterations and return the Premises to the condition it was in prior to the making of the Alternations. In the event Tenant makes any Alterations, Tenant agrees to obtain or cause its contractor to obtain, prior to the commencement of any work, "builders all risk" insurance in an amount approved by Landlord, workers compensation insurance and any other insurance requested by Landlord, in Landlord's sole discretion.

15.2.   PERMITS.   Any Alterations in or about the Premises that Tenant shall desire to make shall be presented to Landlord in written form, with plans and specifications which are sufficiently detailed to obtain a building permit. If Landlord consents to an Alteration, the consent shall be deemed conditioned upon Tenant acquiring a building permit from the applicable governmental agencies, furnishing a copy thereof to Landlord prior to the commencement of the work, and compliance by Tenant with all conditions of said permit in a prompt and expeditious manner. Tenant shall provide Landlord with as-built plans and specifications for any Alterations made to the Premises.

15.3.   MECHANICS LIENS.   Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or the Property, or any interest therein. If Tenant shall, in good faith, contest the validity of any such lien, Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to not less than one and one-half times the amount of such contested lien claim indemnifying Landlord against liability arising out of such lien or claim. Such bond shall be sufficient in form and amount to free the Property from the effect of such lien. In addition, Landlord may require Tenant to pay Landlord's reasonable attorneys' fees and costs incurred as a result of any such lien.

15.4.   NOTICE.   Tenant shall give Landlord not less than ten (10) days' advance written notice prior to the commencement of any work in the Premises by Tenant, and Landlord shall have the right to post notices of non-responsibility in or on the Premises or the Property.

15.5.   HISTORIC OR ARCHEOLOGICAL STATUS.   As of Effective Date of this Lease, there are no known historic or archeological sites on the Premises. If at such time, such determination occurs, then Tenant shall not undertake any activity that may affect an identified historic or archeological property, including excavation, construction, alteration, maintenance or repairs of Premises or sites without prior written approval of Landlord. Buried cultural materials may be present on the Premises. If such materials are encountered, Tenant shall stop work immediately and notify Landlord.

15.6.   SURRENDER.   Subject to Landlord's right to require removal or to elect ownership as hereinafter provided, all Alterations made by Tenant to the Premises shall be the property of Tenant, but shall be considered to be a part of the Premises. Unless Landlord

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 36 of 103

gives Tenant written notice of its election not to become the owner of the Alterations at the end of the term of this Lease, the Alterations shall become the property of Landlord at the end of the term of this Lease. Landlord may require, on notice to Tenant, that some or all Alterations be removed prior to the end of the Term of this Lease and that any damages caused by such removal be repaired at Tenant's sole expense. On the last day of the Term hereof, or on any sooner termination, Tenant shall surrender the Premises (including, but not limited to, all doors, windows, floors and floor coverings, skylights, heating and air conditioning systems, dock boards, truck doors, dock bumpers, plumbing work and fixtures, electrical systems, lighting facilities, sprinkler systems, fire detection systems and nonstructural elements of the exterior walls, foundation and roof (collectively the "**Elements of the Premises**")) to Landlord in the same condition as received, ordinary wear and tear and casualty damage excepted, clean and free of debris and Tenant's personal property, trade fixtures and equipment. Tenant's personal property shall include all computer wiring and cabling installed by Tenant. Provided, however, if Landlord has not elected to have Tenant remove the Alterations, Tenant shall leave the Alterations at the Premises in good condition and repair, ordinary wear and tear excepted. Tenant shall repair any damage to the Premises occasioned by the installation or removal of Tenant's trade fixtures, furnishings and equipment. Damage to or deterioration of any Element of the Premises or any other item Tenant is required to repair or maintain at the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices. If the Premises are not surrendered at the expiration of the term or earlier termination of this Lease in accordance with the provisions of this section, at Landlord's option, Tenant shall continue to be responsible for the payment of Base Rent and all other amounts due under this Lease until the Premises are so surrendered in accordance with said provisions. Tenant shall indemnify, defend and hold Landlord harmless from and against any and all damages, expenses, costs, losses or liabilities arising from any delay by Tenant in so surrendering the Premises including, without limitation, any damages, expenses, costs, losses or liabilities arising from any claim against Landlord made by any succeeding tenant or prospective tenant founded on or resulting from such delay and losses and damages suffered by Landlord due to lost opportunities to lease any portion of the Premises to any such succeeding tenant or prospective tenant, together with, in each case, actual attorneys' fees and costs.

15.7. FAILURE OF TENANT TO REMOVE PROPERTY. If this Lease is terminated due to the expiration of the Term or otherwise, and Tenant fails to remove its property, in addition to any other remedies available to Landlord under this Lease, and subject to any other right or remedy Landlord may have under applicable law, Landlord may remove any property of Tenant from the Premises and store the same elsewhere at the expense and risk of Tenant.

16. DAMAGE AND DESTRUCTION.

16.1. EFFECT OF DAMAGE OR DESTRUCTION. If all or part of the Premises is damaged by fire, earthquake, flood, explosion, the elements, riot, the release or existence of Hazardous Materials (as defined below) or by any other cause whatsoever (hereinafter collectively

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 37 of 103

referred to as "**Damages**"), but the Damages are not material (as defined in Section 16.2 below), Landlord shall repair the Damages to the Premises as soon as is reasonably possible, and this Lease shall remain in full force and effect. If all or part of the Premises is destroyed or materially damaged (as defined in Section 16.2 below), Landlord shall have the right, in its sole and complete discretion, to repair or to rebuild the Premises or to terminate this Lease. Landlord shall within one hundred twenty (120) days after the discovery of such material damage or destruction notify Tenant in writing of Landlord's intention to repair, rebuild or terminate this Lease. Tenant shall in no event be entitled to compensation or damages on account of annoyance or inconvenience in making any repairs, or on account of construction, or on account of Landlord's election to terminate this Lease. Notwithstanding the foregoing, if Landlord shall elect to rebuild or repair the Premises after material damage or destruction, but in good faith determines that the Premises cannot be substantially repaired within three hundred sixty (360) days after the date of the discovery of the material damage or destruction, without payment of overtime or other premiums, and the damage to the Premises will render the entire Premises unusable during said three hundred sixty (360) day period, Landlord shall notify Tenant thereof in writing at the time of Landlord's election to rebuild or repair, and Tenant shall thereafter have a period of fifteen (15) days within which Tenant may elect to terminate this Lease, upon thirty (30) days' advance written notice to Landlord. Tenant's termination right described in the preceding sentence shall not apply if the damage was caused by the negligent or intentional acts of Tenant or its employees, agents, contractors or invitees. Failure of Tenant to exercise said election within said fifteen (15) day period shall constitute Tenant's agreement to accept delivery of the Premises under this Lease whenever tendered by Landlord, provided Landlord thereafter pursues reconstruction or restoration diligently to completion, subject to delays caused by Force Majeure Events. If Landlord is unable to repair the damage to the Premises or the Premises during such three hundred sixty (360) day period due to Force Majeure Events, the three hundred sixty (360) day period shall be extended by the period of delay caused by the Force Majeure Events. Subject to Section 16.3 below, if Landlord or Tenant terminates this Lease in accordance with this Section 16.1, Tenant shall continue to pay all Base Rent, Operating Expenses and other amounts due hereunder which arise prior to the date of termination.

16.2. DEFINITION OF MATERIAL DAMAGE. Damage to the Premises shall be deemed material if, in Landlord's reasonable judgment, the uninsured cost of repairing the damage will exceed twenty five thousand dollars ($25,000). If insurance proceeds are available to Landlord in an amount which is sufficient to pay the entire cost of repairing all of the damage to the Premises, the damage shall be deemed material if the cost of repairing the damage exceeds one hundred thousand dollars ($100,000). Damage to the Premises shall also be deemed material if (a) the Premises cannot be rebuilt or repaired to substantially the same condition it was in prior to the damage due to laws or regulations in effect at the time the repairs will be made, (b) the holder of any mortgage or deed of trust encumbering the Premises requires that insurance proceeds available to repair the damage in excess of twenty five thousand dollars ($25,000) be applied to the repayment

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 38 of 103

of the indebtedness secured by the mortgage or the deed of trust, or (c) the damage occurs during the last twelve (12) months of the Lease Term.

16.3.  ABATEMENT OF RENT.  If Landlord elects to repair damage to the Premises and all or part of the Premises will be unusable or inaccessible to Tenant in the ordinary conduct of its business until the damage is repaired, and the damage was not caused by the negligence or intentional acts of Tenant or its employees, agents, contractors or invitees, Tenant's Base Rent and Tenant's Percentage Share of Operating Expenses shall be abated until the repairs are completed in proportion to the amount of the Premises which is unusable or inaccessible to Tenant in the ordinary conduct of its business.  Notwithstanding the foregoing, there shall be no abatement of Base Rent or Tenant's Percentage Share of Operating Expenses by reason of any portion of the Premises being unusable or inaccessible for a period equal to five (5) consecutive business days or less.

16.4.  TENANT'S ACTS.  If such damage or destruction occurs as a result of the negligence or the intentional acts of Tenant or Tenant's employees, agents, contractors or invitees, and the proceeds of insurance which are actually received by Landlord are not sufficient to pay for the repair of all of the damage, Tenant shall pay, at Tenant's sole cost and expense, to Landlord upon demand, the difference between the cost of repairing the damage and the insurance proceeds received by Landlord.

16.5.  TENANT'S PROPERTY.  Landlord shall not be liable to Tenant or its employees, agents, contractors, invitees or customers for loss or damage to merchandise, tenant improvements, fixtures, automobiles, furniture, equipment, computers, files or other property (hereinafter collectively "**Tenant's Property**") located at the Premises.  Tenant shall repair or replace all of Tenant's property at Tenant's sole cost and expense.  Tenant acknowledges that it is Tenant's sole responsibility to obtain adequate insurance coverage to compensate Tenant for damage to Tenant's Property.

16.6.  WAIVER.  Landlord and Tenant hereby waive the provisions of any present or future statutes which relate to the termination of leases when leased property is damaged or destroyed and agree that such event shall be governed by the terms of this Lease.

17.  CONDEMNATION. If any portion of the Premises or the Property are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "**Condemnation**"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or Property are taken by such Condemnation as would substantially and adversely affect the operation and profitability of Tenant's business conducted from the Premises, and said taking lasts for ninety (90) days or more, Tenant shall have the option, to be exercised only in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession.  If a taking lasts for less than ninety (90) days, Tenant's rent shall be abated during said period but Tenant shall not have the right to terminate

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 39 of 103

this Lease.  If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in the proportion that the usable floor area of the Premises taken bears to the total usable floor area of the Premises.  Common Areas taken shall be excluded from the Common Areas usable by Tenant and no reduction of rent shall occur with respect thereto or by reason thereof.  Landlord shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by Condemnation of any part of the Premises or the Property.  Any award for the taking of all or any part of the Premises or the Property under the power of eminent domain or any payment made under threat of the exercise of such power shall be the exclusive property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold, for good will, for the taking of the fee, as severance damages, or as damages for tenant improvements; provided, however, that Tenant shall be entitled to any separate award for loss of or damage to Tenant's removable personal property and for moving expenses.  In the event that this Lease is not terminated by reason of such Condemnation, and subject to the requirements of any lender that has made a loan to Landlord encumbering the Property, Landlord shall to the extent of severance damages received by Landlord in connection with such Condemnation, repair any damage to the Property caused by such Condemnation except to the extent that Tenant has been reimbursed therefor by the condemning authority.  This section, not general principles of law or California Code of Civil Procedure Sections 1230.010 et seq., shall govern the rights and obligations of Landlord and Tenant with respect to the Condemnation of all or any portion of the Property.

18.    ASSIGNMENT, SUBLETTING AND LICENSING.

18.1.    LANDLORD'S CONSENT REQUIRED.  Tenant shall not voluntarily or by operation of law assign, transfer, hypothecate, mortgage, sublet, license or otherwise transfer or encumber all or any part of Tenant's interest in this Lease, the Premises or the Property (hereinafter collectively a "**Transfer**"), without Landlord's prior written consent, which shall not be unreasonably withheld.  Landlord shall respond to Tenant's written request for consent hereunder within thirty (30) days after Landlord's receipt of the written request from Tenant.  Any attempted Transfer without such consent shall be void and shall constitute a material default and breach of this Lease.  Tenant's written request for Landlord's consent shall include, and Landlord's thirty (30) day response period referred to above shall not commence, unless and until Landlord has received from Tenant, all of the following information: (a) financial statements for the proposed assignee, subtenant or licensee prepared in accordance with generally accepted accounting principles for the lesser of (i) the past three (3) years or (ii) the time period the assignee, subtenant or licensee has been in existence, (b) federal tax returns for the proposed assignee, subtenant or licensee for the lesser of (i) the past three (3) years or (ii) the time period the assignee, subtenant or licensee has been in existence, (c) a TRW credit report or similar report on the proposed assignee, subtenant or licensee, (d) a detailed description of the business the assignee, subtenant or licensee intends to operate at the Premises, (e) the proposed effective date of the assignment, sublease or license, (f) a copy of the proposed assignment, sublease or license agreement which includes all of the terms and conditions

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 40 of 103

of the proposed assignment, sublease or license, (g) a detailed description of any ownership or commercial relationship between Tenant and the proposed assignee, subtenant or licensee, (h) a detailed description of any Alterations the proposed assignee, subtenant or licensee desires to make to the Premises, and (i) a Hazardous Materials Disclosure Certificate substantially in the form of **Exhibit E** attached hereto (the "**Transferee HazMat Certificate**").  If the obligations of the proposed assignee, subtenant or licensee will be guaranteed by any person or entity, Tenant's written request shall not be considered complete until the information described in (a), (b) and (c) of the previous sentence has been provided with respect to each proposed guarantor. "**Transfer**" shall also include the transfer (a) if Tenant is a corporation, and Tenant's stock is not publicly traded over a recognized securities exchange, of more than twenty five percent (50%) of the voting stock of such corporation during the term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the corporation, or (b) if Tenant is a partnership, limited liability company, limited liability partnership or other entity, of more than twenty five percent (50%) of the profit and loss participation in such partnership or entity  during the term of this Lease (whether or not in one or more transfers) or the dissolution, merger or liquidation of the partnership, limited liability company, limited liability partnership or other entity.  If Tenant is a limited or general partnership (or is comprised of two or more persons, individually or as co-partners), Tenant shall not be entitled to change or convert to (i) a limited liability company, (ii) a limited liability partnership or (iii) any other entity which possesses the characteristics of limited liability without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole discretion.  Tenant's sole remedy in the event that Landlord shall wrongfully withhold consent to or disapprove any assignment, sublease or license shall be to obtain an order by a court of competent jurisdiction that Landlord grant such consent; in no event shall Landlord be liable for damages with respect to its granting or withholding consent to any proposed assignment, sublease or license.  If Landlord shall exercise any option to recapture the Premises, or shall deny a request for consent to a proposed assignment, sublease or license, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all losses, liabilities, damages, costs and claims that may be made against Landlord by the proposed assignee, subtenant or licensee, or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or sublease.

18.2.    LEVERAGED BUY-OUT.  The involvement by Tenant or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, refinancing, transfer, leveraged buy-out or otherwise) whether or not a formal assignment or hypothecation of this Lease or Tenant's assets occurs, which results or will result in a reduction of the "**Net Worth**" of Tenant as hereinafter defined, by an amount equal to or greater than twenty-five percent (25%) of such Net Worth of Tenant as it is represented to Landlord at the time of the execution by Landlord of this Lease, or as it exists immediately prior to said transaction or transactions constituting such reduction, at whichever time said Net Worth of Tenant was or is greater, shall be considered to be an assignment of this Lease by Tenant to which Landlord may reasonably withhold its consent.  Net Worth of Tenant for

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 41 of
103

purposes of this section shall be the net worth of Tenant (excluding any guarantors) established under generally accepted accounting principles consistently applied.

