MACDONALD | FERNANDEZ LLP
IAIN A. MACDONALD (SBN 051073)
RENO F.R. FERNANDEZ III (SBN 251934)
MATTHEW J. OLSON (SBN 265908)
221 Sansome Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Debtor in Possession,
AQH, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>AQH, LLC,<br><br>               Debtor. | Case No. 15-50553-SLJ-11<br><br>Chapter 11<br><br>DECLARATION OF SEAN WALSH IN SUPPORT OF MOTION TO APPROVE DEBTOR IN POSSESSION FINANCING, USE OF SPACE FOR THIRD-PARTY HOSTING, AND RESALE CONTRACT<br><br>Proposed Preliminary Hearing:<br><br>Date:  October 15, 2015<br>Time:  3:30 p.m.<br>Place:  Courtroom 3099<br>          280 South First Street<br>          San Jose, California<br><br>Honorable Steven L. Johnson |

I, Sean Walsh, declare:

1. I am the Managing Member of AQH, LLC, Debtor-in-Possession herein. I am familiar with the Debtor's business. I am over the age of 18. The following facts are true and correct of my own personal knowledge. If called as a witness, I could and would competently testify as follows

2. On behalf of the Debtor, I have negotiated a contract with Beijing Canaan Creative Information Technology Co., Ltd. ("Avalon") for the purchase of Avalon 6 Bitcoin Servers on credit terms, leasing of space in the Debtor's datacenter to Avalon for hosting of additional Avalon 6 Bitcoin Miners owned by Avalon, and authorizing AQH to serve as an authorized, non-exclusive end-user

reseller of all of Avalon's products for a 24-month period starting on October 1, 2015. A redacted[1] true and correct copy of the fully executed *Contract for Purchase and Sale of Equipment, Provision for Hosting Service, and Resale Contract Between AQH, LLC and Beijing Canaan Creative Information Technology Co., Ltd.* (the "Agreement") is attached as Exhibit "1."

3. The Debtor leases facilities located at 5300 Claus Road, Buildings 3, 5, 21 and 49, in Modesto, California, to serve as its primary datacenter (the "Riverbank Datacenter"). The Debtor has constructed various tenant improvements in the Leased Facility which are not being fully utilized because of a lack of servers to perform the Bitcoin blockchain security function.

4. The Debtor needs to purchase additional servers to supplement and replace its existing servers to improve electricity efficiency and increase revenue to fund its successful reorganization.

5. Avalon, a manufacturer of Bitcoin servers, has agreed to sell Avalon 6 Bitcoin servers to AQH on favorable pricing and credit terms, avoiding the need for the Debtor to procure more expensive debtor in possession financing on the market. AQH and Avalon entered into a definitive agreement to document the proposed transaction, subject to Court approval.

6. Avalon is one of only two producers of specialized Bitcoin servers that sell servers to the public and it enjoys the longest track record in the industry. Avalon

7. Under the terms of the Agreement, the Debtor and Avalon have agreed as follows:

   a. <u>Total Amount</u>: Avalon will sell AQH approximately ▮▮▮ Avalon 6 Bitcoin Miners at the price of ▮▮▮ per server, exclusive of taxes, shipping, and other government-imposed fees,[2] for an initial extension of credit of $819,000. This amount represents a discount on the normal retail price at which these servers are offered, which is approximately $1,100 per unit. The Agreement contemplates that additional advances may be made to fund additional purchases on an

---

[1] By separate motion, the Debtor is seeking to file the motion, this declaration, and the agreement and under seal pursuant to 11 U.S.C. § 107(b) to redact certain confidential commercial information, including pricing. The Debtor will make the information available to parties in interest after the execution of an appropriate nondisclosure agreement.

