-S. Craig Hunter – SB# 125247
Karl A. Schweikert - SB# 291497
Nubia I. Goldstein – SB# 272305
CHURCHWELL WHITE LLP
1414 K Street, 3rd Floor
Sacramento, CA 95814
(916) 468-0950 Phone
(916) 468-0951 Fax


Attorneys for Creditor
RIVERBANK LOCAL REDEVELOPMENT AUTHORITY

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No.: 15-50553-11-SLJ |
| AQH, LLC, | **RIVERBANK LOCAL REDEVELOPMENT AGENCY'S OPPOSITION TO DEBTOR IN POSSESSIONS MOTION TO APPROVE FINANCING, USE OF SPACE FOR THIRD PARTY HOSTING, AND RESALE CONTRACT** |
| Debtor. | |

Date:    October 15, 2015
Time:    2:30 p.m.
Place:   280 South First Street, Room 3099
            San Jose, California

Honorable Stephen L. Johnson

## I. INTRODUCTION

Creditor Riverbank Local Redevelopment Authority ("RLRA") opposes AQH, LLC's ("Debtor" or "AQH") motion to approve financing, use of space for third party hosting, and resale contract.  Within its own motion, AQH has demonstrated an inability to repay the requested loan based on the proposed terms.  Further, the contract AQH seeks to enter is not limited to a credit contract.  It also seeks to sublet property that is part of an unassumed lease, attempts to resell utility service provided by RLRA in excess of its authority, and seeks to fund repayment of the loan through a new line of business that AQH forecasts to generate more profits within 60 days than the core business currently generates in revenue.  As Rumpelstiltskin was able to turn straw into gold, AQH believes it will accomplish the same as a reseller, within 60 days, and attempts to

Objection to Debtor's Motion to Approve Financing

1    protect its fairy tale by claiming the protection of the business judgment rule. The business

2    judgment rule exists to protect debtors from excessive creditor interference. It does not exist to

3    protect decisions that are clearly based on whim and caprice.

4    **II. LEGAL STANDARD**

5          The relevant legal standard is business judgment. *In re Continental Air Lines, Inc.*, 780

6    F.2d 1223, 1226 (5th Cir. 1986) (standard under 11 U.S.C. § 363(b)(l) is "business judgment"); *In*

7    *re Ernst Home Center, Inc.*, 209 B.R. 974, 22 979 (Bankr. W.D. Wash. 1997). "[T]he bankruptcy

8    court should presume that the debtor-in-possession acted prudently, on an informed basis, in good

9    faith, and in the honest belief that the action taken was in the best interests of the bankruptcy

10   estate." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) (applying

11   business judgment standard). However, the court in *Pomona Valley* noted that the court should

12   approve the debtor's decision unless it is "so manifestly unreasonable that it could not be based

13   on sound business judgment, but only on bad faith, or whim or caprice." *Id.*

14   **III. DISCUSSION**

15   **A.  Opposition to Subleasing Unassumed Lease**

16         AQH appears to be attempting to sidestep the subleasing problem created by their

17   decision to delay the assumption of the RLRA lease. A standard business model exists for a

18   server hosting facility. In that model, the hosting facility leases discrete locked cages to parties

19   seeking to have their servers hosted in the facility; a lease for a specific physical space within a

20   larger space. This is similar to AQH's problem, they wish to sublease the unused space within

21   their leased space at RLRA. However, AQH has not yet assumed the lease. AQH has attempted

22   to sidestep this issue by proposing no fee for the space, opting instead to charge a premium on the

23   cost of electricity. Motion 8:3-5. The proposed contract is silent as to numerous traditional

24   hosting duties such as who is providing maintenance services, management services, responsible

25   for repair costs, etc. *Id.*

26         RLRA opposes this arrangement as a sham work-around to avoid officially subletting the

27   space.

28   //

Objection to Debtor's Motion to Approve Financing

Churchwell White LLP

**B.  Opposition Based On Reselling Utility Services**

RLRA entered into a lease with AQH as a tenant at the former Riverbank Army Depot. Under the agreement with the Army, RLRA purchases power from the Hetch Hetchy Water and Power System run by the City of San Francisco.  Hetch Hetchy bills RLRA for electricity, and RLRA subsequently bills each of its tenants on a monthly basis.  Because of this arrangement, RLRA is also the utility service provider within the meaning of Bankruptcy Code section 366.  As noted by section 366, RLRA may not discriminate against AQH based on its filing of bankruptcy or its past due debt.  RLRA currently has an adequate assurance payment on deposit of $150,000 as ordered by this Court on April 17, 2015. Docket # 76.

