S. Craig Hunter – SB# 125247
Karl A. Schweikert – SB# 291497
Nubia I. Goldstein – SB# 272305
CHURCHWELL WHITE LLP
1414 K Street, 3rd Floor
Sacramento, CA 95814
(916) 468-0950 Phone
(916) 468-0951 Fax

Attorneys for Creditor
RIVERBANK LOCAL REDEVELOPMENT AUTHORITY

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>AQH, LLC,<br><br>    Debtor. | Case No.: 15-50553-11-SLJ<br><br>**RIVERBANK LOCAL REDEVELOPMENT AGENCY'S SUPPLEMENTAL OPPOSITION TO DEBTOR IN POSSESSIONS MOTION TO APPROVE FINANCING, USE OF SPACE FOR THIRD PARTY HOSTING, AND RESALE CONTRACT**<br><br>Date: October 21, 2015<br>Time: 11:00 a.m.<br>Place: 280 South First Street, Room 3099<br>    San Jose, California<br><br>Honorable Stephen L. Johnson |

## I. INTRODUCTION

  Creditor Riverbank Local Redevelopment Authority ("RLRA") submits this supplemental opposition brief to its opposition of AQH, LLC's ("Debtor" or "AQH") motion to approve financing, use of space for third party hosting, and resale contract. This supplemental opposition is based on the supplemental information provided to this Court on October 18, 2015. (Docket # 135-138.) While the Debtor has provided additional information, it remains insufficient to remove all of RLRA's objections, as the size of the loan remains unjustified in the face of the unsupported statements provided by AQH.

///

///

## II. DISCUSSION

### A. RLRA's Lease Remains Unassumed.

#### 1. AQH Fails to Address the Fact that It Has Not Assumed the Lease.

This Court asked AQH to address how it intended to honor a long-term commitment contained within the proposed loan contract without a long-term facility in which to provide those services. In this regard, the Court expressly raised the point that AQH has not assumed the RLRA lease. AQH, through its CEO Sean Walsh, does not address this issue at all in his supplemental declaration.

#### 2. AQH Seeks to Ignore the Subletting Issue.

RLRA objects to the proposed "hosting" element of the Avalon transaction because, no matter how AQH wishes to represent the issue, the "hosting" constitutes an impermissible attempt to sublet the AQH premises without AQH either having assumed the RLRA lease or having complied with the provisions of that lease pertaining to sublets. Instead, AQH seeks to defer the issue to a later date. Declaration of Sean Walsh ("Walsh Supp. Decl.") at ¶10. However, the Court cannot provide interim approval for the loan without addressing the hosting issue since the contract that must be approved for the loan includes the hosting provision. RLRA continues to maintain that this hosting arrangement is a sublease of space within the RLRA facility and not charging a monthly space amount does not avoid the sublease problem.

### B. AQH Is Not Authorized To Resell Utility Services

RLRA renews its objection that it has not entered into an agreement with AQH for AQH's reselling of electricity and, thus, RLRA should not be obligated by this Court to do so. Given the wonderfully rosy projections submitted by AQH regarding its ability to resell servers, it is unclear why it continues to pursue this effort given the low profit amount of $6,048 monthly. RLRA estimates the hosting effort is the equivalent to about 11 server sales each month.

///
///
///
///

Churchwell White LLP

## C. AQH Plan Exceeds The Bounds Of Business Judgment

### 1. AQH Refuses to Provide Reliable Financial Information.

RLRA amends its objection, narrowing the objection from the entire tranche of servers to objecting that the size is unreasonably large and beyond the bounds of the business judgment rule. RLRA notes that it is not in possession of AQH's actual pricing, although offered under a non-disclosure agreement ("NDA") attached to the Declaration of Matt Olson as Exhibit 1.

RLRA draws the Court's attention to AQH's disclaimer within section 2 of the proposed NDA: "… [AQH] does not make any representation or warranty, express or implied, as to the accuracy or completeness of any of the Information." Given that AQH is not willing to warrant the accuracy of the financial information it is willing to provide to RLRA under the proposed NDA, RLRA is unwilling to consider the other terms contained within the NDA for unreliable pricing information. This unreliable information is the same pricing information that AQH has presented to this Court. Accordingly, this Court should seriously question the validity of the pricing information it has received if the Debtor disclaims its accuracy when presenting it to Creditors.

### 2. AQH Cannot Meet Repayment Obligations Through Mining Alone.

As noted in RLRA's original opposition, AQH's current monthly fixed costs plus current electricity use run roughly $190,000 monthly. April thru August MORs. AQH estimates it will receive roughly $300,000 of monthly revenue each month during the first 90 days from mining operations. Given known expenses of $190,000 per month, this leaves $110,000 monthly (or $330,000 total), from mining operations during the first 90 days.