18.3.    STANDARD FOR APPROVAL.   Landlord shall not unreasonably withhold its consent to a Transfer provided that Tenant has complied with each and every requirement, term and condition of this Section 18.   Tenant acknowledges and agrees that each requirement, term and condition in this Section 18 is a reasonable requirement, term or condition.   It shall be deemed reasonable for Landlord to withhold its consent to a Transfer if any requirement, term or condition of this Section 18 is not complied with or: (a) the Transfer would cause Landlord to be in violation of its obligations under the Base Lease or any other lease or agreement to which Landlord is a party;   (b) in Landlord's reasonable judgment, a proposed assignee, subtenant or licensee has a smaller net worth than Tenant had on the date this Lease was entered into with Tenant or is less able financially to pay the rents due under this Lease as and when they are due and payable; (c) a proposed assignee's or subtenant's business will impose a burden on the Property's parking facilities, Common Areas or utilities that is greater than the burden imposed by Tenant, in Landlord's reasonable judgment; (d) the terms of a proposed assignment, subletting or licensing will allow the proposed assignee, subtenant or licensee to exercise a right of renewal, right of expansion, right of first offer, right of first refusal or similar right held by Tenant; (e) a proposed assignee, subtenant or licensee refuses to enter into a written assignment agreement or sublease, reasonably satisfactory to Landlord, which provides that it will abide by and assume all of the terms, conditions, covenants and restrictions in this Lease for the term of any assignment, sublease or license, and containing such other terms and conditions as Landlord reasonably deems necessary;  (f) the use of the Premises by the proposed assignee, subtenant or licensee is not permitted by this Lease;   (g) any guarantor of this Lease refuses to consent to the Transfer or to execute a written agreement reaffirming the guaranty;  (h) Tenant is in default as defined in Section 19 below at the time of the request; (i) if requested by Landlord, the assignee, subtenant or licensee refuses to sign a non-disturbance and attornment agreement in favor of Landlord's lender; (j) Landlord has sued or been sued by the proposed assignee, subtenant or licensee or has otherwise been involved in a legal dispute with the proposed assignee, subtenant or licensee; (k)  the assignee, subtenant or licensee is involved in a business which is not in keeping with the then-current standards of the Property;  (l) the proposed assignee, subtenant or licensee is an existing tenant of the Property or is a person or entity then negotiating with Landlord for the lease of space in the Property; (m) the assignment, sublease or license will result in there being more than one subtenant of the Premises; (n) the assignee, subtenant or licensee is a governmental or quasi-governmental entity or an agency, department or instrumentality of a governmental or quasi-governmental agency; (o) the assignee, subtenant or licensee will use, store or handle Hazardous Materials in or about the Premises of a type, nature, quantity not acceptable to Landlord, in Landlord's sole discretion or (p) the assignee, subtenant or licensee is a person or entity to whom Landlord has agreed not to lease space in the Property pursuant to a lease with another tenant.

18.4. ADDITIONAL TERMS AND CONDITIONS. The following terms and conditions shall be applicable to any Transfer:

18.4.1. Regardless of Landlord's consent, no Transfer shall release Tenant from Tenant's obligations hereunder or alter the primary liability of Tenant to pay the rent and other sums due Landlord hereunder and to perform all other obligations to be performed by Tenant hereunder or release any guarantor from its obligations under its guaranty.

18.4.2. Landlord may accept rent from any person other than Tenant pending approval or disapproval of an assignment, subletting or licensing.

18.4.3. Neither a delay in the approval or disapproval of a Transfer, nor the acceptance of rent, shall constitute a waiver or estoppel of Landlord's right to exercise its rights and remedies for the breach of any of the terms or conditions of this Section 18.

18.4.4. The consent by Landlord to any Transfer shall not constitute consent to any subsequent Transfer by Tenant or to any subsequent or successive Transfer by an assignee, subtenant or licensee. However, Landlord may consent to subsequent Transfers or any amendments or modifications thereto without notifying Tenant or anyone else liable on the Lease and without obtaining their consent, and such action shall not relieve such persons from liability under this Lease.

18.4.5. In the event of any default under this Lease, Landlord may proceed directly against Tenant, any guarantors or anyone else responsible for the performance of this Lease, including any subtenant, assignee or licensee, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord.

18.4.6. Landlord's written consent to any Transfer by Tenant shall not constitute an acknowledgment that no default then exists under this Lease nor shall such consent be deemed a waiver of any then existing default.

18.4.7. The discovery of the fact that any financial statement relied upon by Landlord in giving its consent to an assignment, subletting or license was materially false shall, at Landlord's election, render Landlord's consent null and void.

18.4.8. Landlord shall not be liable under this Lease or under any sublease or to any subtenant.

18.4.9. Landlord shall not be liable under this Lease or under any license or to any licensee.

18.4.10. No assignment, sublease or license may be modified or amended without Landlord's prior written consent.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 43 of 103

18.4.11. The occurrence of a transaction described in Section 18.2 shall give Landlord the right (but not the obligation) to require that Tenant immediately provide Landlord with an additional security deposit equal to three (3) times the monthly Base Rent payable under the Lease, and Landlord may make its receipt of such amount a condition to Landlord's consent to such transaction.

18.4.12. Any assignee of, or subtenant or licensee under this Lease shall, by reason of accepting such assignment or entering into such sublease or license, be deemed, for the benefit of Landlord, to have assumed and agreed to conform and comply with each and every term, covenant, condition, obligation and restriction herein to be observed or performed by Tenant during the term of said assignment, sublease or license, other than such obligations as are contrary or inconsistent with provisions of an assignment, sublease or license to which Landlord has specifically consented in writing.

18.4.13. At Landlord's request, Tenant shall deliver to Landlord, Landlord's standard consent to assignment or consent to sublease or license agreement, as applicable, executed by Tenant, the assignee and the subtenant or licensee, as applicable.

18.5. ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO SUBLETTING AND LICENSING. The following terms and conditions shall apply to any subletting or licensing by Tenant of all or any part of the Premises and shall be deemed included in all subleases and licenses under this Lease whether or not expressly incorporated therein:

18.5.1. ASSIGNMENT OF RENTS AND INCOME. Tenant hereby absolutely and unconditionally assigns and transfers to Landlord all of Tenant's interest in all rentals and income arising from any sublease or license entered into by Tenant, and Landlord may collect such rent and income and apply same toward Tenant's obligations under this Lease; provided, however, that until a default shall occur in the performance of Tenant's obligations under this Lease, Tenant may receive, collect and enjoy the rents accruing under such sublease or license. Landlord shall not, by reason of this or any other assignment of such rents to Landlord nor by reason of the collection of the rents from a subtenant or licensee, be deemed to have assumed or recognized any sublease or licensee, or to be liable to the subtenant or licensee for any failure of Tenant to perform and comply with any of Tenant's obligations to such subtenant or licensee under such sublease or license, including, but not limited to, Tenant's obligation to return any security deposit. Tenant hereby irrevocably authorizes and directs any such subtenant or licensee, upon receipt of a written notice from Landlord stating that a default exists in the performance of Tenant's obligations under this Lease, to pay to Landlord the rents due as they become due under the sublease or license. Tenant agrees that such subtenant or licensee shall have the right to rely upon any such statement and request from Landlord, and that such subtenant or licensee shall pay such rents to Landlord

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 44 of 103

without any obligation or right to inquire as to whether such default exists and notwithstanding any notice or claim from Tenant to the contrary.

18.5.2. ATTORNMENT.  In the event Tenant shall default in the performance of its obligations under this Lease, Landlord, at its option and without any obligation to do so, may require any subtenant or licensee to attorn to Landlord, in which event Landlord shall undertake the obligations of Tenant under such sublease or license from the time of the exercise of said option to the termination of such sublease or license; provided, however, Landlord shall not be liable for any prepaid rents or security deposit paid by such subtenant or licensee to Tenant or for any other prior defaults of Tenant under such sublease or license.

18.6.  TRANSFER PREMIUM FROM ASSIGNMENT OR SUBLETTING.  Landlord shall be entitled to receive from Tenant (as and when received by Tenant) as an item of additional rent one-half of all amounts received by Tenant from the assignee, subtenant or licensee in excess of the amounts payable by Tenant to Landlord hereunder (the "**Transfer Premium**").  The Transfer Premium shall be reduced by the reasonable brokerage commissions, tenant improvement costs and legal fees actually paid by Tenant in order to assign the Lease or to sublet all or a portion of the Premises.  "**Transfer Premium**" shall mean all Base Rent, additional rent or other consideration of any type whatsoever payable by the assignee, subtenant or licensee in excess of the Base Rent and additional rent payable by Tenant under this Lease.  If less than all of the Premises is subleased, for purposes of calculating the Transfer Premium, the Base Rent and the additional rent due under this Lease shall be allocated to the subleased or licensed premises  on a per-leasable-square-foot basis (e.g., if one-half of the Premises is subleased, for purposes of determining the amount of the Transfer Premium, one-half of the Base Rent and additional rent due under this Lease would be allocated to the subleased premises, and this amount would be subtracted from the base rent, additional rent and other monies payable to Tenant under the sublease). "**Transfer Premium**" shall also include, but not be limited to, key money and bonus money paid by the assignee, subtenant or licensee to Tenant in connection with such Transfer, and any payment in excess of fair-market value for services rendered by Tenant to the assignee, subtenant or licensee for assets, fixtures, inventory, equipment or furniture transferred by Tenant to the assignee, subtenant or licensee in connection with such Transfer.  Landlord and Tenant agree that the foregoing Transfer Premium is reasonable.

18.7.  LANDLORD'S OPTION TO RECAPTURE SPACE.  Notwithstanding anything to the contrary contained in this Section 18, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any request by Tenant to assign this Lease or to sublease or license space in the Premises, to terminate this Lease with respect to said space as of the date thirty (30) days after Landlord's election.  In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Base Rent, Tenant's Percentage Share of Operating Expenses and the number of parking spaces Tenant may use shall be adjusted on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 45 of 103

contained in the original Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either Party, the Parties shall execute written confirmation of same. If Landlord recaptures only a portion of the Premises, it shall construct and erect at its sole cost such partitions as may be required to sever the space to be retained by Tenant from the space recaptured by Landlord. Landlord may, at its option, lease any recaptured portion of the Premises to the proposed assignee, subtenant or licensee or to any other person or entity without liability to Tenant. Tenant shall not be entitled to any portion of the profit, if any, Landlord may realize on account of such termination and reletting. Tenant acknowledges that the purpose of this section is to enable Landlord to receive profit in the form of higher rent or other consideration to be received from an assignee, subtenant or licensee, to give Landlord the ability to meet additional space requirements of other tenants of the Property and to permit Landlord to control the leasing of space in the Property. Tenant acknowledges and agrees that the requirements of this section are commercially reasonable and are consistent with the intentions of Landlord and Tenant.

18.8.  LANDLORD'S EXPENSES. In the event Tenant shall assign this Lease or sublet or license the Premises or request the consent of Landlord to any Transfer, then Tenant shall pay (a) five ($500) to Landlord to compensate Landlord for its internal administrative costs in processing the request plus (b) Landlord's reasonable out-of-pocket costs and expenses incurred in connection therewith, including, but not limited to, attorneys', architects', accountants', engineers' or other consultants' fees.

19.  DEFAULT.

19.1.  DEFAULT BY TENANT. Landlord and Tenant hereby agree that the occurrence of any one or more of the following events is a material default by Tenant under this Lease and that said default shall give Landlord the rights described in Section 20. Landlord or Landlord's authorized agent shall have the right to execute and to deliver any notice of default, notice to pay rent or quit or any other notice Landlord gives Tenant.

19.1.1.  FAILURE TO MAKE PAYMENTS. Tenant's failure to make any payment of Base Rent, Tenant's Percentage Share of Operating Expenses or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof from Landlord to Tenant. In the event that Landlord serves Tenant with a notice to pay rent or quit pursuant to applicable unlawful detainer statutes, such notice shall also constitute the notice required by this Section.

19.1.2.  ABANDONMENT OF THE PREMISES. The abandonment of the Premises by Tenant coupled with the nonpayment of rent, in which event Landlord shall not be obligated to give any notice of default to Tenant.

19.1.3.  FAILURE TO COMPLY WITH ITS LEASE OBLIGATIONS. The failure of Tenant to comply with any of its obligations under this Lease and where Tenant fails to comply with its

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 46 of 103

obligations or fails to cure any earlier breach of such obligation within ten (10) days following written notice from Landlord to Tenant. In the event Landlord serves Tenant with a notice to quit or any other notice pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 19.1.3.

19.1.4. FAILURE TO PERFORM IN ACCORDANCE WITH THE LEASE. The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant (other than those referenced in Sections 19.1.1, 19.1.2 and 19.1.3, above), where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's nonperformance is such that more than ten (10) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said ten (10) day period and thereafter diligently pursues such cure to completion. In the event that Landlord serves Tenant with a notice to quit or any other notice pursuant to applicable unlawful detainer statutes, said notice shall also constitute the notice required by this Section 19.1.4.

19.1.5. TENANT CREDIT WORTHINESS. (a) The making by Tenant or any guarantor of Tenant's obligations hereunder of any general arrangement or general assignment for the benefit of creditors; (b) Tenant or any guarantor becoming a "debtor" as defined in 11 U.S.C. 101 or any successor statute thereto (unless, in the case of a petition filed against Tenant or guarantor, the same is dismissed within sixty (60) days); (c) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; (d) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days; or (e) the insolvency of Tenant. In the event that any provision of this Section 19 is unenforceable under applicable law, such provision shall be of no force or effect.

19.1.6. FALSE INFORMATION. The discovery by Landlord that any financial statement, representation or warranty given to Landlord by Tenant, or by any guarantor of Tenant's obligations hereunder, was materially false at the time given. Tenant acknowledges that Landlord has entered into this Lease in material reliance on such information.

19.1.7. DISSOLUTION OR LIQUIDATION. If Tenant is a corporation, partnership, limited liability company or similar entity, the dissolution or liquidation of Tenant.

19.1.8. TERMINATION OF GUARANTEE / GUARANTOR OBLIGATION. If Tenant's obligations under this Lease are guaranteed: (a) the death of a guarantor, (b) the termination of a guarantor's liability with respect to this Lease other than in accordance with the

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 47 of 103

terms of such guaranty, (c) a guarantor's becoming insolvent or the subject of a bankruptcy filing, (d) a guarantor's refusal to honor the guaranty, (e) a guarantor's breach of its guaranty obligation on an anticipatory breach basis or (f) if the guarantor is a corporation, limited liability company or partnership, the dissolution of the guarantor or the termination of the guarantor's existence.

19.2. DEFAULT BY LANDLORD.  Landlord shall not be in default under this Lease unless Landlord fails to perform obligations required of Landlord within thirty (30) days after written notice by Tenant to Landlord, specifying therein the obligation Landlord has failed to perform; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its cure, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently pursues the same to completion.  In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default, and Tenant's remedies shall be limited to damages and/or an injunction.  Tenant hereby waives its right to recover consequential damages (including, but not limited to, lost profits) or punitive damages arising out of a Landlord default.  This Lease and the obligations of Tenant hereunder shall not be affected or impaired because Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of a Force Majeure Event, and the time for Landlord's performance shall be extended for the period of any such delay.  Any claim, demand, right or defense by Tenant that arises out of this Lease or the negotiations which preceded this Lease shall be barred unless Tenant commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of the inaction, omission, event or action that gave rise to such claim, demand, right or defense.

20. REMEDIES.

20.1. LANDLORD REMEDIES.  In the event of any material default or breach of this Lease by Tenant, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

20.1.1. TERMINATE LEASE AND TENANT'S POSSESSION OF THE PREMISES.  Landlord shall have the right to terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease and the Term hereof shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord.  If Landlord terminates this Lease, Landlord may recover from Tenant (a) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (b) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (c) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; and (d)

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 48 of
103

any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under the Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, the cost of recovering possession of the Premises, expenses of releasing, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, any real estate commissions actually paid by Landlord and the unamortized value of any free rent, reduced rent, tenant improvement allowance or other economic concessions provided by Landlord. The "worth at time of award" of the amounts referred to in Section 20.1.1 and 20.1.2 shall be computed by allowing interest at the lesser of ten percent (10%) per annum or the maximum interest rate permitted by applicable law.  The worth at the time of award of the amount referred to in Section 20.1.1 shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).  For purposes of this Section 20.1.1, "**Rent**" shall be deemed to be all monetary obligations required to be paid by Tenant pursuant to the terms of this Lease.

20.1.2. MAINTAIN THE LEASE.  Landlord shall have the right to maintain Tenant's right of possession, in which event Landlord shall have the remedy described in California Civil Code Section 1951.4 which permits Landlord to continue this Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due.  In the event Landlord elects to continue this Lease in effect, Tenant shall have the right to sublet the Premises or assign Tenant's interest in the Lease subject to the reasonable requirements contained in Section 18 of this Lease and provided further that Landlord shall not require compliance with any standard or condition contained in Section 18 that has become unreasonable at the time Tenant seeks to sublet or assign the Premises pursuant to this Section 18.