[2] Avalon will make additional advances to cover the costs of shipping and any import duties, which AQH will reimburse to Avalon.

ongoing basis on similar terms, including purchases of servers for resale to consumers throughout the world. The terms of the credit extended by Avalon are provided in the Agreement. *See* Agreement §§ 1–3.

   b. <u>Liens and Priority</u>: The aforesaid trade credit shall be secured by a purchase-money security interest in the new servers purchased from Avalon pursuant to Bankruptcy Code Section 364(c)(2) and, to the extent Andrew L. Faris contends that his pre-petition lien on all of the Debtor's assets is superior to the proposed lien in favor of Avalon Mining, a priming lien on the new servers purchased from Avalon to grant Avalon's lien priority over the lien of Andrew L. Faris. *See* Agreement § 7. The new lien created by the agreement only attaches to new equipment purchased from Avalon.

   c. <u>Interest Rate</u>: The extension of credit to AQH is without interest.

   d. <u>Maturity</u>: The initial payment of $819,000 (plus costs of shipping and import duties, if any) is due 90 days after Avalon delivers the first shipment of servers. Future purchases for servers to be installed in the datacenter will be paid for in advance. Future purchases for servers to be resold to consumers may be on credit, but payment for such purchases is due monthly at the same time that AQH bills Avalon for the hosting services contemplated by the contract. *See* Agreement §§ 1, 2, 4(b). The Debtor has the option to prepay any obligation without penalty.

   e. <u>Payment of Expenses</u>. The Agreement requires the Debtor to reimburse Avalon for costs of shipping, import duties, and other government-imposed charges. These costs will be paid form additional advances of trade credit. The parties agreed to bear their own costs in connection with the Agreement, but in the event of a breach of the Agreement, the breaching party is obligated to pay the attorneys' fees and costs of the nonbreaching party. *See* Agreement § 17.

   f. <u>Events of Default</u>: The Agreement defines an event of default as failure to make a payment required by the Agreement, or failure to comply with another term of the Agreement, including not providing notice of sales of more than 50 units (§ 4(d)), complying with the approved price range when reselling the servers (§ 4(e)), not providing sales support to consumers (§ 4(f)), or the unauthorized use of Avalon's trademarks (§ 4(g)). *See* Agreement § 7.

g. <u>Borrowing Limits</u>. Other than the initial purchase of servers, the Agreement does not have a preset borrowing limit. The parties intend for the agreement to provide a framework for standard trade credit between AQH and Avalon.

h. <u>Borrowing Conditions</u>. The Agreement is conditional upon approval by the Bankruptcy Court.

i. <u>Provisions Regarding the Automatic Stay</u>. The Agreement contains no provisions concerning the automatic stay.

j. <u>Limitations on the Debtor's Right to Procure Post-petition Credit</u>. The Agreement contains no provisions concerning the Debtor's right to procure post-petition credit.

k. <u>Indemnification Provisions; Release of Liability</u>. Section 6 of the Agreement provides a limited warranty and limitation of remedies in the event of a fault with any of the products purchased from Avalon, including a right to have Avalon to repair or replace defective equipment. Additionally, paragraph 13 contains a mutual indemnification clause for claims arising out of the Agreement.

l. <u>Waiver of Claims</u>. The Agreement contains no provisions concerning the waiver of claims.

m. <u>No Surcharge</u>. The Agreement contains no provisions concerning surcharging Avalon.

n. <u>Deadlines for Filing a Plan of Reorganization and Confirmation Thereof</u>. The Agreement does not contain any provisions setting deadlines for filing a plan of confirming a plan.

o. <u>Provisions for "Carve-Outs" for Chapter 11 Professional Fees and Expenses, Chapter 7 Trustee</u>. The Agreement does not contain any provisions regarding carve-outs for professional fees. The proposed lien only encumbers new equipment and inventory purchased from Avalon; the lien does not attach to existing property of the estate.

8. There is no known connection between AQH and Avalon.

9. The proposed transaction allows 90 days following delivery to make the payment on the initial purchase, permitting the Debtor time to install the servers in the Riverbank Datacenter and

4

generate the cash necessary to repay the advance.

10. The Debtor anticipates that it will have the ability to repay said initial purchase within the 90-day period while remaining current its present post-petition obligations, as shown by the attached projections. *See* Exhibit "2." The projections are based upon my experience in the Bitcoin market, the expected performance of the new servers, AQH's experience with its existing servers, AQH's cost of purchasing electricity, and AQH's fixed costs of operations.