AQH proposes to significantly change the nature of this arrangement.  No longer is AQH content to be a tenant/end-user, it seeks instead to resell RLRA's electricity.  The role of reseller is not one agreed to by RLRA, contemplated by the lease, nor contemplated by the lease terms. AQH approached RLRA as a tenant seeking space to operate its own servers, not as a hosting service providing hosted computing for others.  As such, RLRA is within its right under section 366 to refuse additional electrical services to support this role as a reseller of electricity.

Moreover, the current amount of adequate protection for AQH's payment of electricity use may become inadequate, a matter which, as may be necessary, RLRA will address in a motion to increase the current amount provided as adequate protection based on the increased use of electricity caused by operation of the hosted servers.[1]

**C.  Opposition Based on Lack of Business Judgment**

RLRA objects to this loan and business expansion as being so imprudent, uniformed, capricious, and entered into by whim as to exceed the bounds of the business judgment rule.  The proposed debt service is beyond AQH's ability to pay, even at zero percent interest.  AQH proposes to resolve this issue by embarking on a new business model, acting as a reseller for its server vendor.  AQH claims this new business line will be so profitable within the first 90 days as

---

[1] In an email of this date, AQH advises RLRA that it can obtain the information necessary to determine whether or not the current amount of adequate assurance is, in fact, adequate in the face of the increased electricity demand to be caused by the hosted servers only by executing a non-disclosure agreement.  Rather, AQH insists that RLRA "trust" AQH's representations on the matter.  AQH's position is absurd and flies in the face of applicable law.

to meet its debt service requirement on the requested loan.  This claim is so outlandish as to exceed the bounds of the business judgment rule.  The following facts plead by the Debtor demonstrate it has stepped outside the protections of the business judgment rule:

*1)  The Total Loan Amount Is Unclear*

AQH has indicated it is requesting $819,000 to acquire the servers.  It leaves open how much shipping and import duties will increase that burden.  It seems incredible that a well informed purchaser would not have inquired as to prior shipping costs, estimates, or whether US Customs has previously required import duties on products shipped by the vendor to the United States.  Not even an estimate within an order of magnitude is provided, letting the creditors know if this amounts to an $8,190 expense (1%) or an $81,900 expense (10%).  The business judgment rule requires informed decision-making.  For the purposes of the calculations below, RLRA will assume there are no shipping fees or duties (0%).

*2)  AQH Cannot Meet Debt Service From Bitcoin Mining Operations*

The most recent Monthly Operating Report filed with this Court is August ("August MOR"). Docket # 123.[2]  In the August MOR, the debtor states a gross income of $159,563.48 resulting in a loss of $33,041.64.  In its pro-forma projections, AQH states the income from Bitcoin mining for the next 90 days will be roughly $900,000. Declaration of Sean Walsh, Exhibit "2".  Even assuming this would occur without an increase in electricity costs due to increased efficiency, Bitcoin mining would result in no more than $330,000 of free cash flow to repay the $819,000 debt.

It is important the new servers must have increased efficiency because as of October 13, 2015, AQH has failed to complete the final tests requested in late July by RLRA's outside tenant improvement review engineers to allow AQH to energize its second high-voltage transformer.  In

---

[2]  AQH claims that this motion is "necessary to avoid immediate and irreparable harm to the estate."  However, nothing appears in AQH's monthly operating reports to support that claim. To the contrary, in the MORs, AQH paints a picture of a debtor progressing satisfactorily with its business.  AQH's only explanation is that existing servers are failing because they have run out of spare parts, without explanation as to why they have not purchased replacement parts as part of the normal course of business.  It appears the financial crisis is manufactured by the debtor-in-possession's failure to maintain the primary assets of the estate in good order and now AQH seeks additional funding to compensate for that failure.

Churchwell White LLP

a repetition of the issues addressed by this Court in March with respect to AQH's first high-voltage transformer, RLRA can only begin the three-day high voltage connection process once final sign off on the substation has occurred. Final sign-off allows RLRA to schedule its high-voltage electrical contractor and submission of the plans for the approval (or more likely lack of denial) by the U.S. Army. It is clear that AQH has not exercised business judgment within the meaning of that term in scheduling the commencement of the 90 day deadlines based on its failure over the last 60 days to complete the open final review problems.

However, even assuming sufficient power is available, the servers (old and new servers combined) would be unable to meet the debt service for the loan through Bitcoin mining alone.