Assuming AQH has received a 50% discount on list price for the Avalon servers, the first tranche of roughly 1500 servers will generate approximately $90-$100/month/server when revenue from the existing servers is discounted (based on the August MOR less discount for further performance degradation). Thus each server brought online in mining operations will generate no more than $300 of revenue during the 90-day repayment period. Therefore, each new Avalon server entering mining operations will require AQH to sell half an additional server in its brand new reseller business just to meet the loan repayment terms.

To meet AQH's prior projected revenues of $200,000 through the end of the year, RLRA estimates AQH will need roughly 500 Avalon servers to stem the bleeding. RLRA supports AQH's need to stem the bleeding, but disagrees that the business judgment rule supports cutting oneself unreasonably deeply for unneeded inventory.

### 3. AQH Is Not Becoming A Master Distributor.

AQH's supplemental declaration states "[Avalon] want[s] AQH to act as the global master distributor, and decide how to build the global distribution channel." Walsh Supp. Decl. ¶ 15. AQH opines as to how one builds such a distribution channel. *Id.* ¶¶ 16-18. Unfortunately, as expressly stated in the proposed contract, Avalon has not agreed to make AQH its global master distributor. Avalon has, instead, appointed "AQH as an authorized, *non-exclusive end-user reseller*." Contract ¶ 4a; emphasis added. No evidence of a current or potential distributorship is contained within the contract. While AQH may wish for, and Avalon may actually desire, such an arrangement, the contract does not support any such inference, nor should the Court disregard the plain meaning of the contract terms.

### 4. AQH Has Not Sufficiently Supported Its Claimed Demand.

AQH, through its CEO, asserts an opinion regarding the market size during the next 90 days and the next year. Walsh Supp. Decl. ¶¶ 22-25. This reference is made with no outside verification, no public reports, no website references. Simply, AQH offers the biased, self-serving opinions of its CEO, Walsh, who hardly can be considered to be an objective analyst. Nowhere in the supplement materials does AQH provide evidence that its CEO Walsh has the expertise, or even first-hand, personal knowledge, of the many factual statements and opinions offered.

Mr. Walsh estimates the global market for Bitcoin servers as the equivalent of 204,000 Avalon servers. *Id.* ¶ 25. He asserts that the Avalon 6 server is significantly more power efficient than most other Bitcoin servers. *Id.* ¶ 22. He provides the estimate within the hosting review of 300 watts per Terrahash. *Id.* ¶10. However, all of these estimates presume no other vendors improve efficiency and claims a lack of competition in the market. Research on the web indicates there are currently 21 different custom ASIC Bitcoin mining hardware companies in the

Supplemental Objection to Debtor's Motion to Approve Financing

marketplace, four of which appear to be currently shipping products to the public.[1] A company named Spoondoolies released a 110 Terrahash server in September 2015 that uses only 150 watts per Terrahash, or roughly half Avalon's claimed electrical usage.[2] Based on a brief internet search and blog search it appears that contrary to Mr. Walsh's declaration, the market is not limited to only two vendors. Walsh Supp. Decl. ¶ 27.

However, this research does support Mr. Walsh's view the market is growing and efficiency is critical. But AQH's rose-colored glasses projections of total market size and its refusal to acknowledge the ability of multiple hardware vendors to update current offerings do not help in the initial days of launching a new business venture. AQH claims, without support, that it believes demand will outpace initial supply, requiring AQH to sell some or all of the servers that it purchases from Avalon in the first tranche. *Id*. ¶ 30. Avalon's contract requires Avalon to deliver on 2 to 3 weeks notice. Contract § 1 [Anticipated delivery by November 7, with full knowledge that the instant motion must be approved by this Court]. Given this capability, it is unclear why a smaller initial purchase volume is unwarranted.

### 5. AQH Cannot Ignore The Non-exclusive Nature Of Their Agreement.

As noted by RLRA's opposition, this is a non-exclusive agreement and Avalon may compete at any time with AQH. In response, AQH asserts Avalon is almost entirely comprised of engineers with no experience with building a sales and distribution network. Walsh Supp. Decl. ¶ 14. This is also an apt description of AQH's employees and staff. Although AQH CEO Sean Walsh offers an explanation how a global distribution network works, he provided no support regarding his own experience or lack thereof in building a global distribution network. *Id*. ¶¶ 16-18. A purported understanding of the process is dramatically different from actually building the network. However, despite claiming the same experience level as Avalon in building a global distribution network, AQH appears to believe, again without support, that it will remain wildly successful, even within the first 30 days.

///

---

[1] https://en.bitcoin.it/wiki/Mining_hardware_comparison
[2] http://www.spondoolies-tech.com/products/sp50?mc_cid=c35e4a5083&mc_eid=6a9486d50c; http://bitcoinasichosting.com/blog

Supplemental Objection to Debtor's Motion to Approve Financing

AQH points to purported interest it has received regarding a sale of 300 servers, which if closed, would meet its November goal in its entirety. *Id.* ¶ 29. AQH also claims that a second party is interested in 500 servers. *Id.* AQH further claims that a third is looking at "no fewer than 3,000 servers." *Id.* Based on AQH's assertion that 300 servers would exceed the $150,000 goal for November, AQH must receive at least a 100% mark-up on the sale of each server, meaning each server sold would allow AQH to purchase two replacement servers. This claimed profit also greatly exceeds any value from mining operations with those servers.