20.1.3. Collect Rents.  Landlord shall have the right to collect sublease and/or license rents (or appoint a receiver to collect such rent) and otherwise perform Tenant's obligations at the Premises, it being agreed, however, that the appointment of a receiver for Tenant shall not constitute an election by Landlord to terminate this Lease.

20.1.4. Any Other Remedy Available in Law.  Landlord shall have the right to pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of California.

20.2.  Cumulative Remedies.  No remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.  The expiration or termination of this Lease and/or the termination of Tenant's right to possession of the Premises shall not relieve Tenant of liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term of the Lease or by reason of Tenant's occupancy of the Premises.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 49 of 103

20.3. Surrender of Premises. If and when Tenant abandons the Premises, Landlord may re-enter the Premises, and such re-entry shall not be deemed to constitute Landlord's election to accept a surrender of the Premises or to otherwise relieve Tenant from liability for its breach of this Lease. No surrender of the Premises shall be effective against Landlord unless Landlord has entered into a written agreement with Tenant in which Landlord expressly agrees to (a) accept a surrender of the Premises and (b) relieve Tenant of liability under the Lease. The delivery by Tenant to Landlord of possession of the Premises shall not constitute the termination of the Lease or the surrender of the Premises.

21. LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT. All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of rent. If Tenant shall fail to perform any of its obligations under this Lease, Landlord may, but shall not be obligated to, after three (3) days' prior written notice to Tenant, make any such payment or perform any such act on Tenant's behalf without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder. Tenant shall pay to Landlord, within ten (10) days after delivery by Landlord to Tenant of statements therefore, an amount equal to the expenditures reasonably made by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of this section.

22. INDEMNITY. Tenant hereby agrees to indemnify, defend and hold harmless Landlord, the City of Riverbank, Government and each of their respective boards, commissions, officers, employees, partners, agents, property managers, volunteers, contractors, lenders and ground lessors (said persons and entities are hereinafter collectively referred to as the "**Indemnified Parties**") from and against any and all liability, loss, cost, damage, claims, loss of rents, liens, judgments, penalties, fines, settlement costs, investigation costs, cost of consultants and experts, attorneys fees, court costs and other legal expenses, effects of environmental contamination, cost of environmental testing, removal, remediation and/or abatement of Hazardous Materials (as said term are defined below), insurance policy deductibles and other expenses (hereinafter collectively referred to as "**Damages**") arising out of or related to an Indemnified Matter (as defined below). For purposes of this section, an "**Indemnified Matter**" shall mean any matter for which one or more of the Indemnified Parties incurs liability or Damages if the liability or Damages arise out of or involve, directly or indirectly, (a) Tenant's or its employees', agents', contractors' or invitees' (all of said persons or entities are hereinafter collectively referred to as "**Tenant Parties**") use or occupancy of the Premises or the Property, (b) any act, omission or neglect of a Tenant Party, (c) Tenant's failure to perform any of its obligations under the Lease, (d) the existence, use or disposal of any Hazardous Materials (as defined below) brought on to the project by a Tenant Party or (e) any other matters for which Tenant has agreed to indemnify Landlord pursuant to any other provision of this Lease. Tenant's obligations hereunder shall include, but shall not be limited to (f) compensating the Indemnified Parties for Damages arising out of Indemnified Matters within ten (10) days after written demand from an Indemnified Party and (g) providing a defense, with counsel reasonably satisfactory to the Indemnified Party, at Tenant's sole expense, within ten (10) days after written demand from the Indemnified Party, of any claims, action or proceeding arising out of or relating to an Indemnified Matter whether or

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 50 of 103

not litigated or reduced to judgment and whether or not well founded.  If Tenant is obligated to compensate an Indemnified Party for Damages arising out of an Indemnified Matter, Landlord shall have the immediate and unconditional right, but not the obligation, without notice or demand to Tenant, to pay the damages, and Tenant shall, upon ten (10) days' advance written notice from Landlord, reimburse Landlord for the costs incurred by Landlord.  By way of example, and not limitation, Landlord shall have the immediate and unconditional right to cause any damages to the Common Areas, another tenant's premises or to any other part of the Property to be repaired and to compensate other tenants of the Property or other persons or entities for Damages arising out of an Indemnified Matter.  The Indemnified Parties need not first pay any Damages to be indemnified hereunder.  Tenant's obligations under this section shall not be released, reduced or otherwise limited because one or more of the Indemnified Parties are or may be actively or passively negligent with respect to an Indemnified Matter or because an Indemnified Party is or was partially responsible for the Damages incurred.  This indemnity is intended to apply to the fullest extent permitted by applicable law.  Tenant's obligations under this section shall survive the expiration or termination of this Lease unless specifically waived in writing by Landlord after said expiration or termination.   Notwithstanding anything to the contrary contained in this section, Tenant shall not be obligated to indemnify an Indemnified Party from liability to the extent such liability arises out of the Indemnified Party's negligence.

23.     EXEMPTION OF LANDLORD FROM LIABILITY. Tenant hereby agrees that Landlord, City and Government, and their respective councils, boards, commissions, officers, employees, property managers, agents and volunteers ("**Landlord Parties**") shall not be liable for injury to Tenant's business or any loss of income therefrom or for loss of or damage to the merchandise, tenant improvements, fixtures, furniture, equipment, computers, files, automobiles, or other property of Tenant, Tenant's employees, agents, contractors or invitees, or any other person in or about the Property, nor shall Landlord Parties be liable for injury to the person of Tenant, Tenant's employees, agents, contractors or invitees, whether such damage or injury is caused by or results from any cause whatsoever including, but not limited to, theft, criminal activity at the Property, negligent security measures, bombings or bomb scares, acts of terrorism, Hazardous Substances or Medical Waste (as defined above), fire, steam, electricity, gas, water or rain, flooding, breakage of pipes, sprinklers, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the Property, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Property, and regardless of whether the cause of the damage or injury arises out of the active negligence, or passive negligence acts of Landlord Parties.  Landlord Parties shall not be liable for any damages arising from any act or neglect of any employees, agents, contractors or invitees of any other tenant, occupant or user of the Property, nor from the failure of Landlord Parties to enforce the provisions of the lease of any other tenant of the Property.  Tenant, as a material part of the consideration to Landlord hereunder, hereby assumes all risk of damage to Tenant's property or business or injury to persons, in, upon or about the Property arising from any cause, including the active or passive negligence of Landlord Parties, and Tenant hereby waives all claims in respect thereof against any and all Landlord Parties.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 51 of
103

24.    LANDLORD'S LIABILITY.  Tenant acknowledges that Landlord shall have the right to transfer all or any portion of its interest in the Property and to assign this Lease to the transferee.  Tenant agrees that in the event of such a transfer Landlord shall automatically be released from all liability under this Lease; and Tenant hereby agrees to look solely to Landlord's transferee for the performance of Landlord's obligations hereunder after the date of the transfer.  Upon such a transfer, Landlord shall, at its option, return Tenant's security deposit to Tenant or transfer Tenant's security deposit to Landlord's transferee and, in either event, Landlord shall have no further liability to Tenant for the return of its security deposit.  Subject to the rights of any lender holding a mortgage or deed of trust encumbering all or part of the Property, Tenant agrees to look solely to Landlord's equity interest in the Property for the collection of any judgment requiring the payment of money by Landlord arising out of (a) Landlord's failure to perform its obligations under this Lease or (b) the negligence or willful misconduct of Landlord, its partners, employees and agents.  No other property or assets of Landlord or Landlord Parties shall be subject to levy, execution or other enforcement procedure for the satisfaction of any judgment or writ obtained by Tenant against Landlord.  No partner, employee or agent of Landlord  or Landlord Parties shall be personally liable for the performance of Landlord's obligations hereunder or be named as a party in any lawsuit arising out of or related to, directly or indirectly, this Lease and the obligations of Landlord hereunder.  The obligations under this Lease do not constitute personal obligations of the individual partners of Landlord or Landlord Parties, if any, and Tenant shall not seek recourse against the individual partners of Landlord, Landlord Parties or their assets.

25.    SIGNS.  Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners or painting, or erect or install any signs, windows or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion.  Upon vacation of the Premises, Tenant shall remove all signs and repair, paint and/or replace the building facia surface to which its signs are attached.  Tenant shall obtain all applicable governmental permits and approvals for signs and exterior treatments.   All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements.

26.    ESTOPPEL CERTIFICATE.

    26.1.    DELIVERY OF CERTIFICATE.  Tenant shall from time to time, upon not less than ten (10) days' prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying such information as Landlord may reasonably request including, but not limited to, the following: (a) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect), (b) the date to which the Base Rent and other charges are paid in advance and the amounts so payable, (c) that there are not, to Tenant's knowledge, any uncured defaults or unfulfilled obligations on the part of Landlord, or specifying such defaults or unfulfilled obligations, if any are claimed,

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 52 of
103

(d) that all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations, and (e) that Tenant has taken possession of the Premises. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Property.

26.2. FAILURE TO DELIVER CERTIFICATE. At Landlord's option, the failure of Tenant to deliver such statement within such time shall constitute a material default of Tenant hereunder, or it shall be conclusive upon Tenant that (a) this Lease is in full force and effect, without modification except as may be represented by Landlord, (b) there are no uncured defaults in Landlord's performance, (c) not more than one month's Base Rent has been paid in advance, (d) all tenant improvements to be constructed by Landlord, if any, have been completed in accordance with Landlord's obligations, and (e) Tenant has taken possession of the Premises.

27. REPORTS, INSPECTIONS AND FINANCIAL INFORMATION.

27.1. SAFETY REPORTS AND INSPECTIONS. Landlord shall have the right to review any and all safety reports and inspections, including any associated documentation, relating to the Premises or Property in Tenant's possession or control. Tenant shall make such safety reports and inspections available to Landlord within forty eight (48) hours of receipt of such written notice from Landlord.

27.2. FINANCIAL INFORMATION. From time to time, at Landlord's request, Tenant shall cause the following financial information to be delivered to Landlord, at Tenant's sole cost and expense, upon not less than ten (10) days' advance written notice from Landlord: (a) a current financial statement for Tenant and Tenant's financial statements for the previous two accounting years, (b) a current financial statement for any guarantor(s) of this Lease and the guarantor'(s) financial statements for the previous two (2) accounting years and (c) such other financial information pertaining to Tenant or any guarantor as Landlord or any lender or purchaser of Landlord may reasonably request. All financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant. Tenant hereby authorizes Landlord, from time to time, without notice to Tenant, to obtain a credit report or credit history on Tenant from any credit reporting company.

28. ENVIRONMENTAL MATTERS/HAZARDOUS MATERIALS.

28.1. ENVIRONMENTAL COMPLIANCE\HAZARDOUS MATERIALS.

28.1.1. HAZARDOUS MATERIALS. "**Hazardous Materials**" shall mean any material, substance or waste that is or has the characteristic of being hazardous, toxic, ignitable, reactive, flammable, explosive, radioactive or corrosive, including, without limitation, petroleum, solvents, lead, acids, pesticides, paints, printing ink, PCBs, asbestos, materials commonly known to cause cancer or reproductive problems and those materials, substances and/or wastes, including wastes which are or

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 53 of 103

later become regulated by any local governmental authority, the state in which the Premises are located or the United States Government, including, but not limited to, substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "hazardous wastes" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 *et seq.*; the Resource Conservation and Recovery Act; all environmental laws of the state where the Property is located, and any other environmental law, regulation or ordinance now existing or hereinafter enacted. "**Hazardous Materials Laws**" shall mean all present and future federal, state and local laws, ordinances and regulations, prudent industry practices, requirements of governmental entities (including, without limitation, the U. S. Army) and manufacturer's instructions relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, presence, disposal or transportation of any Hazardous Materials, including without limitation the laws, regulations and ordinances referred to in the preceding sentence.

28.1.2. TENANT'S USE OF HAZARDOUS MATERIALS ON PREMISES / PROPERTY. Except as permitted in this Section, Tenant hereby agrees that Tenant and Tenant's officers, employees, representatives, agents, contractors, subcontractors, successors, assigns, subtenants, concessionaires, invitees and any other occupants of the Premises (for purposes of this Section, referred to collectively herein as "**Tenant Representatives**") shall not cause or permit any Hazardous Materials to be used, generated, manufactured, refined, produced, processed, stored or disposed of, on, under or about the Premises or Property or transport to or from the Premises or Property without the express prior written consent of Landlord and Government, which consent may be limited in scope and predicated on strict compliance by Tenant of all applicable Hazardous Materials Laws and such other reasonable rules, regulations and safeguards as may be required by Landlord (or any insurance carrier, environmental consultant or lender of Landlord, or environmental consultant retained by any lender of Landlord) in connection with using, generating, manufacturing, refining, producing, processing, storing or disposing of Hazardous Materials on, under or about the Premises or the Property. In connection therewith, Tenant shall, at its own expense, procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for the storage or use by Tenant or any of Tenant's Representatives of Hazardous Materials on the Premises or the Property, including without limitation, discharge of (appropriately treated) materials or wastes into or through any sanitary sewer serving the Premises or the Property.

28.1.3. TENANT CONTAMINATION. If at any time during the Term, any contamination of the Premises by Hazardous Materials shall occur where such contamination is caused by the act or omission of Tenant or Tenant's Representatives (**Tenant's Contamination**"), then Tenant, at Tenant's sole cost and expense, shall promptly

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 54 of 103

and diligently remove such Hazardous Materials from the Premises or the groundwater underlying the Premises to the extent required to comply with applicable Hazardous Materials Laws. Tenant shall not take any required remedial action in response to any Tenant's Contamination in or about the Premises or enter into any settlement agreement, consent, decree or other compromise in respect to any claims relating to any Tenant's Contamination without first obtaining the prior written consent of Landlord, which may be subject to conditions imposed by Landlord as determined in Landlord's sole discretion. Such prior written consent shall not be required to the extent the delay caused by the requirement to obtain consent may increase the damage to the Premises or the risk of harm to human health, safety or security caused by the Tenant Contamination. Landlord and Tenant shall jointly prepare a remediation plan in compliance with all Hazardous Materials Laws and the provisions of this Lease. In addition to all other rights and remedies of Landlord hereunder, if Tenant does not promptly and diligently take all steps to prepare and obtain all necessary approvals of a remediation plan for any Tenant's Contamination, and thereafter commence the required remediation of any Hazardous Materials released or discharged in connection with Tenant's Contamination within thirty (30) days after all necessary approvals and consents have been obtained, and thereafter continue to prosecute such remediation to completion in accordance with the approved remediation plan, then Landlord, at its sole discretion, shall have the right, but not the obligation, to cause such remediation to be accomplished, and Tenant shall reimburse Landlord within fifteen (15) business days of Landlord's demand for reimbursement of all amounts reasonably paid by Landlord (together with interest on such amounts at the highest lawful rate until paid), when such demand is accompanied by proof of payment by Landlord of the amounts demanded. Tenant shall promptly deliver to Landlord, copies of hazardous waste manifests reflecting the legal and proper disposal of all Hazardous Materials removed from the Premises as part of Tenant's remediation of any Tenant's Contamination.

28.2.  ENVIRONMENTAL PERMITS.  Tenant, its contractors, assigns or subtenants shall be solely responsible for obtaining, at their cost and sole expense, any environmental permits required for Tenant's operations under the Lease, independent of any existing permits held by Landlord or Government. Tenant shall not conduct operations or activities under any environmental permit that names Landlord or Government as a secondary discharger or co-permittee. Tenant shall provide prior written notice to Landlord and Government of all environmental permits and permit applications required for any of Tenant's operations or activities. Tenant acknowledges that neither Landlord nor Government will consent to being named a secondary discharger or co-permittee for any operations or activities of Tenant, its contractors, assigns or subtenants.

28.3.  GOVERNMENT'S RIGHT TO INSPECT.  Tenant acknowledges that Government's rights under the Base Lease specifically include the right of Government officials to inspect, upon reasonable notice, the Premises for compliance with environmental, safety and occupational health laws and regulations, whether or not Government is responsible for

enforcing them.  Such inspections are without prejudice to the right of duly constituted enforcement officials to make such inspections.  Landlord shall also have the right to inspect, upon reasonable notice, the Premises for compliance with environmental, safety, and occupational health laws and regulations, regardless of whether Government or Landlord is responsible for enforcing or complying with them.  Government or Landlord normally will give Tenant twenty-four (24) hours' prior notice of its intention to enter the Premises unless it determines the entry is required for exigent circumstances related to health, safety, or security.  Tenant shall have no claim against Landlord, Government, or any officer, agent, employee, contractor or subcontractor of Landlord or Government by reason of entrance of such Landlord or Government officer, agent, employee, contractor or subcontractor onto the Premises.