11. The Debtor has insufficient cash to purchase additional servers and its cash position is eroding. The Debtor's current servers are relatively power inefficient and additional servers are needed to utilize the Riverbank Datacenter to full capacity. These factors combined have caused tipped the Debtor from operating profitably to operating unprofitability. The infusion of additional servers which will necessarily increase the Debtor's share of Bitcoins and therefore income is essential to preserve the Debtor's value as a going concern. Moreover, adding new lines of business, through hosting servers owned by third parties and selling servers at retail prices will add additional sources of income which are less sensitive to volatility in the global Bitcoin market.

12. The Debtor attempted to secure financing from traditional banks following the filing of the petition, but these efforts were not fruitful and I thereafter determined that seeking a loan from a traditional bank was futile. On behalf of the Debtor, I entered in to discussions with several other potential lenders regarding post-petition debtor in possession financing and received only one offer aside from the proposed transaction with Avalon. This offer for credit was in the approximate amount of $400,000, had an effective rate of interest of approximately 22.6% (much greater than the 0% offered in the proposed transaction with Avalon), and included substantial origination fees. Additionally, the lender required the Debtor to sell certain assets to the lender and then lease those assets back from the lender, deposit $52,000 cash with the lender as additional security, and grant super-priority liens to the lender on all of the Debtor's remaining assets to secure the loan.

13. The Debtor has been able to obtain financing from Avalon to provide trade credit on favorable terms: allowing the Debtor to obtain servers, deferring payment for 90 days with no interest charges, and securing the claim with a purchase-money lien on the servers themselves.

5

Accordingly, the terms on the Agreement are appropriate and should be approved.

14. The Debtor negotiated with Avalon regarding the status of its lien rights, and Avalon insists that its liens be first position, purchase-money liens on the assets sold by Avalon. The Debtor understands this may require the priming of the lien held by Andrew Faris that attaches to all assets of the Debtor, and the Debtor requests that the Court approve such priming. The Debtor has not been able to procure credit on a more favorable basis

15. Mr. Faris' lien is adequately protected because the new liens attach to new equipment only. In other words, the basket of assets to which Faris' lien attaches will not be diminished. Moreover, Faris is receiving adequate protection payments.

16. Immediate approval of the extension of trade credit is necessary to avoid immediate and irreparable harm to the estate. As discussed, the estate's cash position has eroded as AQH's existing servers have been failing at an increasing rate (as AQH ran out of spare parts and is unable to repair the existing systems) and AQH's market share in the global Bitcon blockchain security market has reduced, undercutting AQH's income. Immediate infusion of additional servers is needed to backfill the lost processing power cause by the server failures.

17. The income derived from the addition of the new Avalon servers to the Debtor's operations and the additional lines of business related to server hosting and server sales will immediately improve the Debtor's cash positon, allowing it to meet its ongoing post-petition obligations and repay the proposed extension of credit by Avalon, as demonstrated by the projections.

18. The remaining provisions of the agreement provide for AQH to host servers owed by Avalon at the Riverbank Datacenter and to become an authorized reseller of Avalon products. Both of these items are new lines of business that diversify and supplement the Debtor's income stream and make the Debtor's operations less sensitive to the day-to-day shifts in the value of Bitcoin

19. The space that will be used for hosting servers owned by Avalon is currently unused. Additionally, the price for the Debtor's services ($0.08 per kilowatt hour) exceeds its actual cost of electricity (estimated at $0.04 per kilowatt hour going forward). Moreover, the hosting of Avalon-

owned servers will allow the Debtor to quickly take delivery of additional product from Avalon as product is sold to third parties by purchasing servers already on site in the United States rather than waiting for shipments from China. Performance concerns regarding the sale of used equipment do not apply as usual in the Bitcoin processing industry. A Bitcoin processor is an income-producing asset, and actual demonstrated performance is attractive to buyers.

20. The Agreement allows for AQH to further diversify its income streams while leveraging its experience and placement in the Bitcoin Blockchain Security market by reselling Avalon servers and other products they may offer in the future. While final market price sheets have not yet been developed by AQH and Avalon, AQH anticipates that it will earn a fair mark-up on each sale, creating additional income which AQH may commit to repayment of claims. The market price sheets may be revised from time to time by Avalon.

21. For these reasons, in my business judgment the proposed transaction is the in best interest of the Debtor, the estate, and creditors and should be approved.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of October, 2015, at Denver, Colorado.