*3) AQH Cannot Meet Debt Services When Hosting Is Included*

RLRA objects to AQH's subletting a portion of its premises and to AQH's reselling RLRA's electricity. However, assuming arguendo, the Court orders RLRA to allow the practice, the pro-forma projections submitted by AQH indicate total monthly revenue from hosting of $25,920 at $0.08 per kWh. AQH projects its cost of electricity at $0.04 per kWH. Motion 8:4. Resulting in approximately $39,000 of free cash flow to repay the $819,000 debt. Even when combined with free cash flow from operations, AQH has only acquired no more than $369,000 to repay its $819,000 debt.

*4) Projected Income From AQH's New Business Line Is Grossly Unreasonable*

To comply with the terms of the requested loan, AQH must meet its goals both in Bitcoin mining operations and in hosting operations, and still come up with an additional $450,000 of profit within the next 90 days. AQH proposes to enter the business as a Bitcoin server reseller. [3] It would acquire Bitcoin servers from its vendor, Bejing Canaan Creative Information Technology Co., Ltd. ("Avalon") and resell them to U.S., European, and South American purchasers. This is a non-exclusive agreement and Avalon is free to compete against AQH in those markets. Despite not having a marketing presence in any of those global regions, or any demonstrated ability to succeed as a reseller at all, AQH believes it will be able to garner a "fair mark-up on each sale."

---

[3] AQH asserts that reselling servers is within the scope of its current business. However, as discussed below, reselling servers is a completely new venture for AQH, one which will require new staffing with a different expertise.

Objection to Debtor's Motion to Approve Financing

Churchwell White LLP

Motion 8:13. While AQH is unable to provide an estimate of what a fair mark-up is, it states in its pro-forma projections that it will earn profits in the amount of $125,000 in the first 30 days and $250,000 in each of the following 30 days. It claims this is based on sound business judgment, meaning the estimates were created on an informed basis.

AQH is proposing to be a reseller of completed servers. Even assuming fantastic mark-ups of 100%, it would be required to sell, ship, bill, and be paid for approximately $1,300,000 of servers within the first 90 days to meet the payment plan. To achieve this goal, assuming all customers pay in full and in advance, AQH must be at a $6,000,000 steady-state sales run-rate within 30 days. If a more reasonable 30% mark-up is considered, AQH must generate $2.16 million of revenue from server sales within the first 90 days. Given a lack of marketing presence, global support centers, or even sales representatives with any track record selling servers, this pie in the sky belief has not been seen since the founding of WebVan.[4]

Further demonstrating AQH's lack of foundation within the scope of the business judgment rule, RLRA notes the indicate pro-forma projections include no changes to staffing and staff expenses to accomplish the marketing inevitably required for reselling servers and for the subsequent support for the resold serves. This lack of expense projection exists despite a contractual term sending AQH into default for any failure to provide sales support to consumers. Motion 4:10-14. It is unclear how AQH believes it will be able to support South American, European, and United States customers, to whom undoubtedly AQH will seek to, and will, sell and deliver servers, and expects to be paid $1,300,000 within the first 90 days, without any additions to staffing. Nothing within the motion can support this deficiency in expense projection within the business judgment rule. It is beyond the scope of the business judgment rule to indicate the Debtor can enter a new business and suddenly generate almost 3 times its current revenue within 60 days. This is caprice, unsupported by any basis in reality, and paid for on the backs of the creditors.

---

[4] WebVan Group, Inc., (1999-2001) was an online grocery delivery service helmed by executives with no experience in the grocery business. It raised a total of $830 million from investors to build an impressive distribution system to handle a demand that never materialized. Eighteen months after its founding, it filed for Chapter 11 protection in Delaware in 2001 (Case 1:01-bk-02406). It was named the biggest dotcom flop so far by CNET in 2008.

Churchwell White LLP

**IV. CONCLUSION**

The terms proposed within this motion to approve debtor in possession financing is beyond the ability of the debtor to repay.  To the extent AQH is claiming that its becoming an authorized (but unexclusive) reseller will allow AQH to significantly increase its income and to meet the debt service on the loan, AQH has exceeded the bounds of the business judgment rule.

AQH's claim that, by hosting the Alavon servers, it is not subletting a portion of the premises it occupies under a currently unassumed lease also does not stand scrutiny.  Moreover, as this opposition makes clear, there are a great many issues that are raised by AQH's proposed venture that require much fuller and more considered discussion to enable the Court to make an informed decision.

Accordingly, RLRA requests the Court deny the motion in its entirety.


DATED:   October 14, 2015                                   CHURCHWELL WHITE LLP




                                                            _____/s/Karl A. Schweikert_____
                                                            KARL A. SCHWEIKERT
                                                            Attorneys for Riverbank Local
                                                            Redevelopment Authority

Objection to Debtor's Motion to Approve Financing