But this is a non-exclusive deal. Avalon mining products, though admittedly not the Avalon 6 server, are available from Amazon.[3] A quick trip to the Avalon website provides the ability to order servers in either Chinese or English.[4] When contemplating the purchase of 3,000 servers, with a suggested gross retail price of $3.3 million, a potential buyer might consider contacting the manufacturer for a better price. A manufacturer, potentially receiving an additional $1.65 million on a single sale, might even be able to find someone in China who could speak English (or whatever language the buyer speaks) to help close the deal. Mr. Walsh's assertion that AQH's business model is secure because Avalon's Chinese distributor does not speak English blatantly disregards the profit motives of companies world-wide and the concept that they might hire other language speaking sales representative. *Id.* ¶ 14.

### 6. AQH Seeks To Borrow In Excess Of Its Need

As discussed above, and in RLRA's initial opposition, an Avalon server purchased for bitcoin mining will not earn enough in 90 days to repay its costs. AQH is thus seeking a loan it cannot repay with its current business model. To address this issue, AQH proposes to be an end-user reseller of Avalon's servers. RLRA accepts that AQH is in a serious financial situation and desperately needs an infusion of server power to keep the global terrahash growth from eliminating its mining business in its entirety. RLRA questions however the size of that need and believes it to be less than the roughly 1500 servers AQH is proposing. As noted above, based on AQH's proposed financials, RLRA believes at least 500 servers are needed to stabilize AQH's

---

[3] https://www.amazon.com/s/ref=nb_sb_noss_1?url=search-alias%3Daps&field-keywords=avalon+bitcoin

[4] http://www.canaan-creative.com/en/

Case: 15-50553   Doc# 139   Filed: 10/20/15   Entered: 10/20/15 22:36:51   Page 6 of 8

6
Supplemental Objection to Debtor's Motion to Approve Financing

current financial situation. Although Avalon appears capable of replacing production servers in a two-week timeframe, that loss would hurt AQH's ability to maintain its baseline revenue needs.

To meet the needed revenue for its $845,000 loan, and assuming servers are acquired at roughly 50% of retail, or $550 each, AQH must sell roughly 275 servers in month 1, and 455 servers in each of the subsequent months, for a total of 1185 servers sold at full retail price to meet the loan requirements. If instead AQH were to seek $450,000 as a loan, receiving 800 servers, 500 to stem the bleeding and 300 for initial sales, the total server sales required to repay the loan in 90 days falls to roughly 820. If demand outpaces supply, as AQH asserts is likely, then the smaller initial batch will reduce mining revenue by roughly $50 per server sold ($100/month -> 2 week lead time) but still allow AQH sufficient servers on hand to fill both the 300 and 500 unit orders. The 3,000 unit order it would have been unable to fill without drop-shipping from China in any event.

This is the more reasoned approach. Were AQH's projections actually correct, and the proposed transaction was a "can't lose" proposition, AQH would have been able to find an angel investor who was interested in a business with a break-even term of only 4 months, even one in bankruptcy. Instead, AQH looks, improperly and unreasonable, to its creditors, including RLRA, to be the "angel" investor backing AQH's wholly speculative plan.

**III. CONCLUSION**

AQH's supplemental filing does nothing to alleviate the concerns either of the Court or of AQH's creditors, including RLRA. The supplemental filing consists of nothing more that the hearsay and speculative musings of AQH's CEO, Sean Walsh. AQH provides no evidence that Walsh has either the knowledge or expertise to opine as he does on the many issues contained in his supplement declaration. AQH offers no third-person, unbiased and truly expert testimony to support its proposed transaction with Avalon. Therefore, AQH's supplement filing must be disregarded for the wholly biased and incompetent offering that it is.

The terms proposed within AQH's motion to approve debtor in possession financing is beyond the ability of AQH to repay without the projected all-embracing and all-inclusive success that AQH projects in its proposed new role as a reseller of Avalon's servers. RLRA

acknowledges AQH needs to stabilize, and even enhance, its financial condition, but desires that AQH set a more reasonable server sales goal during the first 90 days, which it may only do if it reduces the total number of servers being purchased.

Further, RLRA remains opposed to a hosting sublet of Avalon servers, in violation of the terms of the lease, which lease remains unassumed.

DATED: October 20, 2015                    CHURCHWELL WHITE LLP


                                           /s/Karl A. Schweikert
                                           KARL A. SCHWEIKERT
                                           Attorneys for Riverbank Local
                                           Redevelopment Authority

Supplemental Objection to Debtor's Motion to Approve Financing