28.4.    TENANT NPL ACKNOWLEDGEMENT.  Tenant acknowledges that the Property has been identified as a National Priorities List ("**NPL**") Site under the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**") of 1980, as amended, and acknowledges that Landlord has provided Tenant with a copy of the Installation Federal Facility Agreement ("**FFA**") entered into by the United States Environmental Protection Agency ("**EPA**") Region, the state equivalent, and the Military Department.  Landlord will provide Tenant with a copy of any amendments thereto.  Tenant agrees that should any conflict arise between the terms of such agreement as it currently exists or may be amended ("**FFA**," "**Interagency Agreement**," or "**IAG**") and the provisions of this Lease, the terms of the FFA or IAG will take precedence.  Tenant further agrees that notwithstanding any other provision of this Lease, Government assumes no liability to Tenant or its assigns or subtenants should implementation of the FFA interfere with Tenant's use of Premises.  Tenant shall have no claim on account of any such interference against Landlord or Government or any officer, agent, employee, contractor or subcontractor thereof, other than for abatement of rent, where applicable.

28.5.    NOTICE OF GALBESTOS.  Tenant is informed that the exterior siding of the buildings have been determined to contain Galbestos, a material that includes asbestos and polychlorinated biphenyls ("**PCBs**").  Evaluation of the interior of the buildings reflected the presence of Galbestos material in concrete, in dust, and on the walls.  No PCB material was detected in indoor air.  Landlord has consulted with the United States Environmental Protection Agency, the California Department of Toxic Substance Control, and the United States Army.  These three governmental agencies have indicated that continued occupancy and use of the premises is acceptable.  It is anticipated that the Army will perform remedial activities with respect to Galbestos.  Tenant is informed that PCBs and asbestos have been identified as representing a health hazard when humans are exposed to them.

28.6.    RIGHT TO ENTER PREMISES / PROPERTY.  Government, EPA, and their officers, agents, employees, contractors and subcontractors have the right, upon reasonable notice to Landlord and to Tenant, to enter upon Premises for the purposes enumerated in this subparagraph and for such other purposes consistent with any provisions of Lease or the cleanup program (including, but not limited to, the BRAC Cleanup Plan, IRP, FFA, or IAG): (a) to conduct investigations and surveys, including, where necessary, drilling, soil and

water sampling, testpitting, testing soil borings and other activities related to the cleanup program; (b) to inspect field activities of Government and its contractors and subcontractors in implementing the cleanup program; (c) to conduct any test or survey required by EPA or applicable state equivalent relating to the implementation of the cleanup program; (d) to construct, operate, maintain or undertake any other response or remedial action as required or necessary under the cleanup program, including but not limited to monitoring wells, pumping wells and treatment facilities.

28.7.   TENANT COMPLIANCE WITH HEALTH AND SAFETY PLANS.   Tenant agrees to comply with the provisions of any health or safety plan in effect under the IRP or the FFA during the course of any of the above-described response or remedial actions.   Any inspection, survey, investigation or other response or remedial action will, to the extent practicable, be coordinated with representatives designated by Landlord and Tenant.   Neither Landlord nor Tenant shall have any claim on account of such entries against Government or any officer, agent, employee, contractor or subcontractor thereof.   In addition, Tenant shall comply with all applicable federal, state, and local occupational safety and health regulations.

28.8.   TENANT COMPLIANCE WITH HAZARDOUS WASTER PERMIT REQUIREMENTS.   Tenant shall strictly comply with the hazardous waste permit requirements under the Resource Conservation and Recovery Act or its applicable state equivalent.   Except as specifically authorized by Government in writing, Tenant must provide at its own expense such hazardous waste management facilities complying with all laws and regulations.   Government hazardous waste management facilities will not be available to Tenant.   Any violation of the requirements of this condition shall be deemed a material breach of this Lease.

28.9.   DOD COMPONENT ACCUMULATION POINTS.   Department of Defense ("**DoD**") component accumulation points for hazardous and other waste will not be used by Tenant.   Neither will Tenant permit its hazardous wastes to be commingled with hazardous waste of the DoD component.

28.10.   COPIES OF PERMIT APPLICATIONS.   Tenant shall maintain copies of any permit applications made to any federal, state, or local regulatory agencies and shall provide copies to Landlord or Government on reasonable request.   Tenant shall promptly notify Landlord and Government of any notices of violation or noncompliance received by Tenant from any such agency, concerning environmental matters or hazardous substances or hazardous waste on, about, or pertaining to the Premises.

28.11.   TENANT DISTURBANCE OF PROPERTY SUBSURFACE.   Tenant shall not conduct or permit any subtenant, contractor, agent or employee to undertake any subsurface excavation, digging, drilling or other disturbance of the surface without the prior written approval of Landlord and Government.

28.12.   NO INTERFERENCE WITH GOVERNMENT OPERATIONS.   Tenant shall not conduct operations, nor make any alterations, that would interfere with or otherwise restrict Government

operations or environmental clean-up or restoration actions by Government, Environmental Protection Agency, State of California, or their contractors. Environmental clean-up, restoration, or testing activities by these parties shall take priority over Tenant's use of the Premises in the event of conflict. Government has agreed in the Base Lease to make every reasonable effort to develop a plan to conduct any remediation of environmental contamination in a manner that minimizes interference with Landlord's or Tenant's use of the Premises, and to provide reasonable and timely prior written notice of Government operations that may or will interfere with Landlord's or Tenant's use of the Premises. Any work by Landlord or Tenant in the proximity of operable units that are part of a National Priorities List site may require written approval by Government's Remedial Project Manager.

28.13. VACATION OF PREMISES. In the event environmental contamination is discovered on the Premises which creates, in Government's determination, an imminent and substantial endangerment to human health or the environment which necessitates evacuation of Premises, then notwithstanding any other termination rights and procedures contained in this Lease, Government may require Landlord to require that Tenant vacate the Premises immediately upon notice from Government of the existence of such a condition. The Government shall not be liable for the exercise of authority, which is in conformity with this subsection, except as detailed in the Base Lease. Government's exercise of this right herein to order the Premises immediately vacated does not alone constitute a termination of the Base Lease, but such right may be exercised in conjunction with any other termination rights provided for in the Base Lease or by law.

28.14. ASBESTOS. If Tenant intends to make any improvements or repairs that require the removal of asbestos, an appropriate asbestos disposal plan must be incorporated into the plans and specifications and submitted to Landlord and Government. The asbestos disposal plan will identify the proposed disposal site for the asbestos, or in the event the site has not been identified, will provide for disposal at a licensed facility authorized to receive it. Asbestos containing materials ("**ACM**") which, since the commencement of the Lease, became damaged or deteriorated as a consequence of Tenant's activities under this Lease, including, but not limited to, any emergency, will be abated by Tenant at its sole cost and expense. In an emergency, Tenant will notify Landlord and Government as soon as practicable of its emergency ACM responses. Tenant shall be responsible for monitoring the condition of existing ACM on Premises for deterioration or damage and accomplishing repairs or abatement pursuant to the applicable conditions of this Lease.

28.15. LEAD BASED PAINT. Tenant is hereby advised that the buildings and other painted structures in the Premises are potentially painted with lead-based paints ("**LBP**"). Such buildings and structures shall not be suitable for occupancy for residential purposes until any inspections and abatement required by applicable law have been completed. Subject to Section of this Lease, Tenant may, at its sole cost and expense, have a state-certified LBP Inspector complete a LBP inspection and abatement and provide an abated certification to Landlord and Government, at which time with written Landlord and Government approval, the specified premises can be used for residential purposes.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 58 of 103

28.16.   ABATEMENT COSTS.  If the provisions of Paragraphs 29.14 and 29.15 require Tenant to abate either ACM or LBP, Tenant shall manage at its sole cost and expense any ACM and LBP, and comply with all applicable federal, state, and local laws.

28.17.   ENVIRONMENTAL QUESTIONNAIRE.  Prior to the execution of this Lease, Tenant shall complete, execute and deliver to Landlord an Environmental Questionnaire Disclosure Statement (the "**Environmental Questionnaire**"), in the form of **Exhibit F** attached hereto.  To the extent Tenant intends to store, use, treat or dispose of Hazardous Materials on the Premises, Tenant shall prepare and submit together with the Environmental Questionnaire a Hazardous Materials Handling Plan (the "**Hazardous Materials Handling Plan**").  For a period of fifteen (15) days following Landlord's receipt of the Environmental Questionnaire and Hazardous Materials Handling Plan, if applicable, Landlord and, to the extent required by Paragraph 12.14 or 10 U.S.C. Sec. 2692 the Government, shall have the right to approve or disapprove such documents.  The failure of Landlord or Government to approve such documents shall be deemed Landlord's disapproval thereof.  Landlord and Government's approval of the Environmental Questionnaire and the Hazardous Materials Handling Plan shall constitute approval for Tenant's use of the Hazardous Materials set forth therein in compliance with Hazardous Materials Laws and the Hazardous Materials Handling Plan.  Following approval of the Hazardous Materials Handling Plan, Tenant shall comply therewith throughout the Term.  To the extent Tenant is permitted to utilize Hazardous Materials upon the Premises, such use shall be limited to the items set forth in the Environmental Questionnaire, shall comply with Hazardous Materials Laws and the Hazardous Materials Handling Plan and Tenant shall promptly provide Landlord with complete and legible copies of all the following environmental items relating thereto:  reports filed pursuant to any self-reporting requirements; permit applications, permits, monitoring reports, workplace exposure and community exposure warnings or notices and all other reports, disclosures, plans or documents relating to water discharges, air pollution, waste generation or disposal, and underground storage tanks for hazardous materials; orders, reports, notices, listing and correspondence of or concerning the release, investigation of, compliance, cleanup, remedial and corrective actions, and abatement of hazardous materials; and all complaints, pleadings and other legal documents filed by or against Tenant related to Tenant's use, handling, storage or disposal of hazardous materials.  If, in conjunction with Tenant's Permitted Use of the Premises, Tenant desires to commence the use, treatment, storage or disposal of previously undisclosed Hazardous Materials, prior to such usage thereof, Tenant shall notify Landlord thereof, by written summary detailing the scope of such proposed usage and updating the Hazardous Materials Handling Plan to the extent required by such proposed usage.  For a period of fifteen (15) days following Landlord's receipt of such notice, Landlord and, to the extent required by Paragraph 12.14 or 10 U.S.C. Sec. 2692 the Government, shall have the right to approve or disapprove of such documents.  The failure of Landlord or the Government to approve of such documents within such time period shall be deemed Landlord's disapproval thereof.

28.18.   COMPLIANCE WITH HAZARDOUS MATERIALS LAWS.  Tenant shall at all times and in all respects comply with all Hazardous Materials Laws.  All reporting obligations imposed by

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 59 of 103

Hazardous Materials Laws are strictly the responsibility of Tenant. Tenant and Landlord have been informed that certain California judicial decisions have held that, notwithstanding the specific language of a lease, courts may impose the responsibility for complying with legal requirements and for performing improvements, maintenance and repairs on a landlord or tenant based on the court's assessment of the parties' intent in light of certain equitable factors. Tenant and Landlord have each been advised by their respective legal counsel about the provisions of this Lease allocating responsibility for compliance with laws and for performing improvements, maintenance and repairs between Tenant and Landlord. Tenant and Landlord expressly agree that the allocation of responsibility for compliance with laws and for performing improvements, maintenance and repairs set forth in this Lease represents Tenant's and Landlord's intent with respect to this issue.

28.19. INDEMNITY. In addition to any other provisions of this Lease, Tenant shall, and does hereby agree to, indemnify and hold harmless Government and Landlord from any costs, expenses, liabilities, fines or penalties resulting from discharges, emissions, spills, storage or disposal as a result of any actions by Tenant, use or operations, or any other action by Tenant or its contractors, employees, agents, assigns, invitees, subtenants or licensees giving rise to liability, civil or criminal, or any other action by Tenant or its contractors, employees, agents, assigns, or subtenants giving rise to responsibility under Federal, state or local environmental laws. Tenant's obligations hereunder shall apply whenever Government or Landlord incurs costs or liabilities for Tenant's activities or for the activities of Tenant's contractors, employees, agents, assigns, invitees, or subtenants as provided hereunder. This provision shall survive the expiration or termination of this Lease.

28.20. PROHIBITED USES. Storage, treatment or disposal of toxic or hazardous materials on the Premises is prohibited excepted as authorized by Government in accordance with 10 U.S.C. § 2692.

28.21. GOVERNMENT INDEMNITY. The responsibility of Government to indemnify and hold harmless the Landlord and Tenant against toxic torts and other environmental claims shall be in accordance with Public Law 102-484, Section 330, as amended.

29. SUBORDINATION.

29.1. EFFECT OF SUBORDINATION. This Lease, and any Option (as defined below) granted hereby, upon Landlord's written election, shall be subject and subordinate to the Base Lease and any ground lease, mortgage, deed of trust or any other hypothecation or security now or hereafter placed upon the Property and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default and so long as Tenant shall pay rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. At the request of any mortgagee, trustee or

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 60 of 103

ground lessor, Tenant shall attorn to such person or entity. If any mortgagee, trustee or ground lessor shall elect to have this Lease and any Options granted hereby prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Tenant, this Lease and such Options shall be deemed prior to such mortgage, deed of trust or ground lease, whether this Lease or such Options are dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof. In the event of the foreclosure of a security device, the new owner shall not (a) be liable for any act or omission of any prior landlord or with respect to events occurring prior to its acquisition of title, (b) be liable for the breach of this Lease by any prior landlord, (c) be subject to any offsets or defenses which Tenant may have against the prior landlord or (d) be liable to Tenant for the return of its security deposit.

29.2. EXECUTION OF DOCUMENTS. Tenant agrees to execute and acknowledge any documents Landlord reasonably requests that Tenant execute to effectuate an attornment, a subordination, or to make this Lease or any Option granted herein prior to the lien of any mortgage, deed of trust or ground lease, as the case may be. Tenant's failure to execute such documents within ten (10) days after written demand shall constitute a material default by Tenant hereunder or, at Landlord's option, Landlord shall have the right to execute such documents on behalf of Tenant as Tenant's attorney-in-fact. Tenant does hereby make, constitute and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead to execute such documents in accordance with this section.

30. OPTIONS.

30.1. DEFINITION. As used in this Lease, the word "**Option**" has the following meaning: (a) the right or option to extend the term of this Lease or to renew this Lease, (b) the option or right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Property or the right of first offer to lease other space within the Property, and (c) the right or option to terminate this Lease prior to its expiration date or to reduce the size of the Premises. Any Option granted to Tenant by Landlord must be evidenced by a written option agreement attached to this Lease as a rider or addendum or said option shall be of no force or effect. For purposes of this section, an Option shall also include any Option contained in any subsequent amendment to this Lease.

30.2. OPTIONS PERSONAL. Each Option granted to Tenant in this Lease, if any, is personal to the original Tenant and may be exercised only by the original Tenant while occupying the entire Premises and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant, including, without limitation, any permitted transferee as defined in Section . The Options, if any, herein granted to Tenant are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise. If at any time an Option is exercisable by Tenant, the Lease has been assigned or a sublease exists as to any portion

of the Premises, the Option shall be deemed null and void and neither Tenant nor any assignee or subtenant shall have the right to exercise the Option.

30.3.　MULTIPLE OPTIONS.  In the event that Tenant has multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Option to extend or renew this Lease has been so exercised.

30.4.　EFFECT OF DEFAULT ON OPTIONS.  Tenant shall have no right to exercise an Option (a) during the time commencing from the date Landlord gives to Tenant a notice of default pursuant to Section 19 and continuing until the noncompliance alleged in said notice of default is cured, or (b) if Tenant is in default of any of the terms, covenants or conditions of this Lease.  The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise an Option because of the provisions of this section.

30.5.　LIMITATIONS ON OPTIONS.  Notwithstanding anything to the contrary contained in any rider or addendum to this Lease, except as outlined in Section 1.16 of this Lease, any options, rights of first refusal or rights of first offer granted hereunder shall be subject and secondary to Landlord's right to first offer and lease any such space to any tenant who is then occupying or leasing such space at the time the space becomes available for leasing and shall be subject and subordinated to any other options, rights of first refusal or rights of first offer previously given to any other person or entity.