    /s/ Sean Walsh
SEAN WALSH

# EXHIBIT 1

CONTRACT FOR PURCHASE AND SALE OF EQUIPMENT, PROVISION OF
HOSTING SERVICE, AND RESALE CONTRACT BETWEEN AQH, LLC AND
BEIJING CANAAN CREATIVE INFORMATION TECHNOLOGY CO., LTD.

This Contract for Purchase and Sale of Equipment (the "Contract") is made and entered into as of September ___, 2015, (the "Effective Date") by and between AQH, LLC ("AQH"), a California Limited Liability Company, Debtor in Possession, and Beijing Canaan Creative Information Technology Co., Ltd. ("Avalon Miner"), a company organized under the laws of the People's Republic of China.

## RECITALS

A. Avalon Miner is in the business of designing, manufacturing, and selling specialized computer equipment for securing the block chain related to the Bitcoin global network.

B. AQH is in the business of operating specialized computer equipment for securing the block chain related to the Bitcoin global network.

C. Avalon Miner desires a non-exclusive partner to offer its specialized computer equipment for sale in the United States and other markets outside of its domestic Chinese market, and AQH desires to partner with Avalon Miner to offer Avalon Miner's specialized computer equipment for sale in the United States and other nations.

D. AQH is a debtor in possession under a Chapter 11 bankruptcy reorganization case (case number 15-50553-SLJ-11, the "Reorganization Case") currently pending before the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court").

E. AQH has agreed to purchase from Avalon Miner, and Avalon Miner has agreed to sell to AQH, subject to Bankruptcy Court approval, certain specialized computer equipment as more fully described herein to be used by AQH, resold by AQH, or both, on the terms and conditions contained in this Contract.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated by reference into this Contract, the covenants and conditions contained in the contract, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledge, the parties agree as follows:

1. **Initial Sale of Servers.** Avalon Miner shall sell to AQH, and AQH shall purchase from Avalon Miner, a total of ▮▮▮ Avalon 6 Bitcoin Miners (the "Servers") at a price not to exceed ▮▮▮ per terrahash (exclusive of costs of shipping, import duties, and taxes) with the parties to agree to the final price on or before October 1, 2015. Avalon Miner shall deliver the Servers to AQH's Riverbank datacenter (or such other place designated by AQH in writing) and pay all costs for bringing the goods to the destination including import duties and taxes (Incoterms DDP (Riverbank, California)); provided, however, that AQH shall be responsible for all shipping costs, import taxes, and sales and use taxes. Risk of loss during transit shall remain with Avalon Miner. Avalon Miner shall deliver the initial ▮▮▮ systems to AQH on or before November 7, 2015. The purchase price, including shipping costs and import taxes is due and

1

payable in full on the 90th calendar day following Avalon Miner's actual delivery of the Servers to AQH and AQH shall pay the purchase price in United States Dollars.

2. **Sale of Additional Servers.** Avalon Miner agrees to sell to AQH, and AQH agrees to purchase from Avalon Miner, such additional Servers as AQH may from time to time order at such prices as the parties may from time to time agree. Avalon Miner shall deliver the Servers to AQH's Riverbank datacenter (or such other place designated by AQH in writing) and pay all costs for bringing the goods to the destination including import duties and taxes (Incoterms DDP (Riverbank)); provided, however, that AQH shall be responsible for all sales and use taxes. Risk of loss during transit shall remain with Avalon Miner. All orders for additional Servers require payment in advance by check, wire transfer, or money order, unless special payment terms have been agreed and approved by Avalon Miner.

3. **Server Hosting.**

   a. **Hosting Services.** AQH agrees to host at least 200 servers in its Riverbank datacenter for Avalon Miner (the "Hosted Servers"). Avalon Miner will retain ownership of these Hosted Servers and will directly collect all Bitcoin revenue from the Hosted Servers.