30.6.　GUARANTEES.  Notwithstanding anything to the contrary contained in any rider or addendum to this Lease, Tenant's right to exercise and the effectiveness of an Option is conditioned upon Landlord's receipt from any prior tenant that has not been expressly released from liability under this Lease, and any guarantor of any obligation of Tenant under this Lease, of a written agreement satisfactory to Landlord, in Landlord's sole discretion, reaffirming such person's obligations under this Lease or the guaranty, as modified by Tenant's exercise of the Option.

30.7.　NOTICE OF EXERCISE OF OPTION.  Notwithstanding anything to the contrary contained in Section, Tenant shall give written notice exercising the Option using certified mail return receipt requested or some other method where the person delivering the package containing the notice obtains a signature of the person accepting the package containing the notice (e.g., by FedEx with the requirement that the FedEx delivery person obtain a signature from the person accepting the package).  It shall be the obligation of Tenant to prove that Landlord received the notice exercising the Option in a timely manner.

31.　LANDLORD RESERVATIONS.  Landlord shall have the right: (a) to change the name and address of the Property or building upon not less than ninety (90) days prior written notice; (b) to permit any tenant the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and (c) to place signs, notices or displays upon the roof, interior or exterior of the building or Common Areas of the Property.   Landlord reserves the right to use the exterior walls of the Premises, and the area beneath, adjacent to and above

the Premises together with the right to install, use, maintain and replace equipment, machinery, pipes, conduits and wiring through the Premises, which serve other parts of the Property provided that Landlord's use does not unreasonably interfere with Tenant's use of the Premises.

32.     CHANGES TO PROPERTY. Landlord shall have the right, in Landlord's sole discretion, from time to time, to make changes to the size, shape, location, number and extent of the improvements comprising the Property (hereinafter referred to as "**Changes**") including, but not limited to, the interior and exterior of buildings, the Common Areas, HVAC, electrical systems, communication systems, fire protection and detection systems, plumbing systems, security systems, parking control systems, driveways, entrances, parking spaces, parking areas and landscaped areas.  In connection with the Changes, Landlord may, among other things, erect scaffolding or other necessary structures at the Property, limit or eliminate access to portions of the Property, including portions of the Common Areas, or perform work in the building, which work may create noise, dust or leave debris in the building.  Tenant hereby agrees that such Changes and Landlord's actions in connection with such Changes shall in no way constitute a constructive eviction of Tenant or entitle Tenant to any abatement of rent.   Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Changes, nor shall Tenant be entitled to any compensation or damages from Landlord for any inconvenience or annoyance occasioned by such Changes or Landlord's actions in connection with such Changes.   Landlord shall use commercially reasonable efforts to minimize disruption to Tenant's business operations caused by Changes.

33.     SUBSTITUTION OF OTHER PREMISES.  Landlord shall have the right at any time to move Tenant to any other leasable space in the Property provided that said space shall be approximately the same size as the Premises and that Landlord shall pay the cost of moving Tenant's furniture, equipment and trade fixtures to the new space.  The new space shall include tenant improvements that are substantially equivalent to the tenant improvements contained in the Premises, and the cost of any required tenant improvements shall be paid by Landlord.  If Landlord elects to relocate Tenant, Landlord shall give Tenant written notice of its election, and Tenant shall have thirty (30) days thereafter to agree to be relocated in accordance with the terms and conditions of this section or to elect to terminate this Lease.  If Tenant elects to terminate this Lease within said thirty (30) day period or fails to respond to Landlord's notice within said thirty (30) day period, this Lease shall then terminate on the date which is sixty (60) days after the date Landlord gave Tenant its written notice electing to relocate Tenant.  Landlord shall have no liability to Tenant as a result of Tenant's election to terminate this Lease.  Prior to said termination, Landlord and Tenant shall perform all of their obligations under this Lease.  If Tenant elects to be relocated, Landlord shall deliver substitute space to Tenant not more than one hundred eighty (180) days after (a) Tenant agrees to be relocated and (b) Tenant approves plans for the construction of required tenant improvements at the new space, if any.  Tenant shall not unreasonably withhold or delay its approval of any plans for the construction of tenant improvements.  Landlord shall give Tenant thirty (30) days' advance notice of the estimated move-in date.  Prior to the date that Tenant is moved to the new space, Tenant shall remain in the Premises and shall continue to perform all of its obligations under this Lease.  After Tenant moves into the new space, this Lease shall remain in full force and effect and be deemed applicable to such new space, except as to

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 63 of 103

Base Rent, Tenant's Percentage Share of Operating Expenses and the number of parking spaces Tenant shall be entitled to use, all of which shall be adjusted based on the relationship between the number of leasable square feet in the original Premises and the number of leasable square feet in the substituted space. Upon Tenant's election to be relocated, Landlord and Tenant shall amend this Lease to provide for the relocation of the Premises.

34. HOLDING OVER. If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of the Term hereof with Landlord's consent, such occupancy shall be a tenancy from month to month upon all the terms and conditions of this Lease pertaining to the obligations of Tenant, except that the Base Rent payable shall be the greater of (a) one hundred fifty percent (150%) of the Base Rent payable immediately preceding the termination date of this Lease or (b) one hundred twenty-five percent (125%) of the fair market Base Rent for the Premises as of the date Tenant holds over, and all Options, if any, shall be deemed terminated and be of no further effect. If Tenant remains in possession of the Premises or any part thereof, after the expiration of the Term hereof without Landlord's consent, Tenant shall, at Landlord's option, be treated as a tenant at sufferance or a trespasser. Nothing contained herein shall be construed to constitute Landlord's consent to Tenant holding over at the expiration or earlier termination of the Lease term or to give Tenant the right to hold over after the expiration or earlier termination of the Lease term. Tenant hereby agrees to indemnify, hold harmless and defend Landlord from any cost, loss, claim or liability (including attorneys' fees) Landlord may incur as a result of Tenant's failure to surrender possession of the Premises to Landlord upon the termination of this Lease.

35. GOVERNMENT / LANDLORD'S ACCESS.

35.1. ACCESS. Government, Landlord and their agents, contractors and employees shall have the right to enter the Premises at reasonable times upon reasonable advance telephonic notice to Tenant (except in the case of any emergency, where no advance notice shall be required) for the purpose of inspecting the Premises, performing any services required of Landlord, showing the Premises to prospective purchasers, lenders or tenants, undertaking safety measures and making alterations, repairs, improvements or additions to the Premises or to the Property. In the event of an emergency, Landlord may gain access to the Premises by any reasonable means, and Landlord shall not be liable to Tenant for damage to the Premises or to Tenant's property resulting from such access. Landlord may at any time place on or about the building or the Property for sale or for lease signs.

35.2. KEYS. Landlord shall have the right to retain keys to the locks on the entry doors to the Premises and all interior doors at the Premises.

36. SECURITY MEASURES. Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Property, and Landlord shall have no liability to Tenant due to its failure to provide such services. Tenant assumes all responsibility for the protection of Tenant, its agents, employees, contractors and invitees and the property of Tenant and of Tenant's agents, employees,

contractors and invitees from acts of third parties. Nothing herein contained shall prevent Landlord, at Landlord's sole option, from implementing security measures for the Property or any part thereof, in which event Tenant shall participate in such security measures and the cost thereof shall be included within the definition of Operating Expenses, and Landlord shall have no liability to Tenant and its agents, employees, contractors and invitees arising out of Landlord's negligent provision of security measures. Landlord shall have the right, but not the obligation, to require all persons entering or leaving the Property to identify themselves to a security guard and to reasonably establish that such person should be permitted access to the Property.

37. GENERAL PROVISIONS.

37.1. EASEMENTS. Landlord reserves to itself the right, from time to time, to grant such easements, rights and dedications that Landlord deems necessary or desirable, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant. Tenant shall sign any of the aforementioned documents within ten (10) days after Landlord's request, and Tenant's failure to do so shall constitute a material default by Tenant. The obstruction of Tenant's view, air or light by any structure erected in the vicinity of the Property, whether by Landlord or third parties, shall in no way affect this Lease or impose any liability upon Landlord.

37.2. TRANSPORTATION MANAGEMENT. Tenant shall fully comply at its sole expense with all present or future programs implemented or required by any governmental or quasi-governmental entity or Landlord to manage parking, transportation, air pollution or traffic in and around the Property or the metropolitan area in which the Property is located.

37.3. SEVERABILITY. The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

37.4. TIME OF ESSENCE. Time is of the essence with respect to each of the obligations to be performed by Tenant and Landlord under this Lease.

37.5. INCORPORATION OF PRIOR AGREEMENTS. This Lease and the attachments listed in Section contain all agreements of the parties with respect to the lease of the Premises and any other matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. Except as otherwise stated in this Lease, Tenant hereby acknowledges that no real estate broker nor Landlord nor any employee or agents of any of said persons has made any oral or written warranties or representations to Tenant concerning the condition or use by Tenant of the Premises or the Property or concerning any other matter addressed by this Lease.

37.6. AMENDMENTS. This Lease may be modified in writing only, signed by the parties in interest at the time of the modification.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 65 of 103

37.7.   NOTICES.   All notices required or permitted by this Lease shall be in writing and may be delivered (a) in person (by hand, by messenger or by courier service), (b) by U.S. Postal Service regular mail, (c) by U.S. Postal Service certified mail, return receipt requested, (d) by U.S. Postal Service Express Mail, Federal Express or other overnight courier, or (e) by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this section.  Any notice permitted or required hereunder, and any notice to pay rent or quit or similar notice, shall be deemed personally delivered to Tenant on the date the notice is personally delivered to any employee of Tenant at the Premises.  The addresses set forth in Section 1.20 of this Lease shall be the address of each party for notice purposes.   Landlord or Tenant may by written notice to the other specify a different address for notice purposes, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for the purpose of mailing or delivering notices to Tenant.  A copy of all notices required or permitted to be given to Landlord hereunder shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereinafter designate by written notice to Tenant.  Any notice sent by regular mail or by certified mail, return receipt requested, shall be deemed given three (3) days after deposited with the U.S. Postal Service.  Notices delivered by U.S. Express Mail, Federal Express or other courier shall be deemed given on the date delivered by the carrier to the appropriate party's address for notice purposes.  If any notice is transmitted by facsimile transmission, the notice shall be deemed delivered upon telephone confirmation of receipt of the transmission thereof at the appropriate party's address for notice purposes.  A copy of all notices delivered to a party by facsimile transmission shall also be mailed to the party on the date the facsimile transmission is completed.  If notice is received on Saturday, Sunday or a legal holiday, it shall be deemed received on the next business day.  Nothing contained herein shall be construed to limit Landlord's right to serve any notice to pay rent or quit or similar notice by any method permitted by applicable law, and any such notice shall be effective if served in accordance with any method permitted by applicable law whether or not the requirements of this section have been met.

37.8.   WAIVERS.   No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Landlord or Tenant of the same or any other provision.  Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant.  The acceptance of rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant of any provision hereof, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent.   No acceptance by Landlord of partial payment of any sum due from Tenant shall be deemed a waiver by Landlord of its right to receive the full amount due, nor shall any endorsement or statement on any check or accompanying letter from Tenant be deemed an accord and satisfaction.  Tenant hereby waives California Code of Civil Procedure Section 1179 and Civil Code section 3275 which allow tenants to obtain relief from the forfeiture of a lease.  Tenant hereby waives for Tenant and all those claiming under Tenant all rights now or hereafter existing to redeem by order or judgment of any court

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 66 of 103

or by legal process or writ Tenant's right of occupancy of the Premises after any termination of this Lease.

37.9.   COVENANTS.  This Lease shall be construed as though Landlord's covenants contained herein are independent and not dependent and Tenant hereby waives the benefit of any statute to the contrary.  All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions.

37.10.   BINDING EFFECT; CHOICE OF LAW.  Subject to any provision hereof restricting assignment or subletting by Tenant, this Lease shall bind the parties, their heirs, personal representatives, successors and assigns.  This Lease shall be governed by the laws of the state in which the Property is located, and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Property is located.

37.11.   ATTORNEYS' FEES.  If Landlord or Tenant brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, or appeal thereon, shall be entitled to its reasonable attorneys' fees and court costs to be paid by the losing party as fixed by the court in the same or separate suit, and whether or not such action is pursued to decision or judgment.  The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith.  Landlord shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default.  Landlord and Tenant agree that attorneys' fees incurred with respect to defaults and bankruptcy are actual pecuniary losses within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code or any successor statute.

37.12.   AUCTIONS.  Tenant shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction or going-out-of-business sale upon the Premises or the Common Areas.

37.13.   MERGER.  The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not result in the merger of Landlord's and Tenant's estates and shall, at the option of Landlord, terminate all or any existing subtenancies and licenses or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies and licenses.

37.14.   QUIET POSSESSION. Subject to the other terms and conditions of this Lease, and the rights of any lender, and provided Tenant is not in default hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease.

37.15.   AUTHORITY.  If Tenant is a corporation, trust, limited liability company, limited liability partnership or general or limited partnership, Tenant, and each individual executing this

Lease on behalf of such entity, represents and warrants that such individual is duly authorized to execute and deliver this Lease on behalf of said entity, that said entity is duly authorized to enter into this Lease, and that this Lease is enforceable against said entity in accordance with its terms. If Tenant is a corporation, trust, limited liability company, limited liability partnership or other partnership, Tenant shall deliver to Landlord upon demand evidence of such authority satisfactory to Landlord.

37.16. CONFLICT. Except as otherwise provided herein to the contrary, any conflict between the printed provisions, exhibits, addenda or riders of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

37.17. MULTIPLE PARTIES. If more than one person or entity is named as Tenant herein, the obligations of Tenant shall be the joint and several responsibility of all persons or entities named herein as Tenant. Service of a notice in accordance with Section on one Tenant shall be deemed service of notice on all Tenants.

37.18. INTERPRETATION. This Lease shall be interpreted as if it was prepared by both parties, and ambiguities shall not be resolved in favor of Tenant because all or a portion of this Lease was prepared by Landlord. The captions contained in this Lease are for convenience only and shall not be deemed to limit or alter the meaning of this Lease. As used in this Lease, the words tenant and landlord include the plural as well as the singular. Words used in the neuter gender include the masculine and feminine gender.

37.19. PROHIBITION AGAINST RECORDING. Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant. Landlord shall have the right to record a memorandum of this Lease, and Tenant shall execute, acknowledge and deliver to Landlord for recording any memorandum prepared by Landlord.

37.20. RELATIONSHIP OF PARTIES. Nothing contained in this Lease shall be deemed or construed by the Parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

37.21. RULES AND REGULATIONS. Tenant agrees to abide by and conform to the Rules attached hereto as **Exhibit G** and to cause its employees, suppliers, customers and invitees to so abide and conform (the "**Rules**"). Landlord shall have the right, from time to time, to modify, amend and enforce the Rules in a nondiscriminatory manner. Landlord shall not be responsible to Tenant for the failure of other persons, including, but not limited to, other tenants, their agents, employees and invitees, to comply with the Rules.

37.22. RIGHT TO LEASE. Landlord reserves the absolute right to effect such other tenancies in the Property as Landlord in its sole discretion shall determine, and Tenant is not relying on any representation that any specific tenant or number of tenants will occupy the Property.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 68 of 103

37.23. PATRIOT ACT.  Tenant represents to Landlord that, (a) neither Tenant nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "**Prohibited Person**") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under Executive Order 13224 (the "**Executive Order**") signed on September 24, 2001, and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," or other governmental action, (ii) Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "**Money Laundering Act**") and (iii) throughout the term of this Lease, Tenant shall comply with the Executive Order and with the Money Laundering Act.

37.24. CONFIDENTIALITY.  Tenant acknowledges and agrees that the terms of this Lease are confidential and constitute proprietary information of Landlord.  Disclosure of the terms hereof could adversely affect the ability of Landlord to negotiate other leases with respect to the Property and may impair Landlord's relationship with other tenants of the Property.  Tenant agrees that it and its partners, officers, directors, employees, brokers, and attorneys, if any, shall not disclose the terms and conditions of this Lease to any other person or entity without the prior written consent of Landlord, which may be given or withheld by Landlord, in Landlord's sole discretion.  It is understood and agreed that damages alone would be an inadequate remedy for the breach of this provision by Tenant, and Landlord shall also have the right to seek specific performance of this provision and to seek injunctive relief to prevent its breach or continued breach.