   b. **Fees and Charges.** For the first 60 calendar days following delivery, Avalon Miner will pay a hosting fee of $0.08 per kilowatt hour to AQH for electricity consumed by the Hosted Servers. Prior to installation of the Hosted Servers, Avalon Miner shall deposit with AQH a sum equal to the estimated hosting fee for a three-week period, which sum the parties will determine in good faith with neither party unreasonably withholding or delaying its approval. AQH shall invoice Avalon Miner monthly for all electricity usage such that the three-week pre-paid deposit is replenished when the invoice is paid. At the end of the first 60 calendar-day period, the parties shall confer regarding the hosting fee. If the parties cannot reach an agreement regarding the hosting fee beyond the initial 60-day period, then Avalon Miner may cancel this Section 3 of the Contract in writing, effective upon receipt, without further obligation; provided, however, that if Avalon Miner does not cancel this Section 3 the aforesaid hosting fee of $0.08 per kilowatt hour will renew automatically for successive 60-day periods until Avalon Miner cancels this Section 3 by providing 7 days' written notice.

   c. **Right to Purchase.** As long as any Hosted Server is present in AQH's datacenter, Avalon Miner grants to AQH an option to purchase said Hosted Servers from Avalon Miner in such quantities and at such prices as the parties may from time to time agree.

   d. **Delivery and Taxes.** Avalon Miner shall deliver the Hosted Servers to AQH's Riverbank datacenter and pay all costs for bringing the goods to the destination including import duties and taxes, and Avalon Miner shall be responsible for all use taxes, provided however, that AQH shall pay any sales or use tax arising from its eventual purchase of any of the Hosted Servers.

4. **Resale of Servers.**

   a. **Appointment.** Avalon Miner appoints AQH as an authorized, non-exclusive end-user reseller for markets outside of the People's Republic of China for all of Avalon Miner's products for a twenty-four-month period starting on October 1, 2015.

2

b.  <u>Price and Terms.</u> AQH will purchase Avalon Miner products at such prices, terms, and conditions as described in Section 2 of this Contract, or as the parties may otherwise agree in writing. AQH may resell the Servers purchased under Sections 1, 2, and 3 of this Contract, or directly purchase products from Avalon Miner for resale. In the event of a price increase, AQH may cancel any unshipped orders by written notice to Avalon Miner (effective upon mailing or sending) within ten days of written receipt of notice of the price increase. In the event of a price decrease, Avalon Miner will credit AQH for all unsold products shipped to AQH within 14 days prior to such price decrease by crediting AQH with the amount equal to the difference between the price at which such products were sold to AQH and the new price. AQH will provide Avalon Miner with documentation confirming the quantity of unsold products and the prices paid for the same within 30 calendar days of receipt of written notice of a price decrease, provided that Avalon Miner will have the right to reasonably audit the accuracy of such documentation during normal business hours. Orders received by Avalon Miner after the later of receipt of written notice of a price change or the effective date of a price change will be billed at the new price. Whenever practicable, payments for the servers will be forwarded to Avalon at the same time that AQH bills Avalon for hosting services.

c.  <u>Referral of Inquiries.</u> Avalon Miner shall promptly refer any and all inquires it receives from Europe, North America, and South America regarding the purchase of its products to AQH.

d.  <u>Bulk Sales.</u> AQH will give Avalon Miner 48 hours' written notice of all sales of products where 50 or more units of any one product are sold.

e.  <u>Resale Pricing.</u> Avalon Miner will provide AQH an approved range for retail pricing by September 30, 2015, and may change that range from time to time in consultation with AQH and upon written notice. AQH shall comply with the approved price range when reselling the Servers.

f.  <u>Sale and Promotion Support.</u> AQH will use its best efforts in good faith to promote, demonstrate, and sell Avalon Miner's products so as to create the largest volume of profitable business for Avalon Miner, to ensure the highest quality of pre- and post-sale support to end-users, and to promote the goodwill, name, and interest of Avalon Miner and its products. AQH will train and maintain an adequate number of employees to properly promote, demonstrate, sell, and provide post-sale support of Avalon Miner products and to otherwise carry out its obligations under this Contract. AQH will provide Avalon Miner with monthly sales reports that include the number of products sold to end-users, the location of the end user, the date of purchase, and the product model. AQH will permit Avalon Miner, during normal business hours, to reasonably inspect the sales facilities of AQH and all customer records and correspondence related to the sale of Avalon Miner products.