37.25. WAIVER OF JURY TRIAL.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE THEIR RESPECTIVE RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION, PROCEEDING AND/OR HEARING BROUGHT BY EITHER LANDLORD AGAINST TENANT OR TENANT AGAINST LANDLORD ON ANY MATTER WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR ANY CLAIM OF INJURY OR DAMAGE, OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY LAW, STATUTE, OR REGULATION, EMERGENCY OR OTHERWISE, NOW OR HEREAFTER IN EFFECT.

LANDLORD AND TENANT ACKNOWLEDGE THAT THEY HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LANDLORD AND TENANT WITH RESPECT TO THE PREMISES.  TENANT ACKNOWLEDGES THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO HAVE THIS LEASE

REVIEWED BY ITS LEGAL COUNSEL PRIOR TO ITS EXECUTION. PREPARATION OF THIS LEASE BY LANDLORD OR LANDLORD'S AGENT AND SUBMISSION OF SAME TO TENANT SHALL NOT BE DEEMED AN OFFER BY LANDLORD TO LEASE THE PREMISES TO TENANT OR THE GRANT OF AN OPTION TO TENANT TO LEASE THE PREMISES. THIS LEASE SHALL BECOME BINDING UPON LANDLORD ONLY WHEN FULLY EXECUTED BY BOTH PARTIES AND WHEN LANDLORD HAS DELIVERED A FULLY EXECUTED ORIGINAL OF THIS LEASE TO TENANT. THE DELIVERY OF A DRAFT OF THIS LEASE TO TENANT SHALL NOT CONSTITUTE AN AGREEMENT BY LANDLORD TO NEGOTIATE IN GOOD FAITH, AND LANDLORD EXPRESSLY DISCLAIMS ANY LEGAL OBLIGATION TO NEGOTIATE IN GOOD FAITH.

37.26. DEVELOPMENT OF PROPERTY. Tenant acknowledges that, without any form of representation or warranty, Landlord (or its successor) may cause certain development and redevelopment activities to occur at the Property which may or may not include areas in or about the Premises. As a material inducement for Landlord to enter into this Lease, Tenant agrees not to take any actions, oral or in writing, in opposition to such activities (or the planning and development thereof) by Landlord (or its successor).

38. BASE LEASE.

38.1. BASE LEASE. As of the Effective Date of this Lease, the Government is the owner of the real and personal property located on and comprising the Premises and Property. Landlord operates and maintains the Premises and Property pursuant to a lease between the Government and Landlord dated April 1, 2010, as may be amended from time to time (the "**Base Lease**"). The Base Lease is attached to this Lease as **Exhibit H**. Tenant represents that it has received, read and is familiar with the terms, conditions, covenants and restrictions of the Base Lease and agrees to comply with all obligations of Lessee (as defined in the Base Lease) as it relates to the Premises. Tenant specifically represents that it has received, read and is familiar with the terms, conditions, covenants and restrictions of the Exhibit E of the Base Lease and agrees to comply with all obligation of Lessee (as defined in the Base Lease) as it relates to the Premises. Tenant agrees to sign any acknowledgement provide to Tenant by Landlord within twenty four (24) hours of receipt, acknowledging that Tenant has received, read and is familiar with the terms, conditions, covenants and restrictions of the Base Lease, including Exhibit E. In the event of any conflict in the right of Tenant under this Lease and the rights of Landlord under the Base Lease, the terms conditions, covenants and restrictions of the Base Lease shall control.

38.2. GOVERNMENT DISPOSITION OF PROPERTY. The Property, which was formerly referred to as the Riverbank Army Ammunition Plant, was closed as a military installation and is in the process of being disposed to Landlord pursuant to and in accordance with the Defense Base Closure and Realignment Act of 1991, as amended (Pub. Law No. 101-510). The terms of this conveyance will be set forth in the Economic Development Conveyance Memorandum of Agreement ("**EDC MOA**"), which will be executed between Government and Landlord some time following the Effective Date of this Lease.

38.3.    PRIORITY OF LEASE.  In entering into and executing this Lease, Tenant understands and acknowledges that any leasehold interest granted by Landlord to Tenant in the Premises or Property will be junior and subject to the Base Lease, until such time as the Property is conveyed or the Base Lease is otherwise terminated.  As a result, this Lease is a "sublease" in accordance with all applicable laws, statutes and ordinances.

38.4.    LEGAL DESCRIPTIONS OF PROPERTY AND PREMISES.  No part of the Premises or Property have been surveyed or assigned an Assessor Parcel Number ("**APN**") by any State of California agency, the County of Stanislaus ("**County**") and the City of Riverbank ("**City**").  Any previously used legal description of the Premises or the Property shall not be applicable to this or any future Lease or agreement.  Upon receipt of Landlord's written approval Tenant may, at its sole expense, have the Premises surveyed by competent authority, in order to obtain a legal description of the Premises.  Any survey shall be subject to review and approval by Landlord.  Any such survey and legal description shall not be deemed to be a legally described parcel, nor shall it be assigned an identifying APN unless and until Landlord records a formal subdivision map with respect to the Property.

38.5.    COMPLIANCE WITH BASE LEASE.  Notwithstanding any provision of this Lease, Landlord and Tenant hereby agree as follows:  (a) Tenant will not do or permit anything to be done in or on the Premises which will cause the occurrence of a default by Landlord under the Base Lease, (b) if the Base Lease expires or is terminated for any reason, then this Lease shall thereupon terminate, without any liability to Landlord, as if such date were the scheduled expiration date of the Term, as defined in Section.

38.6.    COMPLIANCE WITH REDEVELOPMENT PLAN / RECORD OF DECISION.  Any use or uses of the Premises shall comply with all terms and conditions of the local Riverbank Redevelopment Plan, and, upon its adoption, be consistent with the National Environmental Protection Act Record of Decision for the disposal and reuse of the former Riverbank Army Ammunition Plant and any applicable environmental permits.   A copy of the ROD will be available for review at Landlord's offices during normal business hours at such time as it becomes available.

38.7.    GOVERNMENT DEFAULT UNDER BASE LEASE.  Landlord shall have no liability to Tenant for Government's default under the Base Lease.  Tenant agrees that Landlord shall not be obligated to perform any of Government's obligations under the Base Lease, except to the extent those obligations are expressly made obligations of Landlord under this Lease. Tenant further agrees that neither this Lease nor any obligation hereunder, including the payment of Base Rent, Equipment Rent or Additional Rent (as defined in Section 2), shall be affected by Government's default under the Base Lease, except to the extent that the Base Lease is terminated, or unless such default causes Landlord to breach the covenant of quiet enjoyment in favor of Tenant contained herein.  Landlord reserves all rights to enforce the Base Lease, but agrees to make reasonable and diligent efforts to enforce Government's obligations under the Base Lease, to the extent that Tenant is a material beneficiary thereof.

38.8. TERMINATION BY GOVERNMENT OF THE BASE LEASE FOR BREACH. The Government has the right to terminate the Base Lease on account of the breach by Tenant thereof of any of the terms and conditions of the Base Lease. In the event of a breach involving the performance of any obligation under the Base Lease, the Base Lease provides that Landlord, as the Tenant thereunder, shall be afforded thirty (30) days from the receipt of Government's notice of intent to terminate ("**Notice of Intent**"), to complete the performance of the obligation or otherwise cure the subject breach and avoid termination of the Base Lease. Landlord agrees to provide Tenant a copy of any Notice of Intent to Tenant as soon as commercially reasonable. In the event that any such notice is delivered to Landlord as the Tenant under the Base Lease, for any such breach occasioned or caused by the action, negligence or inaction of Tenant, or any party acting on behalf of or through Tenant, for an obligation, covenant or undertaking of Tenant under this Lease, then Tenant shall complete the performance of the obligation or otherwise cure the subject breach and avoid termination of this Lease and the Base Lease. Tenant shall cure such breach within thirty (30) days from the date of Landlord's receipt of the Notice of Intent. If Tenant should fail to cure within the grace periods provided above, then Landlord shall have the option to terminate this Lease, without the necessity of providing further notice or rights of cure to Tenant.

38.9. TENANT INDEMNITY. In the event that Government elects to terminate the Base Lease on account of the breach by Tenant of any of the terms and conditions hereof or of the Base Lease to be performed by Tenant, Tenant shall indemnify Landlord against any claims Government may have against Landlord for any of the following under the Base Lease: (a) The costs incurred by Government in resuming possession of the Premises; (b) the costs incurred in performing by Government of any of Tenant's obligations under this Lease; and (c) an amount equal to the aggregate of any maintenance obligations, and charges assumed hereunder and not therefore paid or satisfied, which amounts shall be due and payable at the time when such obligations, and charges would have accrued or become due and payable under this Lease.

38.10. TERMINATION BY GOVERNMENT FOR OTHER THAN BREACH. In addition to the right to terminate the Base Lease for breach, Government is entitled to terminate the Base Lease for its convenience under the following terms and conditions:

38.10.1. USE INCONSISTENT WITH ROD. Upon reasonable determination that the interim uses of Tenant under the Base Lease or the interim uses of Tenant under this Lease for the remaining duration of the Lease term are incompatible with Government's final disposal decision as embodied in the ROD, with respect to the required subsequent uses of the Premises, which subsequent uses must be effected during the balance remaining on the term of this Lease, and a finding is made that the continued use and occupation of the Premises through the end of the remaining Term cannot be permitted because of such irreconcilable incompatibility, unless the parties to this Lease make such modifications to this Lease as are reasonably required to make the uses compatible for the period of time remaining on the Lease term.

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 72 of 103

38.10.2. National Emergency.  In the event of a National Emergency as declared by the President or the Congress of the United States and Government makes a reasonable determination that such National Emergency requires the use by the United States of America of the Premises, or such National Emergency otherwise necessitates the use of the Property and such use will materially interfere with Tenant's use under the Base Lease or any tenant's use of the Premises.

38.10.3. Government Convenience.  In the event of a termination for Government's convenience as set forth in the Base Lease, Landlord, as Tenant under the Base Lease, is to be provided with no less than thirty (30) days written notice of such termination and shall immediately provide Tenant with a copy of any notification it receives from Government relative to such termination.  Landlord shall meet and confer with Tenant and Government to determine what is a reasonable time for Tenant to vacate the Premises, considering the factors of the nature of the exiting uses of Tenant, the consequences which would be affected if such termination is required and the losses and penalties which would be engendered if such termination is required.  Landlord shall provide Tenant with as long and reasonable time as are under the facts and circumstances acceptable to Government relative to such termination. In the event of such termination, Tenant and Landlord, as Tenant under the Base Lease, shall have only such remedies as are otherwise available under the law with respect to compensation from Government for such termination.  Tenant shall not seek and shall not have any claim against Landlord for any such termination for convenience by Government.

38.11. Administration.  Except as may be otherwise provided in the Base Lease or this Lease, Government shall, under the direction of the Command described in addendum (a) to the Base Lease, have complete charge of the administration of the Base Lease and any interests Government has under this Lease, and shall exercise full supervision and general direction thereof insofar as the interests of Government are affected.

39.    Landlord's Sustainability Objectives.

39.1.  Certification / Sustainability Rules.  Landlord may seek certification of all or portions of the Premises or Property under one or more programs of the Leadership in Energy and Environmental Design ("**LEED**") Green Building Rating System™ administered by the U.S. Green Building Council ("**USGBC**") and the Green Building Certification Institute ("**GBCI**"). In particular, Landlord is exploring certification of the overall Property under the LEED for Neighborhood Development ("**LEED-ND**") at the level of "Certified" or greater.   In addition to seeking certification for the overall Property under the LEED-ND program, Landlord may seek certification of individual buildings within the Property, including certification of the buildings under the LEED for New Construction ("**LEED-NC**"), LEED for Core & Shell ("**LEED-CS**"), LEED for Commercial Interiors ("**LEED-CI**") and the LEED for Existing Buildings ("**LEED-EB**") rating systems at the level of "Certified" or greater and Landlord may seek additional sustainable building certifications or incorporate equivalent or additional sustainability features or strategies  into the operation and maintenance of the Premises and Property and may seek third party certification of same (collectively,

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 73 of 103

"**Landlord's Sustainability Objectives**").  While Landlord does not require Tenants to seek LEED certification of the tenant spaces within the Premises, Tenant may do so at its sole cost and expense, and Landlord shall reasonably cooperate with the same provided there is no expense to Landlord, Tenant shall nonetheless be required to adhere to certain construction and operational practices and procedures that may be necessary in order for the Premises or the Property to comply with Landlord's LEED Objectives.  Those required practices and procedures are set forth in the "**Sustainability Rules**" attached to this Lease as **Exhibit H**, as may be amended or modified by Landlord from time to time in Landlord's sole discretion. Tenant acknowledges that it has been provided a copy of the Sustainability Rules and agrees to adhere to and abide by all of the terms, covenants, conditions, restrictions and obligations therein.

39.2.    NO CERTIFICATION WARRANTY OR REPRESENTATION.  While Landlord is exploring and aspires to design and develop all or portions of the Premises and Property to obtain LEED certification or its equivalent, actual certification by the independent, third-party USGBC and GBCI occurs only after substantial completion of construction and development of the Premises and/or the Property, and, therefore, Landlord cannot and does not make any assurance, guaranty, representation or warranty that LEED certification under any program, or any particular level of LEED certification (Certified, Silver, Gold or Platinum) or any other sustainable building certification, will be granted for all or a portion of the Premises or Property.  Nothing contained herein (including any "pre-certification" by the USGBC or GBCI) shall constitute a guarantee, representation, or warranty, express or implied, that Landlord will pursue certification to completion and/or that any such certification will in fact be obtained.  Landlord specifically disclaims any implied warranty or representation regarding achievement of LEED certification or any other sustainable building certification. In the event LEED certification is obtained, Landlord shall have no duty to obtain future certifications or take any actions to ensure that the Premises or Property will continue to meet current or future versions of the LEED or other sustainable rating standards. Tenant acknowledges expressly that it has not relied upon any aspirational goals or statements, oral or written, of the Landlord regarding sustainability or LEED certification.  Furthermore, according to the USGBC, buildings that obtain certification under the LEED Green Building Rating System™ or incorporate sustainable design features may offer the potential benefits of increased energy efficiency, decreased water consumption, and enhanced indoor air quality, among other benefits.  While Tenant, occupants, guests and invitees of the Project may enjoy such benefits on account of the Premises and/or Property's sustainability features or if LEED certification is in fact granted by the USGBC and GBCI for all or a portion of the Project, Landlord cannot and does not make any guarantee, representation, or warranty, express or implied, that any such benefits will be realized.  The conferring of LEED certification by the USGBC and GBCI is as of a date certain and may be predicated on certain assumptions, estimates, energy modeling and other studies conducted by the Landlord and its design and consultant professionals during the design and development process. Nothing herein should be construed as a representation or warranty by Landlord that the Premises or Property will in fact perform at the levels indicated in any such assumptions, estimates, models or studies or that the levels of energy and water efficiency or indoor air quality or other

operational efficiency that may in fact exist as of the Effective Date of this Lease will remain unchanged.

**IN WITNESS WHEREOF,** Landlord and Tenant have respectively signed and sealed this Lease as of the day and year first above written.

**LANDLORD:**                                    **TENANT:**

**CITY OF RIVERBANK LOCAL REDEVELOPMENT**        **AQH, LLC**
**AUTHORITY, AN AGENCY OF THE CITY OF**          a California Limited Liability Corporation
**RIVERBANK**, a political subdivision of the State of
California

                                                 By:_____

By:_____            Name:_____
      Debbie Olson
      Executive Director               Title:_____

Dated:_____            Dated:_____

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 75 of 103

EXHIBIT A

PROPERTY

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 76 of
103

EXHIBIT B

PREMISES

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 77 of
103

EXHIBIT C

EQUIPMENT

None

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 78 of 103

EXHIBIT D

PARKING AREA

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 79 of
103

EXHIBIT E

HAZARDOUS MATERIALS DISCLOSURE

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 80 of
103

EXHIBIT F

## ENVIRONMENTAL QUESTIONNAIRE

The purpose of this form is to obtain information regarding the use, if any, of hazardous substances in the process proposed on the premises to be leased. Any such use must be approved in writing by Landlord. Prospective tenants should answer the questions in light of their proposed operations on the premises. Existing tenants should answer the questions as they relate to ongoing operations on the premises and should update any information previously submitted. If additional space is needed to answer the questions, you may attach separate sheets of paper to this form.