g.  <u>Trademark Usage and Licensing.</u> From time to time, Avalon Miner may designate one or more of its trademarks as available for AQH's use and will provide standards for that use. Avalon Miner authorizes AQH to use these designated marks. AQH will use the designated marks according to the prescribed standards solely in advertising and promoting Avalon Miner's products, in good taste, and in a manner that preserves the trademark's value and Avalon Miner's rights to them. AQH will not use any trademark or trade name in any way that

3

implies AQH is an agency or branch of Avalon Miner. AQH will immediately change or discontinue any use of Avalon Miner's trademarks as requested by Avalon Miner. AQH has no right, title, or interest in any Avalon Miner trademark or trade name and is not authorized to use any Avalon Miner trademark or trade name other than the designated marks. Any rights in any Avalon Miner trademark or trade name acquired through AQH's use belong solely to Avalon Miner at all times.

5. **Relationship.** AQH's relationship to Avalon Miner will be that of an independent contractor engaged in purchasing Avalon Miner products for resale to AQH's customers. AQH and its employees are not agents or legal representatives of Avalon Miner for any purpose and have no authority to act for, bind or commit Avalon Miner. AQH and Avalon Miner agree that this Contract does not establish a franchise, joint venture or partnership. Any commitment made by AQH to its customers with respect to quantities, delivery, modifications, interfacing capability, suitability of product, or suitability in specific applications will be AQH's sole responsibility unless prior written approval is obtained from Avalon Miner. AQH has no authority to modify the warranty contained in Section 6 of this Contract or to make any other commitment on behalf of Avalon Miner, and AQH will indemnify Avalon Miner from liability for any such modified warranty or other commitment by AQH. AQH acknowledges that Avalon Miner may market other products, including products in competition to those sold by AQH without making them available to AQH. Avalon Miner reserves the right to advertise, promote, and sell any product in competition with AQH as Avalon Miner deems appropriate.

6. **Warranty and Limitations of Remedies.** AQH and Avalon Miner agree that the procedure provided below for return and repair or replacement of defective products will be AQH's exclusive remedy for any claim relating to any alleged defect or nonconformity in Avalon Miner's products. If AQH finds that any product sold to AQH by Avalon Miner is defective within 90 days after its shipment to AQH (and prior to its sale by AQH), AQH will contact Avalon Miner regarding its repair or replacement. AQH will not ship (return) any product to Avalon Miner without a "Return Authorization Number" that can be obtained by contacting Avalon Miner. Approval for return or replacement will be based solely on whether the product is in fact defective and will not be unreasonably withheld. Avalon Miner is entitled to determine in its discretion whether to replace rather than repair the product. Avalon Miner does not warrant the performance of the product, as more fully defined in a written limited warranty included with each product, the terms of which Avalon Miner may change from time to time. This warrant is the only warranty covering any product sold under this Contract. No other warranty is expressed or implied. Avalon Miner specifically disclaims the implied warranties of merchantability and fitness for a particular purpose. The remedies provided in this Contract, including the procedure for return of defective goods, are AQH's sole and exclusive remedies. Avalon Miner will not be responsible for any direct, indirect, special, incidental, or consequential damages whether based on contract, tort, or any other legal theory.

7. **Security; Default.** Notwithstanding any other terms or provisions of this Contract, should AQH default in payment due under this Contract, or fail to comply with any provisions of this Contract, Avalon Miner may cancel the sale of the Servers or other products or enforce the terms of such sale, and may remove or repossess such inventory on 10 days' prior written notice and take such other action as it may deem necessary to protect its interests to which it is otherwise entitled, it being understood that the remedies

4

contained in this section are cumulative and in addition to all other rights and remedies of Avalon Miner. Until all installment payments and all other amounts due under this Contract have been fully paid to Avalon Miner, Avalon Miner shall retain ownership of the Servers and other products sold by Avalon Miner to AQH (collectively, the "Goods") and any and all equipment, parts, accessories, attachments, additions, and other goods, and all replacements of them, installed in, affixed to or used in connection with the Goods, and the proceeds of such sale or disposition (collectively, the "Collateral"), provided that AQH may sell, lease, transfer, license, or otherwise dispose of any of the Collateral in the ordinary course of business consisting of (i) the sale of inventory or (ii) sales of worn-out or obsolete equipment.