Your cooperation in this matter is appreciated. Any questions should be directed to, and when completed, the form should be mailed to:

_ _____

_ _____

_ _____

1. Generated Information

Name of Responding Company:_____ _____ _____ ____

Check the Applicable Status:_____ _____

Prospective Tenant ☐         Existing Tenant ☐

Mailing Address:_____ _____

_____ _____

Contact Person and Title:_____ _____

Telephone Number: (_____) ___ _____ _____

Riverbank Industrial Park Address of Proposed Premises to be Leased: _____

_ _____

Length of Lease Term:_____ _____

Your Standard Industrial Classification (SIC) Code Number: _____

Describe the proposed operations to take place on the property, including principal products manufactured, services and a brief process flow description to be conducted. Existing tenants should describe any proposed changes to ongoing operations.

_____ _____

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 81 of 103

_____

_____

2. Use and/or Storage of Hazardous Materials

   2.1 Will any hazardous materials be used or stored onsite?

   **Hazardous Wastes**              **Yes** ☐              **No** ☐

   **Hazardous Chemical Products**   **Yes** ☐              **No** ☐

   2.2 Attach the list of any hazardous materials/wastes to be used, stored, or generated the quantities that will be onsite at any given time, and the location and method of storage (e.g., 55-gallon drums on concrete pad).

   2.3 Does your company handle hazardous materials in a quantity equal to or exceeding an aggregate of 500 pounds, 55 gallons, or 200 cubic feet?

   **Yes** ☐              **No** ☐

   **If yes, please provide Material Safety Data Sheets (MSDS) on such materials.**

   2.4 Has your business filed for a Consolidated Hazardous Materials Permit from the Stanislaus County Environmental Management Department?

   **Yes** ☐              **No** ☐

   **If so, attach a copy of the permit application.**

   2.5 Are any of the chemicals used in your operations regulated under Proposition 65?

   **Yes** ☐              **No** ☐

   **If so, describe the actions taken, or proposed to be taken, to comply with Proposition 65 requirements.** _____

   _____

   _____

   _____

   2.6 Do you store or use or intend to store or use acutely hazardous materials above threshold quantities requiring you to prepare a risk management plan (RMP)?

   **Yes** ☐              **No** ☐

   2.7 Describe the procedures followed to comply with OSHA Hazard Communication Standard requirements. _____

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 82 of 103

_____

_____

3. Storage Tanks and Pumps

    3.1  Are any above or below ground storage of gasoline, diesel, or other hazardous substances in tanks or pumps being used as a part of your present process or proposed for use on this leased premises?

Yes ☐        No ☐

**If yes, describe the materials to be stored, and the type, size and construction of the pump or tank.  Attach copies of any permits obtained for the storage of such substances.** _____

_____

_____

_____

_____

    3.2  If you have an above ground storage tank (AST), do you have a spill prevention containment and countermeasures (SPCC) plan?

Yes ☐        No ☐    Not Applicable ☐

    3.3  Have any tanks, pumps or piping at you existing facilities been inspected or tested for leakage?

Yes ☐        No ☐    Not Applicable ☐

**If so, attach the results.**

    3.4  Have any spills or leaks occurred from such tanks, pumps or piping?

Yes ☐        No ☐    Not Applicable ☐

**If so, describe.** _____

_____

    3.5  Were any regulatory agencies notified of any spills or leaks?

Yes ☐        No ☐    Not Applicable ☐

**If so, attach copies of any spill reports filed, any clearance letters or other correspondence from regulatory agencies relating to the spill or leak.**

Case: 15-50553   Doc# 23   Filed: 02/27/15   Entered: 02/27/15 15:15:43   Page 83 of 103

3.6 Have any underground storage tanks, sumps or piping been taken out of service or removed at the proposed facility or facilities that you operate?

Yes ☐          No ☐          Not Applicable ☐

**If yes, attach copies of any closure permits and clearance obtained from regulatory agencies relating to closure and removal of such tanks.**

4. Spills

4.1 During the past year, have any spills occurred on any site you occupy?

Yes ☐          No ☐          Not Applicable ☐

**If so, please describe the spill and attach the results of any process conducted to determine the extent of such spills.**

4.2 Were any agencies notified in connection with such spills?

Yes ☐          No ☐          Not Applicable ☐

**If no, attach copies of any spill reports or other correspondence with regulatory agencies.**

4.3 Were any clean-up actions undertaken in connection with the spills?

Yes ☐          No ☐          Not Applicable ☐

**If so, briefly describe the actions taken. Attach copies of any clearance letters obtained from any regulatory agencies involved and the results of any final soil or groundwater sampling done upon completion of the clean-up work.** _____ ____

_____ _____

_____ _____

_____ _____

5. Waste Management

5.1 Has your business filed a Hazardous Material Plan with the Stanislaus County Environmental Management Department?

Yes ☐          No ☐

5.2 Has your company been issued an EPA Hazardous Waste Generator I.D. Number?

Yes ☐          No ☐

**If yes:   EPA ID#_____**

5.3  Has your company filed a biennial report as a hazardous waste generator?

Yes ☐            No ☐

**If so, attach a copy of the most recent report filed.**

5.4  Are hazardous wastes stores in secondary containments?

Yes ☐            No ☐

5.5  Do you utilize subcontractors for lighting/electrical, plumbing, HVAC, pest services, landscaping and/or building maintenance services?

Yes ☐            No ☐

**If yes, do any of these subcontractors store, mix or utilize chemicals on site?**

Yes ☐            No ☐

**If yes, what types and quantities?** _____

_____

_____

**Attach the list of the hazardous waste, if any, generated or to be generated at the premises, its hazard class and the quantity generated on a monthly basis.**

**Describe the method(s) of disposal for each waste.  Indicate where and how often disposal will take place.** _____

_____

_____

_____

_____

**Indicate the name of the person(s) responsible for maintaining copies of hazardous waste manifests completed for offsite shipments of hazardous waste.** _____

_____

_____

**Is any treatment, processing and recycling of hazardous wastes currently conducted or proposed to be conducted at the premises:**

Yes ☐            No ☐

**If yes, please describe any existing or proposed treatment, processing or recycling  methods.**

_____

_____

Attach copies of any hazardous waste permits or licenses issued to your company with respect to its operations on the premises.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 85 of 103

6. Wastewater Treatment/Discharge

6.1 Will your proposed operation require the discharge of wastewater to (answer Yes or No to each of the following)?

_____ **storm drain**      _____ **sewer**

_____ **surface water**      _____ **no industrial discharge**

6.2 Does your business have a Sewer Use Questionnaire on file with Stanislaus County Sanitation District?

**Yes** ☐            **No** ☐

6.3 Is your wastewater treated before discharge?

**Yes** ☐        **No** ☐      **Not Applicable** ☐

**If yes, describe the type of treatment conducted.**

_____ ___

_____ ___

6.4 Does your business conduct operations outside the building or store materials outside?

**Yes** ☐        **No** ☐        **Not Applicable** ☐

6.5 Do you have a Storm Water Pollution Prevention Plan (SWPPP)?

**Yes** ☐        **No** ☐        **Not Applicable** ☐

6.6 Does your business have a General Permit for storm water discharge associated with industrial activity?

**Yes** ☐        **No** ☐        **Not Applicable** ☐

6.7 Does your business operate under a National Pollution Discharge Elimination System (NPDES) Permit?

**Yes** ☐        **No** ☐        **Not Applicable** ☐

Attach copies of any wastewater discharge permits issued to your company with respect to its operations on the premises.

7. Air Discharges

7.1 Do you have or intend to have any air filtration systems or stacks that discharge into the air?

**Yes** ☐            **No** ☐

7.2 Do you operate or plan to operate any of the following types of equipment, or any other equipment requiring an air emissions permit (answer Yes or No to each of the following)?

| | | |
|---|---|---|
| **Spray booth** | **Yes** ☐ | **No** ☐ |
| **Dip tank** | **Yes** ☐ | **No** ☐ |

| | | | |
|---|---|---|---|
| Drying oven | Yes ☐ | No ☐ |
| Incinerator | Yes ☐ | No ☐ |
| Other (please describe) | Yes ☐ | No ☐ |
| Boiler | Yes ☐ | No ☐ |
| I/C Engine | Yes ☐ | No ☐ |
| Emergency Backup Generator | Yes ☐ | No ☐ |
| Processes that apply coatings, inks, adhesives or use solvents | Yes ☐ | No ☐ |

7.3  Do you emit or plan to emit any toxic air contaminates?

Yes ☐        No ☐

7.4  Are air emissions from your operations monitored?

Yes ☐        No ☐

**If so, indicate the frequency of monitoring and a description of the monitoring results.**

_____ _____

_____ ____

_____ _____

Attach copies of any air emissions permits pertaining to your operations on the premises.

8.  <u>Enforcement Actions, Complaints</u>

8.1  Has your company, within the past five years, ever been subject to any agency enforcement actions, administrative orders, or consent decrees?

Yes ☐        No ☐

**If so, describe the actions and any continuing compliance obligations imposed as a result of these actions.** _____

_ _____

_____ _____

_ _____

8.2  Has your company ever received requests for information, notice or demand letters, or any other inquiries regarding its operations?

Yes ☐        No ☐

8.3  Have there ever been, or are there now pending, any lawsuits against the company regarding any environmental or health and safety concerns?

Yes ☐        No ☐

8.4  Has any environmental audit ever been conducted at your company's current facility?

Yes ☐        No ☐

**If so, discuss the results of the audit.** _____

_____

_____

_____

8.5  Have there been any problems or complaints from neighbors at the company's current facility?

Yes ☐            No ☐

Please describe: _____

_____

_____

**The undersigned hereby certifies that all of the information contained in this questionnaire is accurate and correct.**

_____,

a _____

By: _____

Name: _____

Title: _____

Date: _____

EXHIBIT G

RULES AND REGULATIONS

1.  Landlord shall have the right to control and operate the public portions of the Building and the public facilities, as well as facilities furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally.  No tenant shall invite to the Premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of the entrances, corridors and facilities of the Building and any Common Areas by other tenants.

2.  Landlord reserves the right to close and keep locked all entrance and exit doors of the Building outside of normal business hours as Landlord may deem to be advisable for the protection of the property however the property shall be accessible by Tenants at all times.

3.  The entries, corridors, and stairways shall not be obstructed by any tenant, or used for any other purpose than ingress or egress to and from its respective offices.

4.  Freight, furniture, business equipment, merchandise and bulky matter of any description ordinarily shall be delivered to and removed from the Premises only through the service entrances and corridors, but special arrangements will be made for moving large quantities or heavy items of equipment and supplies into or out of the Building.

5.  Tenant shall not attach or permit to be attached additional locks or similar devices to any door, transom or window of the Premises; change existing locks or the mechanism thereof; or make or permit to be made any keys for any door thereof other than those provided by Landlord, without providing to Landlord one set of keys therefore.

6.  No awnings or other projections over or around the windows or entrances of the Premises, or sign, advertisement notice or other lettering shall be installed or exhibited by any tenant on the outside or inside of the Premises without the prior written consent of the Landlord.  In the event of any violation of the foregoing by Tenant, Landlord may remove same without any liability, and may charge the expense incurred by such removal to Tenant.

7.  Landlord is not responsible to any tenant for the non-observance or violation of the Rules and Regulations by any other tenant.

8.  Landlord reserves the right by written notice to Tenant, to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in Landlord's reasonable judgment, it is necessary, desirable or proper for the best interest of the Building and its tenants.

9.  The Tenant shall not exhibit, sell or offer for sale on the Premises or in the Building any article or thing except those articles and things essentially connected with the stated use of the Premises by the Tenant without the advance consent of the Landlord.

10.  The Tenant shall cooperate fully with the Landlord to assure the effective operation of the Building's air conditioning system, if such system exists.  If Tenant shall so use the Premises that noxious or objectionable fumes, vapors and odors exist beyond the extent to which they are discharged or eliminated by means of the flues and other devices contemplated by the various plans, specifications and leases, then Tenant shall provide proper ventilating equipment for the discharge of such excess fumes, vapors and odors so that they shall not enter into the air conditioning system or be discharged into other vents or flues of the Building or annoy any of the tenants of the Building or adjacent properties.  The design, location and installation of such equipment shall be subject to Landlord's approval.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 89 of 103

11.  All loading and unloading of merchandise, supplies, materials, garbage and refuse shall be made only through such entryways and at such times as the Landlord shall designate.  Tenant shall not obstruct or permit the obstruction of throughways used by other tenants.

12.  There shall not be used or kept anywhere in the Building by any tenant or persons or firms visiting or transacting business with a tenant any hand trucks, except those equipped with rubber tires and side guards.

13.  The sashes, sash doors, skylights, windows and doors that reflect or admit light or air into the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant.

14.  Tenant shall not mark, paint, or drill into any part of the Premises or the Building without the prior written consent of the Landlord.  No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, and as Landlord may direct.

15.  Tenant's contractors shall, while in the Building or elsewhere in the complex of which the Building forms a part, be subject to and under the control and direction of the Tenant.

16.  If the Premises is or becomes infested with vermin as a result of the use or any misuse or neglect of the Premises by Tenant, its agents, servants, employees, contractors, visitors or licensees, Tenant shall forthwith at Tenant's expense cause the same to be exterminated from time to time to the satisfaction of Landlord and shall employ such licensed exterminators as shall be approved in writing in advance by Landlord.

17.  Tenant shall install and maintain, at Tenant's sole cost and expense, an adequate visibly marked (at all times properly operational) fire extinguisher next to any duplicating or photocopying machine or similar heat producing equipment, which may or may not contain combustible material, in the Premises.

18.  Tenant is encouraged to use the name, logo and associated marketing taglines of the Building or industrial park in Tenant materials, and pictures of the site insomuch as the materials are consistent with Landlord's approved marketing materials, logos, etc.

19.  Prior to any excavation or digging work, written permission shall be approved by Landlord.  The permission, if given, shall include provision for safety (guardrails, barricades, blinking lights) and shall meet all requirements of Applicable Laws.

20.  Landlord may, from time to time, promulgate procedures for dealing with emergency situations such as fire, accidents, damage to person or property, environmental spills, etc.  These procedures shall be considered a part of these Rules and Regulations and shall be as though set forth herein in their entirety.  Said procedures shall not be deemed a part of these Rules and Regulations until Tenant provides a signed receipt for a copy of the procedures or until 30 days have passed after receipt of the procedures.

21.  Landlord may, from time to time, promulgate safety procedures for dealing with storage of equipment, personal protective equipment, electrical equipment, fire protection and prevention, use and storage of hazardous materials, on-site speed limits, badges, etc.  These procedures shall be considered a part of these Rules and Regulations and shall be as though set forth herein in their entirety.  Said procedures shall not be deemed a part of these Rules and Regulations until Tenant provides a signed receipt for a copy of the procedures or until 30 days have passed after receipt of the procedures.

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 90 of
103

EXHIBIT H

BASE LEASE


The Base Lease can be found at

http://www.riverbanklra.org

# EXHIBIT B



# *City of Riverbank*

## *Local Redevelopment Authority*

### THREE-DAY NOTICE TO PERFORM COVENANTS OR QUIT PREMISES

#### *(Cal. Code Civ. Proc. § 1161(3))*

TO:   AQH LLC ("Tenant")
Attn: Sean Walsh
440 N. Wolfe Road, MS #46
Sunnyvale, CA 94085

Tenant in possession at Buildings 5, 21, and 50 at 5300 Claus Road, Modesto, California 95357 and further described in the least ("Premises"):

YOU ARE HEREBY NOTIFIED that you are in violation of the lease dated March 12, 2014 and subsequent amendments ("Lease") because you have violated the covenant to pay the Riverbank Local Redevelopment Authority ("Landlord") for electricity services and propane as Additional Rent, pursuant to Section 10.2 of the Lease. Under the terms of the Lease, there is now due and owing unpaid utilities as well as late penalties for the Premises in the following sum, which is an estimate of the amounts due and owing, not including amounts owed for unpaid rent:

| Service/Expense: | Amount Due: |
| --- | --- |
| Invoice #2030 12.15.2014 | $14,060.50 |
| Invoice #2060 01.12.2015 | $66,946.30 |
| Late Charge (10% of unpaid balance) | $12,513.68 |

"Total Amount Due": $93,520.48

YOU ARE HEREBY REQUIRED within THREE (3) DAYS after the service of this notice to remedy the violation and perform the covenant by paying the Total Amount Due or to vacate and surrender possession of the Premises.

The Total Amount Due should be paid in full in the form of a cashier's check, money order, or certified funds and mailed or personally delivered to City of Riverbank Local Redevelopment Authority, 5300 Claus Road, Suite 1, Modesto, CA 95357 between the hours of 7:00 a.m. and 4:00 p.m. within three (3) days after service of this notice. You may call Landlord's office at (209) 863-8352.