8. **Advice of Counsel.** The parties acknowledge that they have read and considered this Contract carefully, that it was negotiated with their express approval, that they have discussed it with their attorneys, that they have been given a reasonable period of time to consider this Contract before signing, that they fully understand the extent and impact of its provisions, and that they have executed it knowingly and voluntarily and without any coercion, undue influence, threat, or intimidation of any kind whatsoever.

9. **Entire Contract.** No party or any officer, agent, employee, representative, or attorney of or for any party has made any statement or representation to any other party regarding any fact relied upon in entering into this Contract, and no party relies upon any statement, representation, or promise of any other party or of any representative, agent, employee, officer, or attorney of any other party, in executing this Contract, or making the settlement provided for herein, except as expressly stated in this Contract. This Contract constitutes the entire Contract between the parties.

10. **Restriction on Modifications.** It is expressly understood and agreed that this Contract may not be altered, amended, modified, or otherwise changed by authorized representatives of the parties hereto, unless by a signed writing specifying that it amends this Contract. The parties hereto agree and acknowledge that they will make no claim at any time or place that this Contract has been orally altered or modified or otherwise changed by oral communication of any kind or character. This Contract may not be altered, amended, or extinguished, except by a writing executed by all of the parties to this Contract (or their successors-in-interest) that expressly refers to this Contract. So long as the Reorganization Case remains pending, any alteration, amendment, or extinguishment is subject to approval by the Bankruptcy Court.

11. **Authority to Sign.** The parties warrant that the persons signing below are authorized to sign the Contract on their behalf and to bind them to the terms of the Contract. The Buyer acknowledges that he has had an opportunity to consult with counsel regarding the terms of this Contract.

12. **No Assignment.** Except as otherwise provided for within this Contract or under the Bankruptcy Code, neither party may assign any of its rights or delegate any of its obligations under this Contract to any third party without the express written permission of the other. Any such assignment is deemed null and void.

13. **Indemnification.** The parties shall indemnify, defend, and hold harmless the other Party from and against any claim, demand, damage, debt, liability, account, reckoning, obligation, cost, expense, lien, action, or cause of action (including payment of attorneys' fees and costs, expert witness fees, and copy, facsimile, and computer research fees incurred, whether or not mediation or litigation is commenced) arising out of the breach of any obligation, warranty, or representation contained in Contract.

14. **Force Majeure.** In the event that either party is unable to perform any of its obligations under this Contract or to enjoy any of its benefits because of any Act of God, strike, fire, flood, governmental acts, orders or restrictions, Internet system unavailability, system malfunctions, or any other reason where failure to perform is beyond the reasonable control and not caused by the negligence of the nonperforming party (a "Force Majeure Event"), the party who has been so affected shall give notice immediately to the other party and shall use its reasonable best efforts to resume performance. Failure to meet due dates resulting from a Force Majeure Event shall extend such due dates for a reasonable period. However, if the period of nonperformance exceeds 60 days from the receipt of notice of the Force Majeure Event, the party whose ability to perform has not been affected may, by giving written notice, terminate this Contract effective immediately upon such notice or at such later date as is therein specified.

15. **Court Approval.** This Contract is subject to approval by the Bankruptcy Court. AQH shall take the necessary steps to obtain the Bankruptcy Court's approval of this Contract, and Avalon Miner shall cooperate with AQH in obtaining the Bankruptcy Court's approval of this Contract. Bankruptcy Court approval shall be obtained within 60 calendar days after both parties' authorized signers affix their signatures to this Contract.

16. **Further Assurances.** The parties shall execute all such documents and take all such actions as may be necessary and reasonable to effect the consummation of this Contract and the transactions contemplated by this Contract. Each Party agrees to take no action to hinder, delay, or frustrate the consummation of this Contract and the transactions contemplated by this Contract.

17. **Attorneys' Fees.** The parties agree to bear their own attorneys' fees and costs in connection with this Contract. However, in the event of a breach of this Contract by another party to this Contract, the breaching party will pay reasonable attorneys' fees and costs of the non-breaching party incurred by reason of said breach.

18. **Severability.** Should any provision of this Contract be held in valid or illegal, such illegality shall not invalidate the whole of this Contract, but, rather, the Contract shall be construed as if it did not contain the illegal part, and the rights and obligations of the parties shall be construed and enforced accordingly.