You are further notified that the Landlord has elected to, and hereby does, declare the Lease under which you hold the Premises to be forfeited in the event that you fail to pay the Total Amount Due in full as required herein.

Your failure to pay the entire amount due or to surrender up possession of the Premises within three (3) days after service of this notice on you, will result in legal proceedings against you to recover possession of said premises, to declare such Lease forfeited, to all amounts due and damages for unlawful retention of the Premises, and to recover attorneys' fees and costs. Landlord reserves all of its rights of recovery against you, pursuant to the Lease and in accordance with California Civil Code Section 1951.2 and California Code of Civil Procedure Section 1174.5.

Landlord's acceptance of any payment by you, whether prior to or following the expiration of this notice, or at any time prior to trial, shall not constitute a waiver of any rights or defenses any party may have, including the Landlord's right to recover possession of the Premises. Any acceptance by Landlord of a partial payment is evidence only of that payment, without waiver of any rights or defenses of Landlord.

Please be advised that pursuant to California Civil Code Section 1946:

State law permits former tenants to reclaim abandoned personal property left at the former address of the tenant, subject to certain conditions. You may or may not be able to reclaim property without incurring additional costs, depending on the cost of storing the property and the length of time before it is reclaimed. In general, these costs will be lower the sooner you contact your former landlord after being notified that property belonging to you was left behind after you moved out.

Dated: February 20, 2015

By: _____

Debbie Olson
Executive Director

Address:    5300 Claus Road, Suite 1
Modesto, CA 95357

# EXHIBIT C

# PROMISSORY NOTE - SECURED

February 27, 2015                                                                $55,000.00

      FOR VALUE RECEIVED, AQH, LLC, a California limited liability company ("**Borrower**") in accordance with and subject to this promissory note (the "**Note**") promise to pay to the order of Tatiana Korolshteyn and Lucile Darnell (collectively the "**Lender**"), without offset or deduction, all amounts advanced to Borrower by Lender up to Fifty-Five Thousand and No/100 Dollars ($55,000.00).

      **1.**     **Interest**.  The Borrower promises to pay the principal of this Note and interest accrued thereon from the date hereof until maturity at a rate which is at all times equal to ten percent (10%) per annum; provided, however, that such interest rate shall at no time exceed the maximum rate permitted by the usury law of the State of California.  Any and all accrued but unpaid interest shall be added to the principal balance under this Note.  Interest shall be computed on the basis of a 365/366 day year according to the actual number of days elapsed.

      **2.**     **Payments**.  Borrower shall pay the principal under this Note plus accrued interest thereon upon the  earlier of:  (a) dismissal of the pending bankruptcy case in which the Borrower is the debtor, namely *In re AQH, LLC*, United States Bankruptcy Court for the Northern District of California (Case No. 15-50553-11-ASW) (the "Case"); (b) the effective date of any chapter 11 reorganization plan confirmed in the Case; or (c) February 26, 2016.  Upon such maturity date the entire the principal outstanding under this Note, all accrued and unpaid interest thereon and all other applicable fees, costs and charges, if any, shall be due and payable in full to the Lender. All payments received by the Lender on this Note shall be applied by the Lender as follows: first, to the payment of applicable fees, costs and charges, if any; second, to accrued and unpaid interest then due and owing; and third, to the principal outstanding under this Note.

      **3.**     **Immediately Available Funds**.  All payments due hereunder are to be made in lawful money of the United States of America in same day or immediately available funds. Unless payments are made in the required amount in immediately available funds at the place where this Note is payable, remittances of all or any part of the payments due hereunder shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where this Note is payable and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.

      **4.**     **No Offset**.  Borrower shall have no right to off-set payments under this Note against any monies owed Borrower by Lender.  Any non-payment by Borrower for any reason shall be considered an Event of Default hereunder.

      **5.**     **Late Fee**.  If any sum payable under this Note is not paid within five (5) business days of the date on which it is due, regardless of whether such failure shall constitute an Event of Default, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of the delinquent payment or the maximum amount permitted by applicable law to defray

1

the expenses incurred by Lender in handling and processing the delinquent payment and to compensate Lender for the loss of the use of the delinquent payment.

**6.** **Subject to Bankruptcy Court Approval; Carve-Out**. The terms of this Promissory Note and Lender's obligation to provide the funds pursuant to these terms is conditional upon approval under Bankruptcy Code Section 364(c) and (d) by the bankruptcy court presiding over the Case on a secured administrative priority basis.

**7.** **Representations and Warranties**. The Borrower represent and warrant as of the date hereof and for so long as any amount of principal or interest thereon remains unpaid, and subject to bankruptcy court approval as provided above, that:

(a) It has the legal right, power, authority and capacity to execute and deliver this Note and all documents, instruments and agreements related thereto and perform the transactions and agreements contemplated thereby;

(b) This Note, when executed and delivered, shall constitute the legal, valid and binding obligation of the Borrower enforceable in accordance with its terms;

(c) Borrower has and will continue to make, keep and give Lender access to all of Borrower's business and financial records, which, in reasonable detail, accurately and fairly reflect Borrower's activities and ability to pay debts when they become due; and

(d) All material information furnished by or on behalf of the Borrower in writing to the Lender for purposes of or in connection with this Note is, and all other factual information hereafter furnished by or on behalf of Borrower to the Lender will be, true and accurate in all material respects to Borrower's actual knowledge on the date as of which such information is dated or certified, and such information is not, or shall not be, as the case may be, incomplete in any material respect by omitting to state any material fact necessary to make such information not false or misleading.

**8.** **Events of Default**. Any one or more of the following events shall constitute an "Event of Default" by Borrower under this Note:

(a) Borrower's failure to pay any of its obligations under this Note when due (after giving effect to any applicable grace periods);

(b) Borrower's failure to perform any of the obligations, agreements, covenants or conditions contained in this Note;

(c) Conversion of the Borrower's bankruptcy case to a case under Chapter 7 of the Bankruptcy Code;

**9.** **. Security Interest.** As security for performance of Borrower's obligations hereunder, Borrower grants Lender, subject to Bankruptcy Court approval, a security interest in all of its currently held or after acquired assets, subject to the existing liens in favor of Andrew L. Farris and Emergent Systems Exchange, LLC. The security interest granted Lender shall be

2

effective upon entry of the Court's order approving this agreement without any further steps to perfect said interest.

**10. Equity Option.** As part of the consideration for making the loan represented by this Promissory Note, Lender, or their assigns, shall be granted the option to purchase 2.75% of the member interests in the Borrower for $55,000. Lender or their assigns may exercise this option anytime within five (5) years of the date the Bankruptcy Court approves this agreement. Lender or their assigns shall exercise the option by providing notice to Borrower by email or in another form of writing and the payment due in the event Lender or their assigns exercise the option shall be due within thirty (30) days of such exercise. Any interest obtained as a result of the exercise of the option hereunder, shall include the same rights to transfer or assign such interest as were initially placed on the interests obtained by the owners at the inception of Borrower.

**11. Acceleration**. Upon the occurrence of an Event of Default, the Lender may declare amounts owing under this Note to be immediately due and payable. The Lender may, in its sole and absolute discretion, waive any Event of Default or acceleration resulting therefrom. If the Lender exercises its acceleration rights, in addition to the principal amount of the Note outstanding and accrued interest thereon, Lender shall be entitled to collect all costs of collection, including attorneys' fees incurred in connection with the Lender's collection efforts, whether or not suit on this Note is instituted. Any and all such costs and expenses shall be payable on demand.

**12. Usury Law Compliance**. It is the intent of the parties hereto in the making and acceptance of this Note and all other instruments evidencing this indebtedness to contract in strict compliance with the usury laws of the State of California (including any superseding federal law), if and to the extent applicable. In the event Lender (or another holder of this Note) shall collect monies which are deemed to constitute interest in excess of that permitted to be charged by the laws of the State of California (including any superseding federal law), if and to the extent applicable, all such sums so deemed to constitute interest in excess of the maximum lawful interest rate shall, at the option of Lender (or other holder), be credited as of the date of collection to the payment of principal or returned to the Borrower.

**13. Binding Effect; Assignment**. This Note is binding upon and inures to the benefit of the Borrower and the Lender and their respective successors and assigns, except that neither party thereto shall assign or delegate its interests or obligations hereunder without the prior written consent of the other party not to be unreasonably withheld.

**14. Governing Law**. This Note shall be deemed to be a contract made under the laws of the State of California for all purposes and shall be construed in accordance with the internal laws of such State.

**15. Waiver; Effect of Waiver**. All parties hereto, whether as makers, endorsers, or otherwise hereby severally waive, the to full extent permitted by law: (a) presentment for payment, demand, protest and notice of dishonor; and (b) the right to plead any and all statutes of limitations as a defense to any demand on this Note, or any other agreement now or hereafter securing or promising payment under this Note. No failure on the part of the Lender or other

Case: 15-50553    Doc# 23    Filed: 02/27/15    Entered: 02/27/15 15:15:43    Page 98 of 103

holder hereof to exercise any right or remedy hereunder, whether before or after the happening of a default, shall constitute a waiver thereof, and no waiver of any past default shall constitute waiver of any future default or of any other default. No failure to accelerate the debt evidenced hereby by reason of default hereunder, or acceptance of a past due installment, or indulgence granted from time to time shall be construed to be a waiver of the right to insist upon prompt payment thereafter or to impose late charges retroactively, or shall be deemed to be a novation of this Note or as a reinstatement of the debt evidenced hereby or a waiver of such right of acceleration or any other right, or be construed so as to preclude the exercise of any right which the Lender may have, whether by the laws of the State of California governing this Note, by agreement or otherwise; and each Borrower hereby expressly waives the benefit of any statute or rule of law or equity which would produce a result contrary to or in conflict with the foregoing.

**16. Severability**. Every provision in this Note is intended to be severable. In the event any term or provision hereof is declared by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

**17. Time of the Essence**. Time is of the essence in Borrower's performance of their obligations hereunder.

**18. Modification; Amendment**. This Note may only be modified, amended or changed by an agreement in writing signed by both the Lender and the Borrower.

**19. Counterparts**. This Note may be signed in counterparts, each of which shall be considered an original and together which shall constitute one and the same instrument.

**20. Waiver of Jury By Trial**. BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS NOTE, OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

**21. Forum Selection**. The Parties agree that any dispute arising hereunder and in connection herewith shall be resolved before the United States Bankruptcy Court for the Northern District of California, the orders and judgments of which shall be binding upon the Parties.

///

///

///

///

4

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed as of the date first written above.

**BORROWER:**                    AQH, LLC

By:    _____

Chris Cunningham
Responsible Individual for AQH, LLC,
Debtor-in-Possession

_____
AQH, LLC

By:    _____

Sean Walsh
CEO & Managing Member

# EXHIBIT D

| | | 2015 | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | **Aquifer Projections** | | | | | | |
| 2 | | **2015** | | | | | |
| 3 | | **February** | **March** | **April** | **May** | **June** | **July** |
| 4 | Max GHR @ $228/BTC | 400,000 | | | | | |
| 5 | Hashrate Added Per Month, TH | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| 6 | Avg Global Hashrate, TH | 330,000 | 335,000 | 340,000 | 345,000 | 350,000 | 355,000 |
| 7 | | | | | | | |
| 8 | Average Block Time, minutes | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 | 9.7 |
| 9 | BTC Paid To Miners | 105,773 | 105,773 | 105,773 | 105,773 | 105,773 | 105,773 |
| 10 | Pool Variance to theoretical revenue | 5% | | | | | |
| 11 | Revenue Per TH, BTC | 0.32 | 0.32 | 0.31 | 0.31 | 0.30 | 0.30 |
| 12 | BTC Price, $ | 228.00 | 228.00 | 228.00 | 228.00 | 228.00 | 228.00 |
| 13 | Revenue Per TH, $ | 73.08 | 71.99 | 70.93 | 69.90 | 68.90 | 67.93 |
| 14 | 3-Month Revenue Per TH, $ | 216.00 | 212.82 | 209.74 | 206.74 | 136.84 | 67.93 |
| 15 | | | | | | | |
| 16 | kW Per TH (Cointerra) | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| 17 | kW Per TH (BitFury) | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 | 0.80 |
| 18 | Avg kWh Per Month | 720 | 720 | 720 | 720 | 720 | 720 |
| 19 | $ per kWh | 0.050 | 0.050 | 0.050 | 0.050 | 0.050 | 0.050 |
| 20 | Electricity Cost Per TH, $ | 31.07 | 31.77 | 31.77 | 31.77 | 31.77 | 31.77 |
| 21 | | | | | | | |
| 22 | Power online (kW) | 1,640.00 | 3,530.00 | 3,530.00 | 3,530.00 | 3,530.00 | 3,530.00 |
| 23 | Cointerra TH Online | 1,200.00 | 3,300.00 | 3,300.00 | 3,300.00 | 3,300.00 | 3,300.00 |
| 24 | BitFury TH Online | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 |
| 25 | Avg. TH Live | 1,900.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| 26 | BTC Generated | 609.00 | 1,262.96 | 1,244.39 | 1,226.36 | 1,208.84 | 1,191.81 |
| 27 | | | | | | | |
| 28 | **Total Revenue** (line 13 X line 25) | **$138,851** | **$287,956** | **$283,721** | **$279,609** | **$275,615** | **$271,733** |
| 29 | Total Electricity Costs | ($59,040) | ($127,080) | ($127,080) | ($127,080) | ($127,080) | ($127,080) |
| 30 | **Gross Profit** | **$79,811** | **$160,876** | **$156,641** | **$152,529** | **$148,535** | **$144,653** |
| 31 | | | | | | | |
| 32 | Fixed Operating Expenses | | | | | | |
| 33 | Lease | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| 34 | Salaries | 40,000.00 | 46,000.00 | 46,000.00 | 46,000.00 | 46,000.00 | 46,000.00 |
| 35 | Facility Costs | 9,150.00 | 9,150.00 | 9,150.00 | 9,150.00 | 9,150.00 | 9,150.00 |
| 36 | | | | | | | |
| 37 | Reorganization, Reserves & Other | | | | | | |
| 38 | Risk Reserve | | 32,175.14 | 31,328.21 | 30,505.83 | 29,706.95 | 28,930.57 |

| | | | | | |
|---|---|---|---|---|---|
| 39 | US Trustee Fees | | 975.00 | | | 1,625.00 | |

| # | Item | C1 | C2 | C3 | C4 | C5 | C6 |
|---|------|----|----|----|----|----|----|
| 39 | US Trustee Fees | | 975.00 | | | 1,625.00 | |
| 40 | Adequate Protection - A. Faris (est.) | 2,583.33 | 2,583.33 | 2,583.33 | 2,583.33 | 2,583.33 | 2,583.33 |
| 41 | Adequate Protection - Emergent System Exchange | 1,650.00 | 5,280.00 | 8,850.00 | 16,950.00 | 16,950.00 | 16,950.00 |
| 42 | Minimum Franchise Taxes | | | 800 | | | |
| 43 | | | | | | | |
| 44 | Fixed Monthly Operating Expense | ($78,383) | ($121,163) | ($123,712) | ($130,189) | ($131,015) | ($128,614) |
| 45 | **Operating Profit** | **$1,428** | **$39,712** | **$32,930** | **$22,340** | **$17,519** | **$16,039** |
| 46 | **Cumulative Operating Profit** | **$1,428** | **$41,140** | **$74,070** | **$96,410** | **$113,929** | **$129,968** |
| 47 | | | | | | | |
| 61 | Cumulative Risk Reserve | | $32,175 | $63,503 | $94,009 | $123,716 | $152,647 |
| 62 | | | | | | | |
| 63 | Total Operating Expense | ($137,423) | ($248,243) | ($250,792) | ($257,269) | ($258,095) | ($255,694) |
| 64 | | | | | | | |
| 65 | **SOURCES AND USES** | | | | | | |
| 66 | | | | | | | |
| 67 | **Security Deposit for Electricity** | | | | | | |
| 68 | Sources | | | | | | |
| 69 | Minimum Cash on hand as of 2015.02.26 | $50,000 | | | | | |
| 70 | Proceeds from Sale of 170 XBT on hand as of 2015.02.26 | $39,100 | | | | | |
| 71 | DIP Loan | $45,000 | | | | | |
| 72 | **Total Sources** | **$134,100** | | | | | |
| 73 | Uses | | | | | | |
| 74 | Security Deposit for Electricity | ($127,080) | | | | | |
| 75 | **Total Uses** | **($127,080)** | | | | | |