19. **Counterparts and Signatures.** The document may be executed in duplicate originals, each of which is equally admissible in evidence. The Contract shall become effective when all parties have signed the same or separate copies thereof. A facsimile signature shall be deemed to have the same effect as an original, "wet" signature.

20. **Successors and Assigns.** This Contract is binding upon and shall inure to the benefit of the parties hereto, their respective agents, employees, representatives, officers, divisions, directors, subsidiaries, affiliates, assigns, heirs and successors, including any successor trustee in the Bankruptcy Case.

21. **No Presumption Against Drafter.** For purposes of interpretation of the Contract in the event of an ambiguity in any term or provision in the Contract, neither party shall be deemed to have drafted this Contract, but, instead, the Contract shall be deemed to have been drafted by all parties hereto.

22. **Time.** Time is of the essence.

23. **Miscellaneous.** As used in this Contract, the masculine, feminine, or neuter gender, or the singular or plural number, shall be deemed to include the other whenever the text so indicates. Captions and paragraph headings are inserted solely for convenience and shall not be deemed to restrict or limit the meaning of the text. The language of all parts of this Contract shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties.

24. **Choice of Law.** This Contract shall be construed and enforced pursuant to the laws of the State of California, exclusive of its choice of law provisions.

In Witness Whereof, the Parties have approved and executed this Contract on the dates beside their signatures below.

Dated: September __, 2015

AQH, LLC, Debtor in Possession

By: _____
CHRISTOPHER CUNNINGHAM,
Responsible Individual

By: _____
SEAN WALSH,
Managing Member

Dated: September 30, 2015

BEIJING CANAAN CREATIVE INFORMATION TECHNOLOGY CO., LTD.

By: _____
NG Zhang,
Chief Executive Officer

7

# EXHIBIT 2

| **AQH Projections** | **2015** | | **2016** | |
|---|---|---|---|---|
| | **November** | **December** | **January** | **February** |
| Upgraded System Cost, Total | ($819,000) | ($234,000) | ($50,000) | ($50,000) |
| Bitcoin Revenue | $294,348 | $314,768 | $292,666 | $274,053 |
| | | | | |
| Hosted Systems, TH | 1,500 | 1,500 | 1,500 | 1,500 |
| Hosting Fee per kWh | $0.080 | $0.080 | $0.080 | $0.080 |
| Hosting Revenue | $25,920 | $25,920 | $25,920 | $25,920 |
| | | | | |
| System Sales Gross Profit | $125,000 | $250,000 | $250,000 | $250,000 |
| | | | | |
| **Total Revenue** | **$445,268** | **$590,688** | **$568,586** | **$549,973** |
| Total Electricity Costs | ($82,080) | ($88,128) | ($87,264) | ($86,400) |
| **Gross Profit** | **$363,188** | **$502,560** | **$481,322** | **$463,573** |
| | | | | |
| <u>Fixed Operating Expenses</u> | | | | |
| Leases | ($25,000) | ($25,000) | ($25,000) | ($25,000) |
| Salaries/Contractors | ($50,000) | ($50,000) | ($50,000) | ($50,000) |
| Facility Costs | ($10,000) | ($10,000) | ($10,000) | ($10,000) |
| Legal Expenses | ($5,000) | ($5,000) | ($5,000) | ($5,000) |
| | | | | |
| Monthly Expenses | ($90,000) | ($90,000) | ($90,000) | ($90,000) |
| **Net Profit** | **$273,188** | **$412,560** | **$391,322** | **$373,573** |
| | | | | |
| **"EBITDA"** | **$273,188** | **$412,560** | **$391,322** | **$373,573** |
| | | | | |
| 1st Phase Miner Expense Balance | ($819,000) | ($834,835) | ($526,746) | ($286,438) |
| Payment to Avalon Miner (1st Tranche) | $218,165 | $358,089 | $290,308 | $263,038 |
| | | | | |
| Risk Reserve Contribution | $0 | $0 | $0 | ($9,000) |
| | | | | |
| Cash Savings Contribution | $55,023 | $54,471 | $101,014 | $101,535 |
| | | | | |
| Available Cash Savings | $55,023 | $109,494 | $210,508 | $312,043 |